IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PATRICK K. DONNELLY,

    *Plaintiff,*

  v.           C.A. No. 21-cv-000894-CFC

PROPHARMA GROUP TOPCO, LLC,   **CONFIDENTIAL –**
                **FILED UNDER SEAL**

    *Defendant*.

## FIRST AMENDED COMPLAINT

Plaintiff Patrick K. Donnelly ("Plaintiff" or "Mr. Donnelly"), by counsel, hereby files this First Amended Complaint against ProPharma Group Topco, LLC ("Defendant" or "ProPharma"), on the following grounds:

## THE PARTIES

1.  Plaintiff, Mr. Donnelly, is a citizen and resident of Charleston, South Carolina.  Mr. Donnelly currently resides at 8 Church Street, Charleston, South Carolina.

2.  Defendant ProPharma is a Delaware limited liability company, with its principal office located in Kansas at 8717 West 110th Street, Suite 300, Overland Park, Kansas.

## JURISDICTION AND VENUE

3.  The U.S. District Court for the District of South Carolina has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between Mr. Donnelly and Defendant, and the amount at issue exceeds $75,000.[1]

---

[1] Mr. Donnelly includes allegations regarding the U.S. District Court for the District of South Carolina's  subject matter jurisdiction in this matter in order to preserve his arguments raised in his Opposition to ProPharma's Motion to Transfer.  (Dkt. No. 28).

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between Mr. Donnelly and Defendant, and the amount at issue exceeds $75,000.

5.     ProPharma is a limited liability company ("LLC").  The citizenship of an LLC is determined by examining the citizenship of all of its members.  *Cent. W. Virginia Energy Co. v. Mountain State Carbon*, LLC, 636 F.3d 101, 103 (4th Cir. 2011).

6.     Upon information and belief, no member of ProPharma is a citizen of the state of South Carolina.

7.     Pursuant to the South Carolina long-arm statute, SC Code § 36-2-803, "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's … (1) transacting any business in this State."

8.     Personal jurisdiction over Defendant is proper because Defendant transacts business in the State of South Carolina, and a substantial number of the events giving rise to the claims alleged herein took place in South Carolina.

9.     Mr. Donnelly's causes of actions herein against Defendant arise from ProPharma's business transactions within South Carolina.

10.    At all times relevant to the events detailed herein, Mr. Donnelly primarily conducted his duties pursuant to his agreement with Defendant from his home in Charleston, South Carolina.

11.    ProPharma was aware of and accommodated Mr. Donnelly's work from home arrangement in Charleston, South Carolina.  ProPharma not only compensated Plaintiff for work he did in South Carolina, but it also reimbursed him for expenses incurred for all of Mr. Donnelly's

expenses, meals and travel to various locations across the United States and meetings during the over three and a half years that Mr. Donnelly worked in this District.

12.     On June 22, 2021, The U.S. District Court for the District of South Carolina entered an Order transferring this case to this District pursuant to 28 U.S.C. § 1404(a) upon motion filed by Defendant ProPharma.[2]

13.     Venue is proper the U.S. District Court for the District of South Carolina because Plaintiff resides in that District and a substantial part of the events or omissions giving rise to the claims herein occurred in Charleston County, South Carolina.

## **BACKGROUND**

14.     Mr. Donnelly is an experienced executive who has worked in the medical device and pharmaceutical development field for 30 years.

15.     Throughout his career, Mr. Donnelly has held over 12 positions nationally and internationally in these industries, and has served as a chief executive officer, chief financial officer, chief operating officer, consultant, and board member, among other positions.

16.     To date, Mr. Donnelly currently holds several leadership, executive or board membership positions.

17.     Mr. Donnelly has developed an international reputation in the medical device and pharmaceutical development industry for his unique skillset and business acumen, particularly because of his industry experience and business contacts and relationships.

18.     Mr. Donnelly first contemplated his business relationship with ProPharma in 2016.

19.     Mr. Donnelly had known about ProPharma for over 15 years due to its proximity to a company that Mr. Donnelly previously worked for, which was also located in Kansas.

---

[2]     Mr. Donnelly reserves the right to challenge this Order on appeal.

20.     Mr. Donnelly had previously developed a relationship with former ProPharma CEO, Jeff Hargraves, and had helped him create the strategy plan for transition of duties in 2016, which was subsequently presented to the ProPharma Board.

21.     On September 30, 2020, ProPharma was sold to Odyssey Investment Partners Fund VI, LP ("Odyssey Investment Partners") for $560 million.

22.     Mr. Donnelly is not a member of ProPharma.

## FACTUAL ALLEGATIONS

### I.     MR. DONNELLY IS PLACED ON THE PROPHARMA BOARD OF MANAGERS

23.     The relationship between Mr. Donnelly and Defendant is governed by the ProPharma Offer Letter, dated October 24, 2016 ("ProPharma Offer"), attached as **Exhibit A**.

### A.     Mr. Donnelly Signs the ProPharma Offer

24.     On October 31, 2016, Mr. Donnelly signed the ProPharma Offer.

25.     The ProPharma Offer was an agreement drafted by ProPharma.

26.     The ProPharma Offer was an agreement for Mr. Donnelly to join ProPharma's Board of Managers on September 30, 2016 for a term of five years, subject to renewal by the Board of Managers.

27.     On or about October 31, 2016, Mr. Donnelly was added to the ProPharma website as part of the ProPharma leadership team.

### B.     Agreement to Pay Mr. Donnelly's Base Compensation

28.     As consideration for his service to ProPharma, Mr. Donnelly's compensation under the ProPharma Offer consisted of two separate payable components.

29.     Both components of Mr. Donnelly's compensation were equally payable under the ProPharma Offer.

30.     Under the ProPharma Offer, Mr. Donnelly received a payment of $37,500.00 per year ("Donnelly Base Compensation").

31.     ProPharma agreed to pay Plaintiff his Donnelly Base Compensation on a quarterly basis in arrears for services rendered under the ProPharma Offer.

### C.     Agreement to Pay ProPharma Incentive Equity

32.     Under the ProPharma Offer, Mr. Donnelly was also entitled to incentive equity units in ProPharma ("ProPharma Incentive Equity").

33.     The payment of Mr. Donnelly's ProPharma Incentive Equity is governed by the ProPharma Incentive Equity Agreement ("IEA"), attached as **Exhibit B**.

34.     Mr. Donnelly signed the IEA on or about September 30, 2016.

35.     The ProPharma Offer mandates that "if [Mr. Donnelly's] position with the [ProPharma Board of Managers] is terminated for any reason, [his] equity [would] be subject to customary buyback provisions set forth in [his] incentive equity agreement."

36.     The IEA provided Mr. Donnelly 8,046.365 ProPharma Incentive Equity units, which could vest according to either time or performance.  *See* **Exhibit B**.

37.     Under the IEA, 25% of the ProPharma Incentive Equity units could vest over time according to a schedule provided in the IEA ("Time Vesting Units").

38.     Under the IEA, 75% of the ProPharma Incentive Equity units could vest over time only if Mr. Donnelly was "continuously employed by or providing services to and [was] still employed by or providing services to [ProPharma] or its Subsidiaries from the date hereof through the consummation of a Liquidity Event" ("Performance Vesting Units").

39.     ProPharma had the option to elect to purchase all or any portion of the vested ProPharma Incentive Equity units by delivery of a written notice at any time within six months after Mr. Donnelly's separation from ProPharma.

40.     Under the IEA, the purchase price for the ProPharma Incentive Equity is the fair market value of the units as of the date Mr. Donnelly separated from ProPharma.

41.     Under the IEA, "fair market value" means the fair market value thereof as of the valuation date as determined in good faith by the ProPharma Board of Managers.

42.     Under the IEA, the definition of "fair market value" expressly states that the ProPharma Board of Managers shall take into account all relevant factors determinative of value, including, without limitation, any other then-existing determinations of fair market value on or about the valuation date.

## II.     PROPHARMA FAILS TO COMPENSATE MR. DONNELLY UNDER THE PROPHARMA OFFER AND IEA

43.     ProPharma failed to pay Mr. Donnelly his due compensation in the form of both his earned Donnelly Base Compensation and ProPharma Incentive Equity.

### A.     Mr. Donnelly's Base Compensation

44.     Mr. Donnelly last received a portion of his Donnelly Base Compensation on April 18, 2019, in the amount of $9,375.00.

45.     Since April 19, 2019, ProPharma has failed to pay Mr. Donnelly his Donnelly Base Compensation.

46.     Mr. Donnelly remained a ProPharma Board member until September 30, 2020 upon sale of the company.  ProPharma never notified Mr. Donnelly that it was removing him from ProPharma's Board prior to the sale of the company.

47.     Despite not being paid his Donnelly Base Compensation, Mr. Donnelly remained on the ProPharma website until at least April 2020.  It is not known when Mr. Donnelly was removed from ProPharma's website.

48.     To date, ProPharma refuses to pay Mr. Donnelly his Donnelly Base Compensation.

**B.      Mr. Donnelly's ProPharma Incentive Equity**

49.      On or around September 2019, Mr. Donnelly had a telephone discussion with then ProPharma Board Chairman, Mike Farah ("Mr. Farah") regarding the buyback value of his ProPharma Incentive Equity.

50.     Around late August or early September 2019, ProPharma began negotiations with Mr. Donnelly to potentially buy back his ProPharma Incentive Equity.

51.     At no time during these negotiations did Mr. Donnelly agree to leave his position as a ProPharma Board Member before resolution of the valuation of his ProPharma Incentive Equity.

52.     During the call with Mr. Farah on or about September 2019, Mr. Farah indicated that ProPharma desired to exercise its right to purchase Mr. Donnelly's vested ProPharma Incentive Equity units under the IEA.

53.     During the call, Mr. Farah presented Mr. Donnelly with a single valuation chart, which valued Mr. Donnelly's owed ProPharma Incentive Equity at $684,008.19 ("September 2019 Offer"), attached as **Exhibit C**.

54.     The September 2019 Offer was based on a valuation calculated as of June 30, 2019. Pursuant to the June 30, 2019 valuation, ProPharma valued ProPharma Incentive Equity units at $131.78 per unit, based on a 13.9x earnings before interest, taxes, depreciation, and amortization ("EBITDA") multiple and a $472.5 million enterprise value ("June 2019 Valuation").

55.     Upon information and belief, this June 2019 Valuation was never presented to or approved by the ProPharma Board of Managers, as required by the terms of the IEA.

56.     Upon information and belief, the ProPharma Board of Managers did not take into account all relevant factors, including, without limitation, any other then-existing determinations of fair market value on or about the valuation date.

57.     On or about August 2019, Mr. Donnelly became aware that the ProPharma Board of Managers had plans to solicit offers for ProPharma.

58.     During this sales process, ProPharma underwent several valuations conducted by third parties, including investment banks.

59.     During September and October 2019, ProPharma met with numerous investment bankers in connection with a potential sale of the company.

60.     Mr. Farah did not share with Mr. Donnelly these other third-party valuations, and solely based ProPharma's valuation of Mr. Donnelly's shares on the June 2019 Valuation.

61.     Based on ProPharma's plans to sell, Mr. Donnelly was aware that in or around June 2019, the ProPharma Board of Managers had received other determinations of ProPharma's fair market value.

62.     These other determinations of ProPharma's fair market value showed that ProPharma was valued at approximately $550-625 million on or about June 2019.

63.     Mr. Donnelly was aware that the September 2019 Offer substantially undervalued ProPharma based on these previously received market valuations, and market comparable data that showed valuations for similar companies at the time closer to an average 18x EBITDA multiple. An 18x EBITDA multiple would have resulted in an implied $610.2 million enterprise value for ProPharma at the time.

64.     Mr. Donnelly told Mr. Farah that he did not agree with the June 2019 Valuation because it was based on a "trailing EBITDA" valuation—despite the fact that other comparable companies in the marketplace were being valued on a "forward" EBITDA valuation—and did not include any normal "EBITDA" adjustments.  Mr. Donnelly also knew that the June 2019 Valuation was significantly less than previously received third-party ProPharma valuations.

65.     "Forward" EBITA valuation is the standard and accepted industry practice of valuation for businesses in the marketplace.

66.     Mr. Donnelly told Mr. Farah that he believed the proper value of his Incentive Equity was $199.73 a unit, which included a 3.0x multiple vesting on his Performance Vesting Units.

67.     Mr. Donnelly rejected ProPharma's September 2019 Offer, based on the June 2019 Valuation.

68.     Based on Mr. Donnelly's disagreement of the valuation of his ProPharma Incentive Equity units, Mr. Farah told Mr. Donnelly that he would get back to Mr. Donnelly regarding the June 2019 Valuation.

69.     Mr. Farah did not come back with a different offer or provide any new valuation.

70.     On October 4, 2019, Mr. Donnelly counter-offered Mr. Farah's September 2019 Offer, stating that ProPharma and Mr. Donnelly should split the difference between Mr. Donnelly's proposed valuation and the June 2019 Valuation, giving any difference between the two amounts to charity.

71.     Mr. Farah declined this counteroffer from Mr. Donnelly.  Mr. Farah did not reply with any other counteroffer or new valuation.

72.     Instead, on or about November 4, 2019, without consulting Mr. Donnelly, ProPharma unilaterally delivered to him a sum of $105,227.97.

73.     On information and belief, this sum of $105,227.97 was for 1,206.955 vested Time Vesting Units, at a valuation to which Mr. Donnelly did not agree.

74.     ProPharma sent to Mr. Donnelly's bank the sum of $105,227.97 by direct deposit despite the fact that the parties were still negotiating the valuation of Mr. Donnelly's Incentive Equity Units.

75.     Mr. Donnelly never agreed to the $105,227.97 sum.

76.     Mr. Donnelly only discovered that ProPharma had paid him the $105,227.97 sum after his bank called him to notify him of the payment.

77.     Mr. Donnelly never agreed to the June 2019 Valuation or accepted the $105,227.97 sum of money.

78.     At an 18x EBITA multiple valuation (an implied $610.2 million enterprise value), which was the valuation for similar companies at the time, the implied value for a common unit would have been approximately $199.73/unit.  For 1,206.955 vested Time Vested Units, this would have resulted in a total payment of $241,065.12, instead of $105,227.97.

79.     The eventual ProPharma sale on September 30, 2020 to Odyssey Investment Partners was based on a 3.1x MOIC, with upside to 3.2x MOIC.

80.     The sale of ProPharma to Odyssey Investment Partners establishes that the actual MOIC is either 3.1x or 3.2x, which is higher than the 2.5x reflected in the June 2019 Valuation identified in the September 2019 Offer.  **Exhibit C**.

81.     The MOIC ultimately achieved in the ProPharma sale is reflective of Mr. Donnelly's hard work as a Board member.

82.     Mr. Donnelly's work as a Board member was a significant factor in the growth and success of ProPharma, as well as its ultimate $560 million sale price.

83.     To date, Mr. Donnelly has not received any Performance Vesting Units based on the MOIC that ProPharma achieved in its sale to Odyssey Investment Partners on September 30, 2020.

84.     Mr. Donnelly was ready, willing and able to provide services to ProPharma through September 30, 2020.

85.     Mr. Donnelly demanded the fair market value of his earned ProPharma Incentive Equity on November 6, 2019, and again on September 4, 2020.

86.     ProPharma refused to pay Mr. Donnelly his ProPharma Incentive Equity on November 11, 2019, and again on September 23, 2020.

87.     At no time during these negotiations did ProPharma terminate Mr. Donnelly's position on the Board of Managers.

III.    **MR. DONNELLY WAS NEVER REMOVED FROM THE PROPHARMA BOARD OF MANAGERS**

88.      In August 2019, Anthony Davis ("Mr. Davis") talked to Mr. Donnelly about the potential possibility that Mr. Donnelly may have to leave the ProPharma Board of Managers, but did not tell Mr. Donnelly when he would be removed from the ProPharma Board of Managers.

89.     This discussion was based on a perceived conflict of interest by Mr. Davis caused by Mr. Donnelly's presence on the Board of Managers.

90.     The alleged perceived conflict was based on the fact that Mr. Donnelly occupied leadership positions in entities affiliated with ProPharma.

91.     Mr. Donnelly did not agree that there was a conflict of interest and did not agree to his removal or step down from the board.

92.     Mr. Donnelly told Mr. Davis that any departure would be subject to parties coming to an agreement on the proper valuation of his Incentive Equity.

93.     Mr. Donnelly's role in leadership positions in entities affiliated with ProPharma was no different from other ProPharma Board members, such as Mr. Richard Thomas ("Mr. Thomas"), who remained on the ProPharma Board of Managers.

94.     Mr. Donnelly told Mr. Davis that if he was to be removed from the ProPharma Board of Managers, he expected ProPharma to honor its obligations under the ProPharma Offer and IEA.

95.     Mr. Davis assured Mr. Donnelly that ProPharma and Mr. Farah would work with him regarding the value of his Incentive Equity.

96.     Mr. Donnelly understood that he would not be removed from the ProPharma Board of Managers until he reached an agreement regarding the payment of his Incentive Equity, and resolved any potential issues regarding the valuation of his Incentive Equity.

97.     During Mr. Donnelly's conversations with Mr. Farah in September 2019, the parties were unable to come to a resolution on the valuation of his Incentive Equity.

98.     Pursuant to the ProPharma Offer, the term of the ProPharma Offer was for "[f]ive years from execution of this [ProPharma Offer], subject to renewal by majority vote of the Board."

99.     Until September 23, 2020, Mr. Donnelly never received any communication from ProPharma terminating his status as a ProPharma Board member.

100.    Prior to September 23, 2020, ProPharma did not ever otherwise inform Mr. Donnelly that he was no longer a ProPharma Board member.

101.    Between September 1, 2019 and September 30, 2020, other ProPharma Board members never provided necessary board materials or invitations to board meetings to Mr. Donnelly.

102.    By failing to provide Mr. Donnelly with the materials necessary to carry out his duties as a ProPharma Board member, ProPharma prevented Mr. Donnelly from carrying out his duties under the ProPharma Offer.

103.    In preparation for litigation, on September 23, 2020, counsel for Mr. Donnelly requested that counsel for ProPharma send him any record indicating that Mr. Donnelly was properly terminated from ProPharma's Board of Managers.  In response, ProPharma's counsel sent counsel for Mr. Donnelly a document, dated September 3, 2019, which purported to have removed Mr. Donnelly from the ProPharma Board, effective August 31, 2019 ("Purported Removal Letter").  *See* **Exhibit D**, Purported Removal Letter.

104.    September 23, 2020 was the first time Mr. Donnelly received any communication purporting to terminate his status as a Member of the ProPharma Board of Managers.

105.    Before September 23, 2020, Mr. Donnelly had never seen, nor was given any notice of the document dated September 3, 2019 and there is no language in the September 23, 2020 letter indicating that it was sent to Mr. Donnelly in September 2019.

106.    The Purported Removal Letter is addressed to:

ProPharma Group Topco, LLC
8717 W. 110th Street
Suite 300
Overland Park, KS 66210

c/o Linden Capital Partners III LP
c/o Linden LLC
150 N. Riverside Plaza
Suite 5100
Chicago, IL 60606

*Id.*

107. The Purported Removal Letter indicates that "[p]ursuant to Section 5.2(b) of the LLC Agreement, the undersigned hereby removes Patrick Donnelley [sic] from the Board and all Sub Boards effective as of August 31, 2019." *Id.* ¶ 2.

108. The Purported Removal Letter is signed by Michael Farah in his capacity as "Authorized Signatory" on behalf of "Linden Capital Partners III L.P." and "Linden Capital Partners III-A L.P." *See* **Exhibit D**.

109. The relationship of the parties is governed by an Amended and Restated LLC Agreement dated September 30, 2016 ("LLC Agreement"). *See* **Exhibit E**, ProPharma LLC Agreement; *see also Donnelly v. ProPharma Group Topco, LLC*, CA:2:20-cv-4110-JD, Docket No. 36 (D.S.C. June 22, 2021).

110. Section 5.2(a)(i) of ProPharma's LLC Agreement provides, in pertinent part, that:

> The Board shall initially consist of up to eight (8) Managers. Thereafter, the number of Managers on the Board shall be established from time to time by the Majority Linden Investors; provided that, for so long as either Linden Capital Partners III, L.P. (the "Linden III VCOC") or Linden Capital Partners III-A, L.P. (the "Linden III-A VCOC" and, together with the Linden III VCOC, the "Linden VCOC Investors") holds a direct or indirect interest in Holdings LLC, ***each*** such Linden VCOC Investor ***shall have the direct independent right to designate*** <u>***one (1)***</u> ***Manager*** pursuant to Section 5.2(a)(i)(B).

*See* **Exhibit E**, LLC Agreement § 5.2(a)(i) (emphasis added).

111. Thus, Linden Capital Partners III, L.P. and Linden Capital Partners III-A, L.P. each had the "direct independent right" to designate one Manager.

112. Section 5.2(a)(i)(B) provides:

> (B) Three (3) Managers designated by the Linden Investors (each a "Linden Manager"), one (1) of whom ***shall be directly designated by*** the Linden III VCOC (the "Linden III VCOC Manager"), who shall initially be Anthony Davis, one (1)

of whom *shall be directly designated by* the Linden III-A VCOC (the "Linden III-A VCOC Manager", and collectively with the Linden III VCOC Manager, the "Linden VCOC Managers"), who shall initially be Michael Farah, and one (1) of whom *shall be designated by the Linden Investors*, who shall initially be Patrick Donnelly;

*See* **Exhibit E**, LLC Agreement § 5.2(a)(i)(B) (emphasis added).

113.    Thus, Mr. Donnelly was designated to be a Member of the Board of Managers by the "Linden Investors," not by Linden Capital Partners III, L.P. and Linden Capital Partners III-A, L.P., who designated Anthony Davis and Michael Farah, respectively.

114.    Article I ("DEFINITIONS") of the LLC Agreement defines "Linden Investors" as "collectively, Linden Buyer, Linden Splitter and any of their Affiliates and any of their respective Transferees."

115.    Article I of the LLC Agreement defines "Linden Buyer" as "ProPharma Group Buyer, LLC, a Delaware limited liability company." *See* **Exhibit E** at 6.

116.    Article I of the LLC Agreement defines "Linden Splitter" as "ProPharma Group Splitter, LP, a Delaware limited partnership." *See* **Exhibit E** at 6.

117.    The LLC Agreement does not identify any Affiliates or Transferees of ProPharma Group Buyer, LLC or ProPharma Group Splitter, LP.

118.    Section 5.2(b) of the ProPharma LLC Agreement provides, in pertinent part:

Any Linden Manager or Independent Manager will be removed from the Board, with or without cause, *at the written request of the Linden Investors entitled to appoint such Linden Manager* or Independent Manager pursuant to this Section 5.2.

*See* **Exhibit E**, LLC Agreement § 5.2(b) (emphasis added).

119.    Thus, Linden Capital Partners III, L.P. and Linden Capital Partners III-A did not have the direct independent right to remove Mr. Donnelly from the Board of Managers.

120.    The definition of the term Linden Investors, using as it does "and," is conjunctive, not disjunctive. *Silver Lake Office Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 Del. Super. LEXIS 17, at *21-22 (Newcastle Jan. 17, 2014) ("since the parties used the word 'and' . . . they intended to give the 'conjunctive requirement' the power that its plain meaning suggests."); *accord* **Exhibit E**, LLC Agreement § 14.8 (excluding "and" from a list of words that "shall ***not*** be exclusive.") (emphasis added)).  Accordingly, only ProPharma Group Buyer, LLC and ProPharma Group Splitter, LP, acting in concert with any Affiliates and Transferees they may have, had the power to remove Mr. Donnelly from the ProPharma Board of Managers.

121.    Texas Franchise Tax Public Information Reports filed by ProPharma Group Holdings LLC dated October 16, 2019 and October 23, 2020 list ProPharma Group Buyer, LLC and ProPharma Group Splitter, LP under Section A, thus indicating, at the very least, their existence as of these dates. *See* **Exhibit F**, Texas Franchise Tax Public Information Reports.

122.    Upon information and belief, ProPharma Group Buyer, LLC and ProPharma Group Splitter, LP were in existence and remained Linden Investors as of September 3, 2019, the date of the Purported Removal Letter.

123.    ProPharma Group Buyer, LLC and ProPharma Group Splitter, LP did not sign the Purported Removal Letter.  Accordingly, the Purported Removal Letter did not effectively remove Mr. Donnelly from the ProPharma Board of Managers.

124.    The ProPharma Offer remains a binding agreement on the parties.

125.    ProPharma was sold on September 30, 2020.

126.    After September 30, 2020, as a result of a change in control, Mr. Donnelly was no longer a member of ProPharma's Board of Managers, and ProPharma owes him a payout of his shares.

127.    Mr. Donnelly remained a ProPharma Board of Managers member through September 30, 2020, but did not receive any payouts from the September 30, 2020 sale to Odyssey Investment Partners.

128.    After September 30, 2020, as a result of a change in control, Mr. Donnelly was no longer a member of the Board of Managers.

### COUNT I
### BREACH OF PROPHARMA OFFER
### FAILURE TO PAY EARNED DONNELLY BASE COMPENSATION

129.    All prior allegations are incorporated under Count I as if fully set forth herein.

130.    The relationship between Mr. Donnelly and ProPharma is governed by the ProPharma Offer.

131.    On October 31, 2016, Mr. Donnelly signed the ProPharma Offer.

132.    The ProPharma Offer was an agreement drafted by ProPharma.

133.    The ProPharma Offer was an agreement to join ProPharma's Board of Managers on September 30, 2016 for a term of five years, subject to renewal by the Board of Managers.

134.    Under the ProPharma Offer, ProPharma owed Mr. Donnelly his Donnelly Base Compensation.

135.    ProPharma has not paid Mr. Donnelly his Donnelly Base Compensation since April 18, 2019 in breach of the ProPharma Offer.

136.    Mr. Donnelly remains unpaid on his Donnelly Based Compensation for the period from April 19, 2019 through September 30, 2020, when the company was sold.

137.    Mr. Donnelly demanded his earned Donnelly Base Compensation on September 4, 2020.

138.    ProPharma refused to pay Mr. Donnelly his Donnelly Base Compensation on September 23, 2020.

139.    Mr. Donnelly has suffered damages as a direct and proximate cause of ProPharma's refusal to pay him his Donnelly Base Compensation from April 19, 2019 through September 30, 2020, pursuant to the ProPharma Offer.

140.    Mr. Donnelly thus asks this Court to award him damages sufficient to make him whole and compensate him for work he performed pursuant to the ProPharma Offer, consequential damages, and any and all other available remedies.

### COUNT II
#### BREACH OF INCENTIVE EQUITY AGREEMENT
#### FAILURE TO PAY FAIR MARKET VALUE OF PROPHARMA INCENTIVE EQUITY

141.    All prior allegations are incorporated under Count II, as if fully set forth herein.

142.    On or about November 4, 2019, ProPharma unilaterally paid Mr. Donnelly a sum of $105,227.97 for 1,206.955 Time Vesting Units based on the June 2019 Valuation.

143.    Mr. Donnelly never agreed to the June 2019 Valuation, nor that the $105,227.97 sum of money satisfied the full value of his owed ProPharma Incentive Equity units.

144.    On information and belief, Mr. Donnelly has never received any payment for his Performance Vesting Units.

145.    Upon information and belief, the June 2019 Valuation, which served as the basis of the $105,227.97 sum of money for Mr. Donnelly's Time Vesting Units, was never in good faith presented to, approved or determined by the ProPharma Board of Managers.

146.    Upon information and belief, in calculating the June 2019 Valuation, the ProPharma Board never took into account all relevant factors determinative of value, including other then-existing determinations of fair market value on or about the valuation date.

147.    Upon information and belief, ProPharma's June 2019 Valuation was substantially undervalued based on market comparable data that shows valuations for similar companies at the time closer to an average 18x EBITDA multiple in June 2019, which would have resulted in an implied $610.2 million enterprise value for ProPharma at the time.

148.    ProPharma failed to value Mr. Donnelly's Incentive Equity according to a "forward" EBITA valuation, which represents the standard and accepted industry practice of valuation for businesses in the marketplace.

149.    The June 2019 Valuation was not based on the fair market value, in breach of the terms of the IEA.

150.    Mr. Donnelly remained a Member of ProPharma's the Board of Managers through September 30, 2020, when the sale of ProPharma to Odyssey Investment Partners was completed.

151.    Mr. Donnelly did not receive the fair market value of his owed Performance Vesting Units pursuant to ProPharma's sale to Odyssey Investment Partners on September 30, 2020.

152.    Mr. Donnelly demanded the fair market value of his owed ProPharma Incentive Equity on November 6, 2019, and again on September 4, 2020.

153.    Mr. Donnelly has suffered damages as a direct and proximate cause of ProPharma's refusal to pay him the fair market value of his ProPharma Incentive Equity under the ProPharma Offer.

154.    Mr. Donnelly thus asks this Court to award him damages sufficient to make him whole and compensate him for work he performed pursuant to the ProPharma Offer, consequential damages, and any and all other available remedies.

## COUNT III
### BREACH OF PROPHARMA OFFER
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

155.    All prior allegations are incorporated under Count III, as if fully set forth herein.

156.    Mr. Donnelly became a member of the Board of Managers on September 30, 2016 for a term of five years, subject to renewal by the Board of Managers.

157.    Mr. Donnelly was ready, willing and able to provide services to ProPharma at all relevant times until ProPharma's sale to Odyssey Investment Partners on September 30, 2020.

158.    Between September 1, 2019 and September 30, 2020, other ProPharma Board members never provided necessary board materials or invitations to board meetings to Mr. Donnelly.

159.    Between September 1, 2019 and September 30, 2020, Mr. Donnelly was ready and available to carry out his duties as a ProPharma Board member.

160.    By failing to provide Mr. Donnelly with the materials necessary to carry out his duties as a ProPharma Board member, ProPharma prevented Mr. Donnelly from carrying out his duties under the ProPharma Offer.

161.    ProPharma's actions injured Mr. Donnelly's right to receive the benefits of the ProPharma Offer and IEA.

162.    Mr. Donnelly has suffered damages as a direct and proximate cause of ProPharma's breach of the implied covenant of good faith and fair dealing.

163.    Mr. Donnelly thus asks this Court to award him damages sufficient to make him whole and compensate him for work he performed pursuant to the ProPharma Offer, consequential damages, and any and all other available remedies.

20

## COUNT IV
### BREACH OF FIDUCIARY DUTY

164.    All prior allegations are incorporated under Count IV, as if fully set forth herein.

165.    As a member of the Board of Managers, Mr. Farah owed fiduciary duties of care, loyalty and good faith to ProPharma shareholders whenever he communicated with shareholders about ProPharma's affairs within the scope of his duties as a Board member.

166.    In September 2019, Mr. Farah and other members of the ProPharma Board knew that ProPharma was soliciting sales.

167.    In discussing the June 2019 Valuation with Mr. Donnelly in the context of the September 2019 Offer, Mr. Farah failed to provide Mr. Donnelly applicable market comparables or recent third party valuations of ProPharma.

168.    Mr. Farah breached his fiduciary duty by omitting material facts in discussions with Mr. Donnelly regarding the fair market valuation of his Incentive Equity, and failing to undertake a good faith effort to determine the fair market valuation of his Incentive Equity.

169.    In failing to address applicable market comparables or recent third party valuations of ProPharma, Mr. Farah further breached his fiduciary duty by failing to attain all the information necessary to make a proper valuation of Mr. Donnelly's Incentive Equity, and providing Mr. Donnelly with inaccurate information regarding the valuation of his Incentive Equity.

170.    As a Board member of ProPharma, Mr. Farah had a conflicting self-interest to provide Mr. Donnelly the lowest valuation of his Incentive Equity, because the lesser Mr. Donnelly's Incentive Equity, the more value available to the other shareholders and Board members after any future sale of ProPharma.

171.    Mr. Farah attempted to remove Mr. Donnelly from the Board effective August 31, 2019 and pay Mr. Donnelly for his Incentive Equity at a valuation that he knew at the time was lower than the fair market value.

172.    By valuing Mr. Donnelly's Incentive Equity at an artificially lower valuation, Mr. Farah and the ProPharma Board of Managers attempted to deprive Mr. Donnelly of the value of his Incentive Equity, which escalated by the time ProPharma sold itself a year later.

173.    This valuation scheme, had Mr. Donnelly accepted it, would have allowed Mr. Farah and the Board of Managers to get the benefit of a higher price at the time of a ProPharma sale, and would have artificially deflated the value of Mr. Donnelly's Incentive Equity.

174.    Mr. Farah and the ProPharma Board of Managers breached their fiduciary duties by failing to calculate the valuation of Mr. Donnelly's Incentive Equity in good faith and by repurchasing Mr. Donnelly's Incentive Equity at a price well below market value.

175.    Mr. Farah and the ProPharma Board also took steps to deprive Mr. Donnelly of the benefit of his work on the Board of Managers.

176.    Since September 1, 2019, Mr. Donnelly was not allowed to participate in board meetings.

177.    The attempt to notify Mr. Donnelly of his removal from the ProPharma Board on September 23, 2020 was a nullity, as Mr. Farah, acting as Authorized Signatory for Linden Capital Partners III L.P. and Linden Capital Partners III-A L.P. did not have the authority to remove Mr. Donnelly from ProPharma's Board of Managers, as discussed in Paragraphs 102-120, *supra*.

178.    Mr. Donnelly and Mr. Thomas both occupied the same positions on the ProPharma Board and ProPharma affiliates.

179.    The reason provided to Mr. Donnelly for his attempted removal from the Board of Managers in August 31, 2019 was a pretext when compared to Mr. Thomas.

180.    Despite being comparators, Mr. Farah and the ProPharma Board treated Mr. Thomas differently and never required or suggested that his multiple leadership roles posed any conflict of interest that warranted removal from the ProPharma.

181.    Mr. Donnelly has suffered damages as a direct and proximate cause of Mr. Farah's breach of his fiduciary duties of care, loyalty and good faith.

182.    Mr. Donnelly thus asks this Court to award him damages sufficient to make him whole, consequential damages, and any and all other available remedies.

### COUNT V
#### UNJUST ENRICHMENT
#### (PLED IN THE ALTERNATIVE TO COUNTS I AND II)

183.    All prior allegations are incorporated under Count V, as if fully set forth herein.

184.    Mr. Donnelly's work and efforts in connection with his duties as a ProPharma Board member conferred a benefit to ProPharma.

185.    ProPharma realized the value of Mr. Donnelly's contribution in the form of the eventual $560 million sale price to Odyssey Investment Partners on September 30, 2020.

186.    Mr. Donnelly's work as a ProPharma Board member was a significant factor in the growth, success and eventual sale of ProPharma.

187.    Despite Mr. Donnelly's contributions to Defendant, ProPharma has not paid Mr. Donnelly his Donnelly Base Compensation since April 18, 2019.

188.    Mr. Donnelly remained a ProPharma Board member until the company was sold on September 30, 2020.

189. ProPharma has not paid Mr. Donnelly his Donnelly Base Compensation since April 19, 2019.

190. On or about November 4, 2019, ProPharma paid Mr. Donnelly for his ProPharma Incentive Equity units at the June 2019 Valuation, a valuation intentionally below the fair market value.

191. ProPharma's attempts to remove Mr. Donnelly from the Board on September 23, 2020 were in bad faith and intended to deprive Mr. Donnelly of his full equity.

192. Mr. Donnelly has not been compensated for his work and efforts in connection with achieving the eventual $560 million sale price to Odyssey Investment Partners.

193. ProPharma had an equitable duty to pay Mr. Donnelly for the fair market value of his ProPharma Incentive Equity.

194. To date, Mr. Donnelly has not received any contributions to his ProPharma Incentive Equity units on the MOIC that ProPharma achieved at the time of Mr. Donnelly's separation, or that are reflected in the sale price to Odyssey Investment Partners.

195. Mr. Donnelly expected to receive his Donnelly Base Compensation and the fair market value of his ProPharma Incentive Equity units.

196. ProPharma refuses to pay Mr. Donnelly either his earned Donnelly Base Compensation or the fair market value of his ProPharma Incentive Equity units.

197. ProPharma has retained monies owed to Mr. Donnelly under the ProPharma Offer in the form of his earned Donnelly Base Compensation and the fair market value of his ProPharma Incentive Equity units.

198.    ProPharma should have reasonably expected to pay Mr. Donnelly his earned Donnelly Base Compensation and the fair market value of his ProPharma Incentive Equity units after completing its sale to Odyssey Investment Partners.

199.    Principles of justice, equity and good conscience demand that ProPharma not be allowed to retain the funds owed to Mr. Donnelly for his earned Donnelly Base Compensation and the fair market value of his ProPharma Incentive Equity units.

200.    Accordingly, ProPharma must disgorge the amounts payable for his Donnelly Base Compensation and the fair market value of his ProPharma Incentive Equity units that it has retained as they are justly owed to Mr. Donnelly.

WHEREFORE, Plaintiff seeks an award of compensatory damages up to $1,500,000, or an amount to be proven at trial, from Defendant, pre- and post-judgment interest at the lawful rate pursuant to S.C. Code § 34-31-20, attorneys' fees pursuant to S.C. Code § 15-37-10, costs pursuant to S.C. Code § 15-37-20, and such further relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues which may be tried by jury.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ John A. Sensing*

Nicholas D. SanFilippo
Daniel C. Masakayan
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102-4215
(703) 712-5000 – Telephone
(703) 712-5220 – Facsimile
nsanfilippo@mcguirewoods.com
dmasakayan@mcguirewoods.com

John A. Sensing (#5232)
Jesse L. Noa (#5973)
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
jsensing@potteranderson.com
jnoa@potteranderson.com

Dated:  October 19, 2021

*Attorneys for Plaintiff Patrick K. Donnelly*

# EXHIBIT A



PROPHARMA
GROUP

ProPharma Group
8717 W 110th St #300
Overland Park, KS

October 24, 2016

Mr. Patrick Donnelly
8 Church St
Charleston, SC 29401

## Offer to Join the Board of Directors

Dear Pat:

ProPharma Group (or the "Company") is pleased to extend you the following offer to join our Board of Directors (the "Board" or "Directors"). We believe your extensive knowledge and experience will be instrumental in helping ProPharma Group continue on its growth trajectory. On behalf of ProPharma Group and Linden Capital Partners, we welcome you to the Board. The following information highlights the position, compensation and benefits associated with our offer.

**Position**: Director

**Responsibilities:** Please refer to the Board overview document for full details.

**Starting Date:** September 30, 2016.

**Term:** Five years from execution of this offer, subject to renewal by majority vote of the Board.

**Base Compensation:** The Company will pay you at the rate of $37,500 USD per year which will be paid on a quarterly basis in arrears for services rendered upon execution of this offer letter.

All compensation payable to you from the Company shall be subject to all applicable withholding taxes, normal payroll withholding and any other amounts required by law to be withheld.

**Equity Participation Plan:** You will be granted incentive equity units ("Incentive Equity") in ProPharma Group that equate to 75 basis points or 0.75%. The Incentive Equity would be subject to time and performance-based vesting provisions and subject to customary repurchase provisions. The time component equates to 25% of the Incentive Equity and would vest in equal annual increments over 5 years. The performance-based component equates to 75% of the Incentive Equity and would vest in one-third increments upon Linden achieving a cash-on-cash return of 2.0x, 2.5x, and 3.0x, respectively. An incentive equity agreement will follow this term sheet detailing the plan

If your position with the Board is terminated for any reason, your equity will be subject to customary buyback provisions to be set forth in your incentive equity agreement.

**Expenses:** The Company shall pay the reasonable out-of-pocket expenses (including expenses related to travel – economy-class airfare, hotel, car, etc.) incurred by you in connection with attending the meetings of the Board or any committee thereof and other duties in your capacity as Director.

**Directors' and Officers' Liability:** Each Director shall also be entitled to have the Company purchase reasonable directors' and officers' liability insurance on their behalf, to the benefits of indemnification to the fullest extent permitted by law and the Company's Certificate of Incorporation, Bylaws and any indemnification



ProPharma Group
8717 W 110th St #300
Overland Park, KS

agreements, and to exculpation as provided by state law and the Company's Certificate of Incorporation and
Bylaws.

**Confidentiality:** Since you will be exposed to Confidential Information (as defined below) through your Board
position with the Company, you further agree that you will not use or disclose any Confidential Information
during your tenure with the Company and its subsidiaries or at any time thereafter for any reason (except as must
be disclosed to enable you to properly perform your duties for the Company and its subsidiaries). For purposes
of this letter, "Confidential Information" includes writings, equipment, financial information, business plans,
customer lists, the identity of or other facts relating to prospective customers, referral sources, inventory lists,
computer programs, other material embodying trade secrets, customer or product information, technical or
business information or any other confidential information of the Company or its affiliates and subsidiaries.

It is the Company's policy not to receive any confidential, proprietary or trade secret information pertaining to
your other employers and/or any clients or customers you have serviced on behalf of any other employers. The
Company will not accept, and insists that you not provide the Company or any of its subsidiaries with, any
confidential, proprietary or trade secret information pertaining to any previous employment. In addition, it is
the Company's policy to honor any valid and legally enforceable confidentiality, non-competition, no-hire and
non-solicitation agreements that you may have previously signed. You agree to comply with any such
agreements. You represent and warrant to the Company that (A) you are not a party to or bound by any
employment agreement, non-compete agreement, no-hire agreement or confidentiality agreement with any other
person or entity that would be in conflict with this letter agreement, and (B) you have disclosed to the Company
the existence and entire nature of (1) any applicable restrictive covenants and (2) your actions (relating to any
restrictive covenants) taken prior to the date hereof.

Pat, we are genuinely excited about you joining ProPharma Group's Board of Directors and look forward to
working with you as we continue to grow the business. Please let me know if you have any questions or require
further information.

Sincerely,

Anthony B. Davis
Chairman of the Board of Directors

Agreed to and accepted this _31st_ day of October 2016

By: _____
Pat Donnelly



ProPharma Group
8717 W 110th St #300
Overland Park, KS 66210

October 2016

## ProPharma Group
### Board of Directors: Summary Description of Roles and Responsibilities

**Role of BOD:** The ProPharma Group Board of Directors serves several purposes:

- Monitor the development and implementation of the company's long-term strategy
- Ensure that the company has the organization, succession, and compensation needed to accomplish its growth objectives
- Ensure the company has proper controls and reporting systems
- Provide an industry perspective and meaningful connections to customers, partners, and executives
- Oversee the evaluation of significant strategic and financial matters, such as acquisitions, divestitures, and other matters that involve capital or shareholder equity
- Evaluate the performance of the CEO and executive team
- Represent each of the company's constituencies, particularly its employees, shareholders, and customers

The Board of Directors functions as an *oversight* body. Except for unusual circumstances, the board is not involved in day-to-day activities of the company. Linden's principals play an active role with the companies in which we invest, particularly in the first 18 – 24 months, to monitor the implementation of the value creation program.

**Composition:** The ProPharma Group Board of Directors will be comprised of seven or eight individuals. The current board members are:

- Tony Davis, Linden President & Managing Partner (Chairman)
- Pat Donnelly, Linden Operating Partner (Director)
- Michael Farah, Linden Partner (Director)
- Jeff Hargroves, ProPharma Group Chief Executive Officer (Director)

**Board Committee Overview:** Committees will be comprised of members of the Board and will report their discussions and recommendations at regular board meetings; recommendations are subject to Board approval. The board will have the following Committees:

- Compensation & Organizational Development,
- M&A (Development)
- Audit, Risk & Compliance
- Other potential committees (Regulatory, Quality, Strategy)



ProPharma Group
8717 W 110th St #300
Overland Park, KS 66210

**Frequency of meetings:** the BOD will have five scheduled meetings per year – four quarterly meetings plus an annual strategic growth planning retreat. The agenda for each quarterly meeting will include routine detailed financial and operations reviews, sales and value creation plan review and one theme from the annual board calendar.

The Board will also participate in an annual *Strategic Growth Planning* retreat to review ProPharma Group's long-term strategy and financial projections, industry and competitors, the value creation plan, and progression towards successful exit.

The Chairman and CEO will jointly prepare the agenda for each meeting with input from other board members.

**Information/reporting:** Directors require timely, but summarized information about the company's performance. On a monthly basis, the directors should receive a financial summary showing monthly and year-to-date results and forecast updates, if any. ProPharma Group management will receive guidance from Linden regarding content and packaging of the monthly reporting.

**Elements of a successful board meeting:**

- Directors who i) represent a diverse perspective on the company and its industry and ii) understand the company's mission and value creation plan
- Materials sent in advance of the meeting – ideally one week prior
- An agenda set by the Chairman and CEO, with input from other directors
- Work done in committees, summarized and presented for any decisions the board needs to make
- Balance of presentation and discussion
- Exposure to members of the executive management team
- Opportunities for directors to help

# EXHIBIT B

K&E DRAFT 12-22-16

PROPHARMA GROUP TOPCO, LLC
MANAGEMENT INCENTIVE UNIT AGREEMENT

THIS MANAGEMENT INCENTIVE UNIT AGREEMENT (this "Agreement") is made as of _____, 20___, by and between ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company"), and Patrick K. Donnelly ("Participant"). Any capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in Section 3, or if not defined herein, the meanings assigned to them in the LLC Agreement (as defined herein).

WHEREAS, the Company desires to enter into this Agreement to provide for the grant to Participant of 8,046.365 Management Incentive Units.

NOW THEREFORE, in consideration of the promises contained herein and the mutual obligations of the parties hereto, the receipt and sufficiency of which are hereby acknowledged, the Company and Participant, intending to be legally bound, hereby agree as follows:

1.      Grant of the Management Incentive Units.

(a)      Upon execution of this Agreement, the Company shall grant to Participant 8,046.365 Management Incentive Units. The Participation Threshold of each Management Incentive Unit as of the date hereof is $1.00 per Management Incentive Unit and may be adjusted as provided in the LLC Agreement.

(b)      Contemporaneously herewith, Participant shall deliver to the Company (i) an executed Joinder to the LLC Agreement in the form of Exhibit A hereto and (ii) if applicable, an executed spousal consent in the form of Exhibit B hereto. The issuance of the Management Incentive Units to Participant hereunder is intended to be exempt from registration under the Securities Act pursuant to Rule 701 thereunder. Within thirty days after Participant receives any Management Incentive Units from the Company, Participant shall make an effective election with the Internal Revenue Service under Section 83(b) of the Code in the form of Exhibit C hereto.

2.      Representations and Warranties; Acknowledgments.

(a)      Representations and Warranties by Participant. In connection with the grant of the Management Incentive Units hereunder, Participant represents and warrants to the Company that:

(i)      The Management Incentive Units to be acquired by Participant pursuant to this Agreement shall be acquired for Participant's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act, or any applicable state securities laws, and the Management Incentive Units shall not be disposed of in contravention of the Securities Act or any applicable state securities laws.

(ii)      Participant is an Eligible Service Provider of the Company or one of its Subsidiaries, is sophisticated in financial matters and is able to evaluate the risks and benefits of the investment in the Management Incentive Units.

(iii)    Participant is able to bear the economic risk of Participant's investment in the Management Incentive Units for an indefinite period of time because the Management Incentive Units have not been registered under the Securities Act and, therefore, cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

(iv)    Participant and Participant's advisers have had an opportunity to ask questions and have received such answers concerning the terms and conditions of the offering of the Management Incentive Units as Participant and Participant's advisers have requested and have had full and free access and opportunity to inspect, review, examine and inquire about such other information concerning the Company and its Subsidiaries as Participant and Participant's advisors have requested. Participant and Participant's advisers have also been provided an opportunity to review and ask questions about the LLC Agreement.

(v)    The execution, delivery and performance of this Agreement by Participant does not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Participant is a party or by which Participant is bound and upon the execution and delivery of this Agreement by the Company, this Agreement shall be the legal, valid and binding obligation of Participant, enforceable in accordance with its terms.

(vi)    As of the date of this Agreement, Participant is not a party to or bound by any employment agreement, noncompete agreement, confidentiality agreement or similar agreement with any Person other than the Company or one of its Subsidiaries that would adversely affect Participant's ability to perform Participant's duties on behalf of the Company or one of its Subsidiaries.

(vii)    Participant has had an opportunity to consult with independent legal counsel regarding Participant's rights and obligations under this Agreement and the LLC Agreement and fully understands the terms and conditions contained herein. Participant is not relying on the Company or any of its employees, agents or representatives with respect to the legal, tax, economic and related considerations of an investment in the Management Incentive Units. Participant understands that in the future the Management Incentive Units may significantly increase or decrease in value, and the Company has not made any representation to Participant about the potential future value of the Management Incentive Units.

(b)    <u>Acknowledgments</u>.

(i)    As an inducement to the Company to grant the Management Incentive Units to Participant and as a condition thereto, Participant acknowledges and agrees that:

(A)    neither the grant of the Management Incentive Units to Participant hereunder nor any provision contained herein shall entitle Participant to remain in the employment of or continue to provide services (whether as a director, manager, consultant, independent contractor or otherwise) to the Company or its

Subsidiaries or affect the right of the Company or its Subsidiaries to terminate Participant's employment or service at any time;

(B)     other than as expressly set forth in the LLC Agreement, the Company shall have no duty or obligation to disclose to Participant, and Participant shall have no right to be advised of, any material information regarding the Company and its Subsidiaries at any time prior to, upon or in connection with the purchase of the Management Incentive Units upon the termination of Participant's employment with the Company or otherwise;

(C)     neither the grant of the Management Incentive Units to Participant hereunder nor any provision contained herein shall entitle Participant to receive or purchase any additional Management Incentive Units; and

(D)     the Company and Participant agree to treat Participant as the owner of the Management Incentive Units from the date of this Agreement, the Company agrees not to deduct any amount for the fair market value of the interest at the time of grant or as the Management Incentive Units vest, and Participant agrees to take into account the distributive share of income, gain, loss, deduction and credit associated with the Management Incentive Units in computing Participant's income tax liability from the date of this Agreement until Participant no longer holds the Management Incentive Units.

(ii)     The Company and Participant acknowledge and agree that this Agreement has been executed and delivered, and the Management Incentive Units have been granted hereunder, in connection with and as a part of the compensation and incentive arrangements between the Company and Participant.

(iii)     Participant acknowledges and agrees that the Management Incentive Units issued and acquired hereunder shall also be governed by, and have the terms, conditions, rights and obligations contained in, the LLC Agreement, to which Participant acknowledges and agrees he or she is a party.

3.     Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

"2.0x Qualified Sale" shall mean a Liquidity Event upon the consummation of which the Linden Cash Inflows equal or exceed 2.0 times the Linden Cash Outflows.

"2.5x Qualified Sale" shall mean a Liquidity Event upon the consummation of which the Linden Cash Inflows equal or exceed 2.5 times the Linden Cash Outflows.

"3.0x Qualified Sale" shall mean a Liquidity Event upon the consummation of which the Linden Cash Inflows equal or exceed 3.0 times the Linden Cash Outflows.

"Base Rate" means, as of any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

"Business" means the Company's, its Subsidiaries' and/or affiliates' businesses as conducted or as planned to be conducted as of the date hereof, including, without limitation, providing pharmacovigilance or compliance consulting services or regulatory affairs in the pharmaceutical, biotechnology or medical device industries and such additional businesses that the Company or any of its affiliates or Subsidiaries engage in at any time during Participant's employment with or provision of services to the Company or any of its Subsidiaries or affiliates (or any such business that the Company or any of its Subsidiaries or affiliates may have acquired during such time).

"Cause" means, with respect to Participant, any of the following: (i) the conviction of, or plea of nolo contendere to, any felony or any act or omission involving fraud, dishonesty or moral turpitude; (ii) any willful act or omission (including, without limitation, willful violations of applicable laws or regulations, acts of disloyalty to the Company or any of its affiliates, or professional misconduct) that results in, or would reasonably be expected to result in, material harm to the Company's or any of its affiliates' business or reputation; (iii) the failure to perform Participant's duties as an employee of or service provider to the Company or any of its Subsidiaries or comply with the lawful instructions of the Board or the Company's chief executive officer; (iv) the willful material breach, non-performance or non-observance of any of the terms of this Agreement or any other agreement with the Company or any of its Subsidiaries (other than a breach, non-performance or non-observance described in clause (v) below); or (v) any material breach, non-performance or non-observance of any agreement with the Company or any of its Subsidiaries in respect of non-competition, non-solicitation, confidentiality or the like; provided, however, that in the case of clauses (ii) and (iii) above, that the action or omission giving rise to Cause, to the extent capable of being cured, remains substantially uncured after ten days' written notice by the Board; provided further that, notwithstanding the foregoing, in the event that Participant is party to an employment or consulting agreement with the Company or any of its Subsidiaries and such agreement contains a definition of "Cause," then such definition will apply for purposes of this Agreement in lieu of the foregoing.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"Confidential Information" means the information, observations, and data (including trade secrets) obtained by Participant while employed by or providing services to the Company or its affiliates and Subsidiaries concerning the business or affairs of the Company, its Subsidiaries or any of its affiliates.

"Disability" means the permanent and total inability, due to illness, accident, injury, physical or mental incapacity or other disability, of Participant to carry out effectively Participant's duties and obligations to the Company or its Subsidiaries or to participate effectively and actively in the management of the Company and its Subsidiaries for a period of at least 120 consecutive days or for such shorter periods aggregating at least 180 days (whether or not consecutive) during any twelve-month period, as determined in the reasonable judgment of the Board; provided that, notwithstanding the foregoing, in the event that Participant is party to an employment or consulting agreement with the Company or any of its Subsidiaries and such agreement contains a definition of "Disability" or "Permanent Disability," then such definition will apply for purposes of this Agreement in lieu of the foregoing.

"Fair Market Value" means, with respect to any assets or property (including the Management Incentive Units), the fair market value thereof as of the valuation date as determined in good faith by the Board (with it being understood that the Board shall take into account all relevant factors determinative of value, including, without limitation, any other then-existing determinations of fair market value on or about the valuation date). For purposes of purchases under this Agreement due to the termination of Participant's employment or service without Cause or for Good Reason, death or Disability, the determination of Fair Market Value of any Management Incentive Units shall not include any lack of liquidity or minority interest discount.

"Good Reason" means, with respect to Participant, any of the following: (i) a reduction in Participant's then effective base salary (other than as a result of an across-the-board reduction generally affecting similarly situated employees); (ii) the non-renewal or non-extension of Participant's employment or service by the Company or its Subsidiaries; (iii) the relocation of Participant's principal place of work to a location more than fifty miles from Participant's present place of work; or (iv) any other material breach by the Company of its material obligations under this Agreement or any other agreement with the Company or any of its Subsidiaries which breach is not cured within fifteen days after receipt of written notice thereof by Participant to the Board, which notice must be received within thirty days of the occurrence of such event; provided that written notice of Participant's resignation for Good Reason must be delivered to the Board within thirty days after the occurrence of any such; provided further that, notwithstanding the foregoing, in the event that Participant is party to an employment or consulting agreement with the Company or any of its Subsidiaries and such agreement contains a definition of "Good Reason," then such definition will apply for purposes of this Agreement in lieu of the foregoing.

"Linden Cash Inflows" means, without duplication, as of any date, all cash payments or other Distributions received by the Linden Investors on or prior to such date with respect to debt or equity securities of the Company or its Subsidiaries purchased from the Company or its Subsidiaries or others prior to such date by the Linden Investors (whether such payments are received from the Company or any third party, and whether such payments are received as interest, dividends, proceeds with respect to the sale or redemption of such securities, upon a liquidation of the Company or its Subsidiaries or otherwise). For the avoidance of doubt, Linden Cash Inflows (i) shall not include any transaction or management fees or any expense reimbursements or the like received from time to time by the Linden Investors, and (ii) shall assume the exercise of all options, warrants and other rights to acquire equity interests of the Company (whether or not vested) and shall be calculated after giving effect to all payments to be made under any incentive plan, arrangement or other undertaking whereby the Company or any of its Subsidiaries has granted any incentive arrangement.

"Linden Cash Outflows" means, without duplication, the sum of all cash payments and cash investments and the Fair Market Value of all contributions-in-kind made by the Linden Investors to and in the Company and its Subsidiaries and to others to acquire debt and/or equity securities of the Company and its Subsidiaries.

"LLC Agreement" means the Company's Amended and Restated Limited Liability Company Agreement, as such may be amended or modified from time to time in accordance with its terms.

"Management Incentive Unit" (i) has the meaning ascribed to it in the LLC Agreement and (ii) includes all securities issued with respect to the Management Incentive Units referred to in clause (i) above and the securities referred to in this clause (ii) by way of a dividend or split or in connection with any conversion, merger, consolidation or recapitalization or other reorganization affecting such Management Incentive Units or other securities described in this clause (ii).

"Units" (i) has the meaning ascribed to it in the LLC Agreement and (ii) includes all securities issued with respect to the Units referred to in clause (i) above and the securities referred to in this clause (ii) by way of a dividend or split or in connection with any conversion, merger, consolidation or recapitalization or other reorganization affecting such Units or other securities described in this clause (ii).

4.    Vesting of Management Incentive Units.

(a)    General. The Management Incentive Units shall vest in accordance with this Section 4. Notwithstanding any other provision of this Agreement, no Management Incentive Units shall vest after the date on which Participant ceases to be employed by or providing services to the Company or its Subsidiaries for any reason (the "Termination," and the date of any such Termination, the "Termination Date").

(b)    Time Vesting. 25% of the Management Incentive Units (the "Time Vesting Units") issued to Participant under this Agreement (i.e., 2,011.591 Management Incentive Units) shall become vested over time as set forth in the following schedule, if (but only if) as of such date Participant has been continuously employed by or providing services to and is still employed by or providing services to the Company or its Subsidiaries from the date hereof through each such vesting date.

| Anniversary Date of this Agreement | Percentage Vested |
| --- | --- |
| First | 20% |
| Second | 20% |
| Third | 20% |
| Fourth | 20% |
| Fifth | 20% |

(c)    Performance Vesting. 75% of the Management Incentive Units (the "Performance Vesting Units") issued to Participant under this Agreement (i.e., 6,034.774 Management Incentive Units) shall become vested over time as follows, if (but only if) Participant has been continuously employed by or providing services to and is still employed by or providing services to the Company or its Subsidiaries from the date hereof through the consummation of a Liquidity Event:

(i)    33.34% of the Performance Vesting Units (i.e., 2,011.994 Management Incentive Units) will vest upon the Linden Investors' achievement of a 2.0x Qualified Sale in connection with a Liquidity Event.

(ii)    33.33% of the Performance Vesting Units (i.e., 2,011.390 Management Incentive Units) will vest upon the Linden Investors' achievement of a 2.5x Qualified Sale in connection with a Liquidity Event.

(iii)    33.33% of the Performance Vesting Units (i.e., 2,011.390 Management Incentive Units) will vest upon the Linden Investors' achievement of a 3.0x Qualified Sale in connection with a Liquidity Event.

(d)    No Partial Vesting; Accelerated Vesting.  There shall be no proportionate or partial vesting in the periods prior to each vesting date and all vesting shall occur only on the applicable vesting date; provided, that upon the occurrence of a Liquidity Event, 100% of the Time Vesting Units which have not yet become vested shall become vested as of such Liquidity Event if, as of such date, Participant has been continuously employed by or providing services to the Company or any of its Subsidiaries from the date hereof through and including such date. Notwithstanding anything to the contrary in this Agreement, the Board may, in its sole discretion, provide for accelerated vesting of the Management Incentive Units at any time.

5.    Right to Purchase Management Incentive Units Upon Termination of Employment.

(a)    Purchase of Management Incentive Units.  Upon Participant's Termination for any reason, (i) all or any portion of the vested Management Incentive Units, whether held by Participant or by one or more of Participant's permitted transferees, will be subject to repurchase, at the price determined in accordance with the provisions of Section 6, in each case by the Company and the Linden Investors pursuant to the terms and conditions set forth in this Section 5 (the "Purchase Option") and (ii) all of the unvested Management Incentive Units (whether held by Participant or one or more of Participant's permitted transferees) shall automatically be forfeited, effective as of the Termination Date, without any action on the part of Participant or the Company and without any consideration payable to Participant or any of Participant's permitted transferees, and after the Termination Date shall not be outstanding for any purpose.

(b)    Purchase by the Company.  The Company (or its designee) may elect to purchase all or any portion of the vested Management Incentive Units by delivery of written notice (the "Purchase Notice") to Participant or any other holders of Participant's Management Incentive Units at any time within six months after the Termination Date (the "Purchase Notice Period"). The Purchase Notice shall set forth the number and type of Management Incentive Units to be acquired from Participant and such other holder(s), the aggregate consideration to be paid for such Management Incentive Units and the time and place for the closing of the transaction. The number of Management Incentive Units to be purchased by the Company shall first be satisfied to the extent possible from the Management Incentive Units held by Participant at the time of delivery of the Purchase Notice. If the number of Management Incentive Units then held by Participant is less than the total number of Management Incentive Units the Company has elected to purchase, then the Company shall purchase the remaining Management Incentive Units elected to be purchased from the other holders thereof, pro rata according to the number of Management Incentive Units held by each such holder at the time of delivery of such Purchase Notice (determined as close as practical to the nearest whole Unit). The Company may assign its rights set forth in this Section 5(b) to any Person.

(c)    Purchase by the Linden Investors.  If for any reason the Company does not elect to purchase all of the Management Incentive Units pursuant to the Purchase Option, then the Linden Investors shall be entitled to exercise the Company's Purchase Option in the

manner set forth in Section 5(a) for all or any portion of the number of Management Incentive Units the Company has not elected to purchase (the "Available Units"). As soon as practicable after the Company has determined that there shall be Available Units, but in any event within forty-five days prior to the expiration of the Purchase Notice Period referred to in Section 5(b), the Company shall deliver written notice (the "Option Notice") to the Linden Investors setting forth the number of Available Units, each Linden Investor's pro rata share of the Available Units and the price for each Available Unit. The Linden Investors may elect to purchase all or any portion of the Available Units by delivering written notice to the Company within thirty days after receipt of the Option Notice from the Company. As soon as practicable, and in any event within five days after the expiration of such thirty-day period, the Company shall notify Participant and any other holder(s) of Management Incentive Units as to the number of Management Incentive Units being purchased from Participant by the Linden Investors (the "Supplemental Purchase Notice"). At the time the Company delivers the Supplemental Purchase Notice to Participant and such other holder(s) of Management Incentive Units, the Company shall also deliver written notice to the Linden Investors setting forth the number of shares the Linden Investors are entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction. The Linden Investors may assign their rights set forth in this Section 5(c) to any Person.

(d)     Closing of Purchase of Management Incentive Units. The closing of the purchase of Management Incentive Units pursuant to this Section 5 shall take place on the date designated by the Company in the Purchase Notice or Supplemental Purchase Notice, as the case may be, which date shall not be more than sixty days nor less than five days after the delivery of the later of either such notice to be delivered. At the closing, the purchaser or purchasers shall pay the purchase price in the manner specified in Section 6 and Participant and any other holders of Management Incentive Units being purchased shall deliver the certificate or certificates (if certificated) representing such Management Incentive Units to the purchaser or purchasers or their nominees, accompanied by duly executed "unit" powers (if applicable). Any purchaser of Management Incentive Units under this Section 5 shall be entitled to (i) receive customary representations and warranties from Participant and any other selling holders of Management Incentive Units regarding the sale of such Management Incentive Units (including representations and warranties regarding good title to such Management Incentive Units, free and clear of any liens or encumbrances) and (ii) require that signatures be guaranteed by a national bank or reputable securities broker.

(e)     Deemed Purchase. Upon delivery of the Purchase Notice or Supplemental Purchase Notice, as applicable, then from and after such time, the holder of such Management Incentive Units from whom such securities are to be purchased shall cease to have any rights as a holder of such securities (other than the right to receive payment of such consideration in accordance with Section 6), and such securities shall be deemed purchased in accordance with the applicable provisions hereof and the purchaser thereof shall be deemed the owner (of record and beneficially) and holder of such securities, whether or not the certificate (if certificated) representing such Management Incentive Units has been delivered as required by this Agreement.

(f)     Revocation of Election. Any election by the Company or the Linden Investors to purchase Management Incentive Units pursuant to this Section 5 shall be revocable by such Person (with respect to all or any portion of the Management Incentive Units elected to

be purchased) at any time prior to the closing of such purchase, without any liability whatsoever to such Person in respect of the rights and obligations in this <u>Section 5</u>.

(g)     <u>Termination of Purchase Option</u>. The repurchase right for the Units pursuant to this <u>Section 5</u> shall terminate when the Company (or its corporate successor) has sold its common securities pursuant to a Public Offering.

(h)     <u>No Election</u>. If the Company and the Linden Investors do not elect, in the aggregate, to purchase all of the Management Incentive Units, then the repurchase rights for the Management Incentive Units not purchased pursuant to this <u>Section 5</u> shall terminate and Participant or such other holders of Participant's Management Incentive Units shall hold such Management Incentive Units subject to the restrictions set forth in the LLC Agreement and any other applicable restrictions (including, but not limited to, the risk of forfeiture under <u>Section 6(b)</u>).

6.     <u>Purchase Price for Management Incentive Units</u>.

(a)     <u>Purchase Price</u>. The purchase price for each vested Management Incentive Unit shall be the Fair Market Value thereof as of the Termination Date, unless the Management Incentive Units are forfeited as provided in <u>Section 6(b)</u>.

(b)     <u>Forfeiture</u>. Participant's unvested Management Incentive Units are forfeited upon Participant's Termination. Participant's vested and unvested Management Incentive Units are forfeited if (i) Participant's Termination is effected by a termination of Participant's employment or services for Cause, or (ii) Participant breaches the terms of any agreement with the Company or any of its Subsidiaries in respect of non-competition, non-solicitation, confidentiality or the like.

(c)     <u>Manner of Payment</u>. If the Company elects to purchase all or any portion of the Management Incentive Units, including Management Incentive Units held by one or more transferees, the Company shall pay for such Management Incentive Units by certified check or wire transfer of funds to the extent such payment would not cause the Company or any of its Subsidiaries to violate the Delaware Act and would not cause the Company or any of its Subsidiaries to breach any agreement to which it is a party relating to the indebtedness for borrowed money or other material agreement (including any restricted payment covenant prohibiting direct or indirect distributions to the Company in order to effectuate such purchase) (each such restriction, a "<u>Restrictive Covenant</u>"). If any such Restrictive Covenant prohibits the purchase of Management Incentive Units hereunder which the Company is otherwise entitled to make, the time periods provided in <u>Section 5</u> shall be suspended, and the Company may make such purchases as soon as it is permitted to do so under such Restrictive Covenant. In addition, if any such Restrictive Covenant prohibits the purchase of Management Incentive Units hereunder with a cashier's or certified check or wire transfer of funds, or if the Company otherwise does not have sufficient available cash as determined by the Board in its sole discretion, then the Company may make such purchase of Management Incentive Units with a three-year junior subordinated note payable on the earlier to occur of maturity and the consummation of a Liquidity Event, bearing interest (payable at maturity or upon the consummation of a Liquidity Event, as the case may be) at a simple rate per annum equal to the Base Rate (a "<u>Junior Subordinated Note</u>"). Any Junior Subordinated Note issued by the

Company pursuant to this <u>Section 6(c)</u> shall be subject to any Restrictive Covenants and any subordination provisions required by the Company's and its Subsidiaries' senior and subordinated lenders and may be prepaid without premium or penalty at the election of the Company to the extent permitted by the Company's and its Subsidiaries' loan agreements and related documents with the Company's and its Subsidiaries' senior and subordinated lenders. In addition, the Company may pay the purchase price for such Management Incentive Units by offsetting amounts outstanding under any indebtedness or obligations owed by Participant to the Company or any of its Subsidiaries. If the Linden Investors elect to purchase all or any portion of the Available Units, the Linden Investors shall pay for that portion of such Management Incentive Units by certified check or wire transfer of funds.

    7. <u>Restrictions on Transfer of Management Incentive Units</u>.

      (a) <u>Transfer of Management Incentive Units</u>. Participant will not Transfer any interest in any Management Incentive Units, except as otherwise permitted (i) pursuant to the provisions hereof and (ii) pursuant to the LLC Agreement.

      (b) <u>Termination of Restrictions</u>. The restrictions on the Transfer of Management Incentive Units set forth in this Agreement shall continue with respect to each Management Incentive Unit until the earlier of (i) the date on which such Management Incentive Unit has been transferred in a Public Offering and (ii) the consummation of an Approved Sale.

      (c) <u>Transfers in Violation of Agreement.</u> Any Transfer or attempted Transfer of any Management Incentive Units in violation of any provision of this Agreement shall be void, and the Company shall not record such Transfer on its books or treat any purported transferee of such Management Incentive Units as the owner of such shares for any purpose.

    8. <u>Restrictive Covenants</u>.

      (a) <u>Non-Competition; Non-Solicitation; Business Disparagement</u>.

        (i) In further consideration of the issuance of the Management Units to Participant hereunder, Participant acknowledges that during the course of Participant's provision of services to the Company and its affiliates, Participant shall become familiar with the trade secrets of the Company and its affiliates and with other Confidential Information concerning the Company and its predecessors and its affiliates and that Participant's services shall be of special, unique and extraordinary value to the Company and its affiliates, and therefore, Participant agrees that, during the term of Participant's employment with the Company and its affiliates and for two (2) years thereafter (the "<u>Restricted Period</u>"), Participant shall not directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor, member or stockholder of any Person, engage in any business activity within the the United States or Canada, which is directly or indirectly in competition with the Business of the Company or which is directly or indirectly detrimental to the Business or business plans of the Company or its affiliates; provided, however, that the record or beneficial ownership by Participant of five percent (5%) or less of the outstanding publicly traded capital stock of any company for investment purposes shall not be deemed to be in violation of this <u>Section 8(a)(i)</u> so long as Participant is not an officer, director, employee or consultant of such Person.

(ii)     Participant hereby agrees that during the term of Participant's employment with the Company and its affiliates and for the Restricted Period, Participant shall not in any capacity, either separately or in association with others: (1) employ, engage, recruit or solicit for employment or engagement, any Person or agent who is then employed or retained by the Company or any of its respective affiliates (or who was so employed or retained at any time within the one year prior to the date Participant employs or seeks to employ such Person); (2) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer, agent, consultant or any other Person that has a business relationship with the Company or any of its respective affiliates at any time during the Restricted Period, to discontinue or reduce or modify the extent of such relationship with the Company; (3) utilize any of the Company's or any of its respective affiliates' intellectual property, including without limitation, marketing concepts, office layouts, software and systems configurations, business plans or advertising schemes; and (4) submit, solicit, encourage or discuss any proposal, plan or offer to acquire an interest in any of the Company or any of its respective affiliates' identified potential acquisition candidates.  Notwithstanding the above, general solicitations not directed at the employees of the Company or its affiliates will not constitute a violation of this Section 8(a)(ii).

(b)     Intellectual Property, Inventions and Patents. Participant acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) which relate to the Company's or any of its affiliates' actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by Participant (whether alone or jointly with others) during the period of Participant's employment with or provision of services to the Company and/or its affiliates ("Work Product"), belong to the Company or such affiliate. Participant shall promptly disclose such Work Product to the Board and, at the Company's expense, perform all actions reasonably requested by the Board (whether during or after the term of Participant's employment with or provision of services to the Company and/or its affiliates) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorney and other instruments).

(c)     If, at the time of enforcement of Sections 8(a), (b) or (c), a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

(d)     For so long as Participant holds Management Incentive Units and thereafter, Participant shall not directly or indirectly through another entity make any public statement that is intended to or could reasonably be expected to disparage the Company or its Subsidiaries or affiliates or any of their respective businesses, products, services, equityholders, directors, managers, officers or employees.

- 11 -

(e)      Participant acknowledges that the restrictions contained in this Section 8 are reasonable and that Participant has been provided an opportunity to review the provisions of this Agreement with Participant's legal counsel.

(f)      Participant consents and agrees that, in the event of the breach or a threatened breach by Participant of any of the provisions of this Agreement, the Company and its affiliates would sustain irreparable harm and that damages at law would not be an adequate remedy for a violation of this Agreement, and, in addition to any other rights or remedies that the Company may have under this Agreement, common or statutory law or otherwise, the Company shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction enforcing this Agreement and/or restraining Participant from committing, threatening to commit, or continuing any violation of this Agreement (in each case without posting a bond or other security), including, but not limited to, restraining Participant from disclosing, using for any purpose, selling, transferring, or otherwise disposing of, in whole or in part, any Confidential Information.  In addition, in the event of a breach or violation by Participant of the provisions of this Section 8, the Restricted Period shall be automatically extended by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured.  Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for any breach or threatened breach of any provision of this Agreement, including, but not limited to, the recovery of damages, costs, and fees.

9.      Power of Attorney. Participant constitutes, appoints and grants the Company with full power to act as its true and lawful representative and attorney-in-fact, in its name, place and stead to assign and transfer the Management Incentive Units to the appropriate acquirer thereof pursuant to Section 5 and under no other circumstances and to take all related actions and execute all related documents and instruments on behalf of the Participant in furtherance of the foregoing. The powers of attorney granted herein shall be deemed to be coupled with an interest and irrevocable.

10.      Adjustments of Numbers. All numbers set forth herein which refer to Unit prices or amounts will be appropriately adjusted to reflect Unit splits, Unit dividends, combinations of Units and other recapitalizations affecting the subject class of Units.

11.      Notices. Any notice hereunder to the Company shall be addressed to the Company's principal executive office, Attention: Board of Managers, and any notice hereunder to Participant shall be addressed to Participant at Participant's last address on the records of the Company, subject to the right of either party to designate at any time hereafter in writing some other address. Any notice shall be deemed to have been duly given when delivered personally, one day following dispatch if sent by reputable overnight courier, fees prepaid, or three days following mailing if sent by registered mail, return receipt requested, postage prepaid and addressed as set forth above.

12.      Binding Effect. This Agreement shall be binding upon and inure to the benefit of any successors and assigns to the Company and all Persons lawfully claiming under Participant. Any permitted transferee of the Management Incentive Units shall obtain such Management Incentive Units subject to the limitations and restrictions contained in this Agreement.

13.    <u>Governing Law</u>. The validity, construction, interpretation, administration and effect of this Agreement shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

14.    <u>Descriptive Headings</u>. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

15.    <u>Electronic Delivery</u>. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties hereto. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

16.    <u>Company References</u>. All rights of the Company and its affiliates hereunder may, at the request of the Company or such affiliates, be exercised in whole or in part by one or more affiliates or designees of the Company or its affiliates.

17.    <u>Remedies</u>. The parties hereto (and the Linden Investors as third-party beneficiaries) shall be entitled to enforce their rights under this Agreement specifically, to recover damages and costs (including attorney's fees) by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto acknowledge and agree that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party hereto (and the Linden Investor as a third-party beneficiary), in its sole discretion, shall be entitled to specific performance and/or injunctive relief (without posting bond or other security) from any court of law or equity of competent jurisdiction in order to enforce or prevent any violation of the provisions of this Agreement.

18.    <u>Amendment</u>. The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and the Participant or the holders of a majority of the Management Incentive Units.

19.    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

20.    <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same Agreement.

21.     <u>Taxes</u>. Notwithstanding anything contained in this Agreement (or any other agreement between Participant and the Company or any of its affiliates) to the contrary, the Company and its affiliates shall be entitled to deduct and withhold from any amounts distributable to or with respect to the Management Incentive Units or any proceeds from the sale or other disposition of the Management Incentive Units (or any other amounts due or that may become due to Participant from the Company or any of its affiliates, including from the Participant's wages, compensation, or benefits) as may be required by the Code, or under any foreign, state, or local law, in connection with the issuance, vesting, modification, adjustment, disposition or otherwise with respect to the Management Incentive Units. In the event that the Company or its affiliates does not make such deductions or withholdings, Participant shall indemnify the Company and its affiliates for any amounts paid or payable by the Company or any of its affiliates with respect to any such taxes, together with any interest, penalties and additions to tax and any related expenses thereto.

22.     <u>Offset</u>. Notwithstanding anything contained in any agreement between Participant and the Company or any of its Subsidiaries to the contrary and regardless of whether such amounts are being paid hereunder or pursuant to another agreement between Participant and the Company or any of its Subsidiaries, whenever the Company or any of its Subsidiaries is to pay any sum to Participant or any of Participant's affiliates or related persons, any amounts that Participant or such affiliate or related person owes or may owe to the Company or any Subsidiary thereof, may be deducted from that sum before payment.

23.     <u>Construction</u>. References herein to this Agreement and any other agreement shall be references to such agreement, as amended, modified, supplemented or waived from time to time.

*     *     *     *     *

IN WITNESS WHEREOF, the Company and Participant have executed this Management Incentive Unit Agreement as of the date first above written.

<u>THE COMPANY</u>:

PROPHARMA GROUP TOPCO, LLC

By: _____
Name:
Its:

<u>PARTICIPANT</u>:

_____
Patrick K. Donnelly

EXHIBIT A

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Joinder

The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company"), as amended and in effect from time to time (the "LLC Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the LLC Agreement.

By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party thereto, and shall accept and be subject to, and comply with the terms, conditions and provisions of the LLC Agreement as a "Member" and a holder of "Units" thereunder, and shall be entitled to the rights and benefits and subject to the duties and obligations of a Member and a holder of such Units thereunder in the same manner as if the undersigned was an original signatory to the LLC Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of _____, 20___.


_____
Patrick K. Donnelly


Acknowledged and Agreed to by:

PROPHARMA GROUP TOPCO, LLC


By: _____
Name:
Its:

EXHIBIT B

_____, 20___

### PROTECTIVE ELECTION TO INCLUDE MEMBERSHIP INTEREST IN GROSS INCOME PURSUANT TO SECTION 83(b) OF THE INTERNAL REVENUE CODE

On _____, 20___, the undersigned acquired a limited liability company membership interest (the "Membership Interest") in ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company"). Pursuant to the Amended and Restated Limited Liability Company Agreement of the Company, the undersigned is entitled to an interest in Company capital exactly equal to the amount paid therefor and an interest in Company profits.

Based on current Treasury Regulation §1.721-1(b), Proposed Treasury Regulation §1.721-1(b)(1), and Revenue Procedures 93-27 and 2001-43, the undersigned does not believe that issuance of the Membership Interest to the undersigned is subject to the provisions of §83 of the Internal Revenue Code (the "Code"). In the event that the sale is so treated, however, the undersigned desires to make an election to have the receipt of the Membership Interest taxed under the provisions of Code §83(b) at the time the undersigned acquired the Membership Interest.

Therefore, pursuant to Code §83(b) and Treasury Regulation §1.83-2 promulgated thereunder, the undersigned hereby makes an election, with respect to the Membership Interest, to report as taxable income for the calendar year 20___ the excess (if any) of the value of the Membership Interest on _____, 20___ over the purchase price thereof.

The following information is supplied in accordance with Treasury Regulation § 1.83-2(e):

1. The name, address and social security number of the undersigned:

   Name:         Patrick K. Donnelly
   Address:      8 Church St,
                 Charleston, SC 29401
   Soc. Sec. No.: 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

2. A description of the property with respect to which the election is being made: 8,046.365 of the Company's Management Incentive Units representing a membership interest in the Company entitling the undersigned to an interest in the Company's capital exactly equal to the amount paid therefore and an interest in Company profits.

3. The date on which the Membership Interest was transferred: _____, 20___. The taxable year for which such election is made: 20___.

4. The restrictions to which the property is subject: If the undersigned ceases to be employed by or provide services to the Company or any of its subsidiaries, the unvested, and in certain circumstances, the vested portion of the Management Incentive Units will be subject to forfeiture without payment of any consideration and in other circumstances the vested

portion of the Management Incentive Units will be subject to repurchase by the Company at a price equal to the fair market value.

5.      The fair market value on _____, 20____ of the property with respect to which the election is being made, determined without regard to any lapse restrictions and in accordance with Revenue Procedure 93-27: $0.00 per Management Incentive Unit.

6.      The amount paid or to be paid for such property: $0.00 per Management Incentive Unit.

*        *        *        *        *

A copy of this election is being furnished to the Company pursuant to Treasury Regulation § 1.83-2(e)(7). A copy of this election will be submitted with the federal income tax return of the undersigned pursuant to Treasury Regulation § 1.83-2(c).

Dated: _____, 20____

_____
Patrick K. Donnelly

EXHIBIT C

## SPOUSAL CONSENT

       The undersigned spouse of Patrick K. Donnelly ("Participant" or "my spouse") hereby acknowledges that I have read the foregoing Management Incentive Unit Agreement executed by Participant and dated as of the date hereof, as well as the Company's Amended and Restated Limited Liability Company Agreement referred to therein, and that I understand their contents. I am aware that the foregoing Management Incentive Unit Agreement and the Amended and Restated Limited Liability Company Agreement provide for the forfeiture, sale or repurchase of my spouse's Management Incentive Units under certain circumstances and/or impose other restrictions on such securities (including restrictions on transfer). I agree that my spouse's interest in these securities is subject to these restrictions and any interest that I may have in such securities shall be irrevocably bound by these agreements and further, that my community property interest, if any, shall be similarly bound by these agreements.


_____ Date: _____, 20\_\_\_\_

Spouse's Name:_____


_____ Date: _____, 20\_\_\_\_

Witness' Name:_____

# EXHIBIT C

ProPharma Group
*Incentive Equity – Pat Donnelly*

| Value of Incentive Equity[1] | | MOIC Valuation | |
|---|---|---|---|
| | **At 6/30/2019** | | **At 6/30/2019** |
| Fully Diluted Time Units | 2,011.591 | LTM EBITDA | $33.9 |
| *% of Time Units Vested [2]* | *60.0%* | EBITDA Multiple | 13.9x |
| **Total Vested Time Units** | **1,206.955** | **Total Enterprise Value** | **$472.5** |
| | | | |
| 2.0x Vested Performance Units | 2,011.994 | Less: Net Debt | ($189.5) |
| 2.5x Vested Performance Units | 2,011.390 | **Total Equity Value** | **$283.1** |
| **Total Vested Performance Units** | **4,023.384** | | |
| | | Less: Preferred Equity | ($129.2) |
| Total Vested Time Units | 1,206.955 | **Total Common Equity Value** | **$153.9** |
| Total Vested Performance Units | 4,023.384 | | |
| **Total Vested Incentive Units** | **5,230.339** | *Linden Common Ownership %* | *73.2%* |
| | | **LCP Common Equity Value** | **$112.7** |
| LCP Investment | $87.0 | | |
| (x) MOIC | 2.5x | Plus: LCP Preferred Equity and Realized Returns | $104.8 |
| Total LCP Equity Value | $217.4 | **Total LCP Equity Value** | **$217.4** |
| Less: LCP Preferred Equity and Realized Returns | (104.8) | | |
| LCP Common Equity Value | $112.7 | LCP Investment | $87.0 |
| *LCP Common Ownership %* | *73.2%* | **MOIC** | **2.5x** |
| **Total Common Equity Value** | **$153.9** | | |
| Fully Diluted Shares Outstanding[3] | 1,167,540 | | |
| **Current FMV / Unit** | **$131.78** | | |
| | | | |
| Strike Price / Unit | $1.00 | | |
| Current FMV / Unit | $131.78 | | |
| Net Value / Unit | $130.78 | | |
| Total Vested Incentive Units | 5,230.339 | | |
| **Total Value** | **$684,008** | | |

*Note: $ in millions, except per unit figures*

*(1) Valued at Linden's implied mark as of June of 2.5x.*

*(2) Represents 3/5 of total time vesting incentive units.*

*(3) Represents all Class A common units, all time vesting incentive units, and the 2.0x and 2.5x tranches of the performance incentive units.*

# EXHIBIT D

September 3, 2019

ProPharma Group Topco, LLC
8717 W. 110th Street
Suite 300
Overland Park, KS 66210

c/o Linden Capital Partners III LP
c/o Linden LLC
150 N. Riverside Plaza
Suite 5100
Chicago, IL 60606

To whom it may concern:

  Reference is hereby made to the Amended and Restated Limited Liability Company Agreement of ProPharma Group Topco, LLC (the "Company"), dated as of September 30, 2018, by and among the Company, the undersigned and the other parties signatory thereto (the "LLC Agreement"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the LLC Agreement.

  Pursuant to Section 5.2(b) of the LLC Agreement, the undersigned hereby removes Patrick Donnelley from the Board and all Sub Boards effective as of August 31, 2019.

       Sincerely,

       LINDEN CAPITAL PARTNERS III LP

       By:  Linden Manager III LP
       Its:  General Partner

       By:  Linden Capital III LLC
       Its:  General Partner

       By: _____
       Name: Michael Farah
       Its:  Authorized Signatory

       LINDEN CAPITAL PARTNERS III-A LP

       By:  Linden Manager III LP
       Its:  General Partner

       By:  Linden Capital III LLC
       Its:  General Partner

       By: _____
       Name: Michael Farah
       Its:  Authorized Signatory

# EXHIBIT E

EXECUTION VERSION

_____

PROPHARMA GROUP TOPCO, LLC

_____

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of September 30, 2016

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

CERTAIN OF THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MAY ALSO BE SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, VESTING PROVISIONS, REPURCHASE OPTIONS, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH HEREIN AND/OR IN A SEPARATE AGREEMENT WITH THE INITIAL HOLDER OF SUCH UNITS. A COPY OF SUCH AGREEMENT(S) MAY BE OBTAINED BY THE HOLDER OF SUCH UNITS UPON WRITTEN REQUEST AND WITHOUT CHARGE.

**ENCLOSURE 1**

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................................ 1

ARTICLE II ORGANIZATIONAL MATTERS ............................................................................. 12
    2.1     Formation of Holdings LLC ............................................................................ 12
    2.2     Limited Liability Company Agreement ........................................................... 12
    2.3     Name ................................................................................................................ 13
    2.4     Purpose ............................................................................................................ 13
    2.5     Principal Office; Registered Office ................................................................. 13
    2.6     Term ................................................................................................................. 13
    2.7     No State-Law Partnership ............................................................................... 13

ARTICLE III CAPITAL CONTRIBUTIONS ................................................................................ 13
    3.1     Unitholders ...................................................................................................... 13
    3.2     Capital Accounts ............................................................................................. 17
    3.3     Negative Capital Accounts ............................................................................. 18
    3.4     No Withdrawal ................................................................................................ 18
    3.5     Loans From Unitholders ................................................................................. 18
    3.6     Distributions In-Kind ...................................................................................... 19
    3.7     Compliance with Section 1.704-1(b) ............................................................. 19
    3.8     Transfer of Capital Accounts ......................................................................... 19
    3.9     Management Incentive Units ........................................................................... 19

ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS; REDEMPTION AND
CONVERSIONS ............................................................................................................................ 21
    4.1     Distributions .................................................................................................... 21
    4.2     Allocations ...................................................................................................... 23
    4.3     Special Allocations ......................................................................................... 23
    4.4     Offsetting Allocations ..................................................................................... 24
    4.5     Tax Allocations ............................................................................................... 24
    4.6     Indemnification and Reimbursement for Payments on Behalf of a Unitholder ............ 25
    4.7     Preferred Unit Redemptions ........................................................................... 25
    4.8     Conversion of Preferred Units ........................................................................ 26

ARTICLE V MANAGEMENT ....................................................................................................... 27
    5.1     Authority of Board .......................................................................................... 27
    5.2     Composition of the Board ............................................................................... 30
    5.3     Board Actions; Meetings ................................................................................ 31
    5.4     Delegation of Authority .................................................................................. 32
    5.5     Purchase of Units ............................................................................................ 32
    5.6     Limitation of Liability .................................................................................... 32
    5.7     Lending Agreements ....................................................................................... 33

ARTICLE VI RIGHTS AND OBLIGATIONS OF UNITHOLDERS AND MEMBERS ............ 33
    6.1     Limitation of Liability .................................................................................... 33
    6.2     Lack of Authority ........................................................................................... 33
    6.3     No Right of Partition ....................................................................................... 33
    6.4     Indemnification ............................................................................................... 33

i

6.5    Members Right to Act ...................................................................................... 34
6.6    Investment Opportunities and Conflicts of Interest ......................................... 35
6.7    No Impairment of Rights ................................................................................. 36

ARTICLE VII BOOKS, RECORDS, ACCOUNTING AND REPORTS; INSPECTION ....................... 36
7.1    Records and Accounting .................................................................................. 36
7.2    Tax Reports ..................................................................................................... 36
7.3    Transmission of Communications .................................................................... 36
7.4    Financial Statements ....................................................................................... 36

ARTICLE VIII TAX MATTERS ..................................................................................................... 37
8.1    Tax Returns ..................................................................................................... 37
8.2    Tax Elections .................................................................................................. 37
8.3    Tax Controversies ........................................................................................... 37
8.4    New Partnership Audit Rules .......................................................................... 37
8.5    Code Section 83 Safe Harbor Election ............................................................ 38

ARTICLE IX TRANSFER OF UNITS; REPURCHASE OF UNITS ................................................ 38
9.1    Transfer Restrictions ....................................................................................... 38
9.2    Tag Along Rights ............................................................................................ 39
9.3    Approved Sale; Drag Along Obligations ......................................................... 40
9.4    Effect of Assignment ...................................................................................... 43
9.5    Additional Restrictions on Transfer ................................................................ 43
9.6    Legend ............................................................................................................ 44
9.7    Transfer Fees and Expenses ............................................................................ 44
9.8    Void Transfers ................................................................................................ 45
9.9    Conversion to Corporate Form Upon a Public Offering ................................... 45
9.10   Holdback Agreement ...................................................................................... 47
9.11   Forfeiture of Common Units ............................................................................ 47

ARTICLE X ADMISSION OF MEMBERS ..................................................................................... 47
10.1   Substituted Members ....................................................................................... 47
10.2   Additional Members ....................................................................................... 47

ARTICLE XI WITHDRAWAL AND RESIGNATION OF UNITHOLDERS .................................... 47
11.1   Withdrawal and Resignation of Unitholders .................................................... 47

ARTICLE XII DISSOLUTION AND LIQUIDATION ..................................................................... 48
12.1   Dissolution ..................................................................................................... 48
12.2   Liquidation and Termination ........................................................................... 48
12.3   Securityholders Agreement ............................................................................. 49
12.4   Cancellation of Certificate .............................................................................. 49
12.5   Reasonable Time for Winding Up ................................................................... 49
12.6   Return of Capital ............................................................................................ 49
12.7   Hart-Scott-Rodino .......................................................................................... 49

ARTICLE XIII VALUATION ......................................................................................................... 50
13.1   Valuation of Company Securities .................................................................... 50
13.2   Valuation of Other Assets and Securities ........................................................ 50

ARTICLE XIV GENERAL PROVISIONS ....................................................................................... 50

14.1   Power of Attorney.................................................................................. 50
14.2   Amendments ........................................................................................... 51
14.3   Title to Holdings LLC Assets ................................................................. 51
14.4   Remedies ................................................................................................ 51
14.5   Successors and Assigns .......................................................................... 51
14.6   Severability ............................................................................................ 51
14.7   Counterparts; Binding Agreement .......................................................... 52
14.8   Descriptive Headings; Interpretation ...................................................... 52
14.9   Applicable Law ...................................................................................... 52
14.10  Addresses and Notices ........................................................................... 52
14.11  Creditors ................................................................................................ 52
14.12  Waiver .................................................................................................... 53
14.13  Further Action ........................................................................................ 53
14.14  Offset ..................................................................................................... 53
14.15  Entire Agreement ................................................................................... 53
14.16  Opt-in to Article 8 of the Uniform Commercial Code............................. 53
14.17  Delivery by Facsimile, Electronic Mail or Comparable Electronic Transmission ........... 53
14.18  MUTUAL WAIVER OF JURY TRIAL.................................................. 53
14.19  Survival .................................................................................................. 54
14.20  Expenses ................................................................................................ 54
14.21  Acknowledgments .................................................................................. 54

SCHEDULES

Schedule of Unitholders

PROPHARMA GROUP TOPCO, LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, is entered into as of September 30, 2016 by and among the Members (as defined below).

WHEREAS, the Limited Liability Company Agreement of Holdings LLC was entered into as of September 28, 2016 (the "Prior Agreement");

WHEREAS, in connection with the transactions contemplated by the Acquisition Agreement (as defined below), the Linden Investors, the Lender Investors and the Rollover Investor are entering into this Agreement to amend and restate the Prior Agreement in its entirety.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE I

DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the following meanings:

"Acquisition Agreement" means the Equity Purchase Agreement, dated as of September 30, 2016, by and among the Rollover Investor, JCDP-2, LLC, a Delaware limited liability company, Tarsus BioPharma, LLC, a Kansas limited liability company, Holdings LLC, Linden Buyer and Linden Splitter (as amended or modified from time to time).

"Additional Member" means a Person admitted to Holdings LLC as a Member pursuant to Section 10.2.

"Adjusted Capital Account Deficit" means with respect to any Capital Account as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero. For this purpose, such Person's Capital Account balance shall be (i) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and (ii) increased for any amount such Person is obligated to contribute or is treated as being obligated to contribute to Holdings LLC pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and 1.704-2(i) (relating to Minimum Gain).

"Affiliate" of any particular Person means (i) any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, and (ii) if such Person is a partnership or limited liability company (other than Holdings LLC or any of its Subsidiaries), any partner or member thereof.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as amended, modified or waived from time to time in accordance with the terms hereof.

"Applicable Tax Rate" means, with respect to the applicable calendar year and the taxable income in question, the rate determined by the Board to be the sum of the highest maximum marginal federal,

state and local income Tax rates then applicable to any holder or indirect holder of Units (or its partners or members, as applicable) based on the information available to the Board (taking into account the character of the relevant Taxable income and any deductibility of state and local income Tax for federal income Tax purposes).

"Approved Sale" has the meaning set forth in Section 9.3(a).

"Assignee" means a Person to whom Units have been Transferred in accordance with the terms of this Agreement and the other agreements contemplated hereby, but who has not become a Member pursuant to Article X.

"Authorization Date" has the meaning set forth in Section 9.2(a).

"Base Rate" means, as of any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

"Board" means the Board of Managers of Holdings LLC established pursuant to Section 5.2.

"Book Value" means, with respect to any Holdings LLC property, Holdings LLC's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Sections 1.704-1(b)(2)(iv)(d)-(g). For the avoidance of doubt, the initial Book Value of any asset contributed to Holdings LLC shall be the Fair Market Value of such asset at the time it is contributed to Holdings LLC.

"Business" means Holdings LLC's and its Subsidiaries' businesses on the date hereof, including, without limitation, the business of providing medical information, pharmacovigilance or compliance consulting services or regulatory affairs in the pharmaceutical, biotechnology or medical device industries.

"Capital Account" means the capital account maintained for a Unitholder pursuant to Section 3.2.

"Capital Contributions" means any cash, cash equivalents, promissory obligations or the Fair Market Value of other property which a Unitholder contributes or is deemed to have contributed to Holdings LLC with respect to any Unit pursuant to Section 3.1.

"Certificate" means Holdings LLC's Certificate of Formation as filed with the Secretary of State of Delaware.

"Certificated Units" has the meaning set forth in Section 3.1(a).

"CIV Securities" shall have the meaning set forth in Section 9.3(e).

"Class A Common Unit" means a Unit having the rights and obligations specified with respect to Class A Common Units in this Agreement.

"Class B Common Unit" means a Unit having the rights and obligations specified with respect to Class B Common Units in this Agreement, subject to the second sentence of the definition of "Common Unit".

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

2

"Common Unit" means a Class A Common Unit or a Class B Common Unit or such other class of Unit designated by the Board to be a Common Unit; provided that, except as indicated in the following proviso, a "Common Unit" will not include a Management Incentive Unit unless and until such Management Incentive Unit becomes a Vested Common Unit; provided, further, that, for purposes of Section 3.9(a), a "Common Unit" will include a Management Incentive Unit even if such Management Incentive Unit is an Unvested Common Unit. Notwithstanding anything to the contrary set forth in this Agreement, an Unvested Common Unit shall not be entitled to any Distributions (other than Tax Distributions) and shall have no voting, consent or similar rights under this Agreement or under the Delaware Act unless and until such Common Unit becomes a Vested Common Unit.

"Company" means ProPharma Group Holdings, LLC, a Delaware limited liability company, and any successor thereto (whether by merger, conversion, consolidation, recapitalization, reorganization or otherwise).

"Confidential Information" means any information concerning the business and affairs of Holdings LLC or any of its Subsidiaries that is not generally available to the public.

"Conversion Notice" has the meaning set forth in Section 4.8(a).

"Conversion Units" means (i) with respect to a Public Offering of Holdings LLC (or any corporate successor thereto), Common Units or such other common equity securities of Holdings LLC (or any corporate successor thereto) that are sold pursuant to such Public Offering, and (ii) with respect to a Public Offering of the Company (or any successor thereto), common stock or such other common equity securities of the Company (or any successor thereto) that are sold pursuant to such Public Offering.

"Corporate Conversion" has the meaning set forth in Section 9.9(b).

"Corporate Investment Vehicle" means any Linden Corporate Investment Vehicle or any other corporation formed by any other Unitholder or any Affiliate thereof that holds, directly or indirectly, Units of Holdings LLC and each of their respective transferees or Affiliates designated by such Corporate Investment Vehicle to be included as a Corporate Investment Vehicle.

"Credit Agreement" means that certain Credit Agreement, dated as of the date hereof, by and among the Company, ProPharma Group, ProPharma PV, Inc., ProPharma MIS, LLC, each other Subsidiary of the Company that may from time to time become party hereto as a borrower, the financial institutions that are or may from time to time become parties hereto and Monroe, as administrative agent and security trustee.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del.L. § 18-101, et seq., as it may be amended from time to time, and any successor to the Delaware Act.

"Dispute Notice" has the meaning set forth in Section 9.4.

"Distribution" means each distribution made by Holdings LLC to a Unitholder, whether in cash, property or securities of Holdings LLC and whether by liquidating distribution, redemption, repurchase or otherwise; provided that none of the following shall be a Distribution: (i) any redemption or repurchase by Holdings LLC of any securities of Holdings LLC in connection with the termination of employment of an employee of Holdings LLC or any of its Subsidiaries or any service provider of Holdings LLC or any of its Subsidiaries, or (ii) any recapitalization, exchange or conversion of securities of Holdings LLC, and any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise).

3

"Eligible Service Provider" has the meaning set forth in Section 3.9(a).

"Employment Agreement" means any employment agreement, consulting agreement, confidentiality agreement, noncompete agreement, nonsolicit agreement or any similar agreement among a Management Investor and Holdings LLC and/or any of its Subsidiaries, each as amended, modified or waived from time to time.

"Equity Agreement" has the meaning set forth in Section 3.1(b).

"Equity Securities" means (i) units (including, without limitation, the Preferred Units and Common Units), stock or other equity interests in Holdings LLC (including, without limitation, other classes, groups or series thereof having such relative rights, powers, and/or obligations as may from time to time be established by the Board, including rights, powers, and/or duties different from, senior to or more favorable than existing classes, groups and series of units, stock and other equity interests in Holdings LLC, and including, without limitation, any so-called "profits interests"), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into units, stock or other equity interests in Holdings LLC, and (iii) warrants, options or other rights to purchase or otherwise acquire units, stock or other equity interests in Holdings LLC.

"Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in Holdings LLC.

"Excluded Unitholder" has the meaning set forth in Section 3.1(c)(i).

"Executive Manager" has the meaning set forth in Section 5.2.

"Exempt Transfers" has the meaning set forth in Section 9.1.

"Fair Market Value" means, with respect to any asset or equity interest, its fair market value determined according to Article XIII.

"Family Group" means, as to any particular Person, (i) such Person's spouse and descendants (whether natural or adopted), (ii) any trust solely for the benefit of such Person and/or such Person's spouse and/or descendants and (iii) any partnerships or limited liability companies where the only partners or members are such Person and/or such Person's spouse and/or descendants.

"Fiscal Period" means any interim accounting period within a Taxable Year established by the Board and which is permitted or required by Code Section 706.

"Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Board or as required by the Code.

"Fiscal Year" means the calendar year ending on December 31, or such other annual accounting period as may be established by the Board or as required by the Code.

"Forfeiture Allocations" has the meaning set forth in Section 4.2.

"Founder Manager" has the meaning set forth in Section 5.2(a)(i)(D).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Hargroves" means Thomas J. Hargroves.

"Hargroves Employment Agreement" means that certain Employment Agreement, dated as of the date hereof, by and between ProPharma Group and Hargroves.

"Holdings Income Amount" has the meaning set forth in Section 4.1(a).

"Holdings LLC" means ProPharma Group Topco, LLC, a Delaware limited liability company.

"Holdings Total Equity Value" means the aggregate proceeds which would be received by the Unitholders if: (i) the assets of Holdings LLC as a going concern were sold at their Fair Market Value; (ii) Holdings LLC satisfied and paid in full all of its obligations and liabilities (including all Taxes, costs and expenses incurred in connection with such transaction and any reserves established by the Board for contingent liabilities); and (iii) such net sale proceeds were then distributed in accordance with Section 4.1(b), all as determined by the Board. When determined in connection with a Sale of Holdings LLC or a Sale of the Company, Holdings Total Equity Value shall be derived from the consideration paid in connection with such Sale of Holdings LLC or a Sale of the Company.

"HSR Act" has the meaning set forth in Section 12.7.

"Indebtedness" means at a particular time, without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course of business which are not more than 120 days past due), (iv) capitalized lease obligations, (v) any commitment by which a Person assures a creditor against loss (including, without limitation, contingent reimbursement obligations with respect to letters of credit), and (vi) any credit or loan agreement or facility or other agreement, instrument or document evidencing, creating or relating to any of the foregoing.

"Indemnified Person" has the meaning set forth in Section 6.4(a).

"Independent Third Party" means any Person who, immediately prior to the contemplated transaction, (i) does not own, directly or indirectly, in excess of 5% of the Units on a fully diluted basis (a "5% Owner"), (ii) is not controlling, controlled by or under common control with any such 5% Owner, (iii) is not an affiliated investment fund of such 5% Owner, and (iv) is neither a portfolio company of any such 5% Owner nor a Subsidiary of any portfolio company of any such 5% Owner.

"Investment" as applied to any Person means (i) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, stock, securities or ownership interest (including partnership interests, limited liability company interests and joint venture interests) of any other Person and (ii) any capital contribution by such Person to any other Person.

"LCP" means Linden Capital Partners III, L.P.

"Lender Equity" means the Preferred Units and Common Units issued to or acquired by the Lender Investors from time to time hereunder and/or pursuant to any Equity Agreement and any other Equity Securities issued to or acquired by the Lender Investors, and (ii) any securities issued directly or indirectly with respect to the foregoing securities by way of a unit split, unit dividend, or other division of securities, or in connection with a combination of securities, recapitalization, merger, consolidation, or other reorganization. As to any particular securities constituting Lender Equity, such securities shall remain Lender Equity in the hands of transferees but such securities shall cease to be Lender Equity when they have been (A) effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them, (B) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 under the Securities Act (or any similar provision then in force) or (C) redeemed or repurchased by Holdings LLC or any Subsidiary or any designee thereof.

"Lender Investors" means Monroe Capital Private Credit Fund II LP, Monroe Capital Private Credit Fund II (Unleveraged) LP, Monroe Private Credit Fund A LP and any of their Permitted Transferees.

"Linden Buyer" means ProPharma Group Buyer, LLC, a Delaware limited liability company.

"Linden CIV" means ProPharma Group Blocker Corp., a Delaware corporation.

"Linden Splitter" means ProPharma Group Splitter, LP, a Delaware limited partnership.

"Linden III VCOC" has the meaning set forth in Section 5.2(a)(i).

"Linden III VCOC Manager" has the meaning set forth in Section 5.2(a)(i)(B).

"Linden III-A VCOC" has the meaning set forth in Section 5.2(a)(i).

"Linden III-A VCOC Manager" has the meaning set forth in Section 5.2(a)(i)(B).

"Linden Corporate Investment Vehicle" means Linden CIV or any other corporation formed by any Linden Investor or any Affiliate thereof that holds, directly or indirectly, Units of Holdings LLC and each of their respective transferees or Affiliates designated by such Linden Corporate Investment Vehicle to be included as a Linden Corporate Investment Vehicle.

"Linden Equity" means (i) the Preferred Units and Common Units issued from time to time to the Linden Investors hereunder and/or pursuant to any Equity Agreement and any other Equity Securities issued to or acquired by the Linden Investors, and (ii) any securities issued directly or indirectly with respect to the foregoing securities by way of a unit split, unit dividend, or other division of securities, or in connection with a combination of securities, recapitalization, merger, consolidation, or other reorganization. As to any particular securities constituting Linden Equity, such securities shall remain Linden Equity in the hands of transferees but such securities shall cease to be Linden Equity when they have been (A) effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them, (B) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 under the Securities Act (or any similar provision then in force) or (C) redeemed or repurchased by Holdings LLC or any Subsidiary or any designee thereof.

"Linden Investors" means, collectively, Linden Buyer, Linden Splitter and any of their Affiliates and any of their respective Transferees.

"Linden Investors Manager(s)" has the meaning set forth in Section 5.2.

"Linden Manager(s)" has the meaning set forth in Section 5.2.

"Linden VCOC Investors" has the meaning set forth in Section 5.2(a)(i).

"Liquidation Assets" has the meaning set forth in Section 12.2(b).

"Liquidation FMV" has the meaning set forth in Section 12.2(b).

"Liquidation Statement" has the meaning set forth in Section 12.2(b).

"Liquidity Event" means a Sale of Holdings LLC or a Sale of the Company.

"Losses" means items of Holdings LLC loss and deduction determined according to Section 3.2(b).

"Majority Linden Investors" means the Linden Investors holding a majority of the Preferred Units then held by all of the Linden Investors; provided that if no Linden Investor then holds Preferred Units, "Majority Linden Investors" means the Linden Investors holding a majority of the Common Units then held by all Linden Investors.

"Management Equity" means (i) the Common Units and/or Preferred Units that may be issued to Management Investors pursuant to this Agreement and/or any Equity Agreements and identified on the Schedule of Unitholders under the subheading titled "Management Investors" and (ii) any securities issued directly or indirectly with respect to the foregoing securities by way of a unit split, unit dividend, or other division of securities, or in connection with a combination of securities, recapitalization, merger, consolidation, or other reorganization; provided, however, that Management Equity shall not include any Rollover Equity. As to any particular securities constituting Management Equity, such securities shall remain Management Equity in the hands of transferees but such securities shall cease to be Management Equity when they have been (A) effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them, (B) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 under the Securities Act (or any similar provision then in force) or (C) redeemed or repurchased by Holdings LLC or any Subsidiary or designee thereof or any Linden Investor, or forfeited to Holdings LLC.

"Management Incentive Plan" means the plan or program, if any, established by the Board to facilitate the grant of Management Incentive Units to Eligible Service Providers, as in effect from time to time.

"Management Incentive Unit Agreements" means those certain Management Incentive Unit Agreements by and among Holdings LLC and certain Eligible Service Providers as in effect from time to time and which may, at the discretion of the Board, be entered into pursuant to, and subject to the terms of, a Management Incentive Plan.

"Management Incentive Units" has the meaning set forth in Section 3.9(a).

"Management Investors" means the Persons that may from time to time be listed under the subheading titled "Management Investors" on the Schedule of Unitholders attached hereto, and any other Member who acquires Equity Securities after the date hereof and/or enters into an Equity Agreement after the date hereof pursuant to the terms of Section 3.1, and in either case is designated as a "Management Investor" by the Board.

"Manager" means a Manager on the Board, who, for purposes of the Delaware Act, will be deemed a "manager" (as defined in the Delaware Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"Member" means each of the Linden Investors, the Rollover Investor, the Lender Investors, the Management Investors and each other Person listed on the Schedule of Unitholders attached hereto, and any Person admitted to Holdings LLC as a Substituted Member or Additional Member; but only for so long as such Person is shown on Holdings LLC's books and records as the owner of one or more Units.

"Minimum Gain" means the partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d).

"Monroe" means Monroe Capital Management Advisors, LLC, a Delaware limited liability company.

"New Partnership Audit Rules" shall mean, as enacted pursuant to the Bipartisan Budget Act of 2015, Code Sections 6221 through 6241, including any amendments thereto or other Code provisions with respect to the same subject matter as Code Sections 6221 through 6241, and any regulations promulgated or proposed under any such Sections and any administrative guidance with respect thereto.

"Offering Price" means (i) with respect to Conversion Units in connection with a Public Offering of Holdings LLC, the price, net of underwriters' discount, of a Conversion Unit in such Public Offering, and (ii) with respect to Conversion Units in connection with a Public Offering of the Company, the amount a Conversion Unit would receive if an amount equal to the Holdings Total Equity Value were distributed to all Units in accordance with Section 4.1(b) in connection with such Public Offering.

"Other Business" has the meaning set forth in Section 6.6.

"Other Members" has the meaning set forth in Section 9.2(a).

"Permitted Transferee" means (i) with respect to any Person who is an individual, a member of such Person's Family Group, (ii) with respect to any Person which is an entity (other than any Person who holds Management Equity), any of such Person's affiliated investment funds (if any), but only for so long as such Person remains a Permitted Transferee of such Person, (iii) with respect to the Linden Investors, to any limited partner or member of any Linden Investor, (iv) with respect to the Rollover Investor, a member of Hargroves's Family Group or a pro rata distribution to the then current equityholders of the Rollover Investor in connection with any liquidation of the Rollover Investor, and (v) with respect to the Lender Investors, any Affiliate of any Lender Investor and any buyer, transferee or assignee of any or all of Monroe or its Affiliates' Loans (as defined in the Credit Agreement) under the Credit Agreement.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Entity.

"Preferred Redemption Price" means, with respect to each Preferred Unit, the sum of (i) the Unreturned Capital of such Preferred Unit, plus (ii) the Unpaid Preferred Return thereon.

"Preferred Return" means, with respect to each Preferred Unit, an amount accruing on such Preferred Unit on a daily basis, at the rate of 8% per annum, compounded on March 31, June 30, September 30 and December 31 of each calendar year (commencing on December 31, 2016), on the sum of (i) the Unreturned Capital of such Preferred Unit, plus (ii) the Unpaid Preferred Return thereon for all

prior periods. In calculating the amount of any Distribution to be made at any time, the portion of the Preferred Return for such portion of the period elapsing before such Distribution is made shall be taken into account.

"Preferred Unit" means a Unit having the rights and obligations specified with respect to Preferred Units in this Agreement.

"Pro Rata Share" means with respect to each Unit, the proportional amount such Unit would receive if an amount equal to the Holdings Total Equity Value were distributed to all Units in accordance with Section 4.1(b), and with respect to each Unitholder, such Unitholder's pro rata share of Holdings Total Equity Value represented by all Units owned by such Unitholder, in each case as determined in good faith by the Board.

"Profits" means items of Holdings LLC income and gain determined according to Section 3.2(b).

"ProPharma Group" means ProPharma Group, LLC, a Kansas limited liability company.

"Proportional Share" has the meaning set forth in Section 3.1(c)(i).

"Public Offering" means any underwritten sale of common equity securities of Holdings LLC or the Company (or, in the case of Holdings LLC, any corporate successor thereto) pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission.

"Regulatory Allocations" has the meaning set forth in Section 4.3(e).

"Rollover Equity" means (i) the Preferred Units and Common Units issued from time to time to the Rollover Investor hereunder and/or pursuant to any Equity Agreement and any other Equity Securities issued to or acquired by the Rollover Investor, and (ii) any securities issued directly or indirectly with respect to the foregoing securities by way of a unit split, unit dividend, or other division of securities, or in connection with a combination of securities, recapitalization, merger, consolidation, or other reorganization; provided, however, that Rollover Equity shall not include any Management Incentive Units. As to any particular securities constituting Rollover Equity, such securities shall remain Rollover Equity in the hands of transferees but such securities shall cease to be Rollover Equity when they have been (A) effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them, (B) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 under the Securities Act (or any similar provision then in force) or (C) redeemed or repurchased by Holdings LLC or any Subsidiary or any designee thereof.

"Rollover Investor" means ProPharma Group, Inc., a Kansas corporation.

"Sale of the Company" means either (i) the sale, lease, license, transfer, conveyance or other disposition, in one transaction or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole or (ii) a transaction or a series of related transactions (including by way of merger, consolidation, recapitalization, reorganization or sale of securities by the holders of securities of the Company) the result of which is that (A) the holders of the Company's outstanding voting securities immediately prior to such transaction or series of related transactions are (after giving effect to such transaction or series of related transactions) no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act), directly or indirectly through one or more intermediaries, of more than 50% of the voting power of the outstanding voting securities of the Company, and (B) the Linden Investors are no longer entitled to appoint a majority of the managers to the Company's board of managers.

Notwithstanding the foregoing, (a) no such transaction or series of related transactions (including by way of merger, consolidation, recapitalization, reorganization, sale of units or otherwise) in connection with a Public Offering of the Company shall be deemed a Sale of the Company and (b) a Sale of the Company shall not include any such transaction or series of related transactions effected by the issuance of voting securities by the Company, unless in connection with such issuance the Company either (x) redeems securities of the Company outstanding immediately prior to such issuance having a redemption price equal to more than 50% of the Holdings Total Equity Value immediately prior to such issuance or (y) makes a distribution upon the securities of the Company outstanding immediately prior to such issuance in an amount equal to more than 50% of the Holdings Total Equity Value immediately prior to such issuance payable otherwise than in cash out of earnings or earned surplus and other than a dividend payable solely in equity securities of the Company.

"Sale of Holdings LLC" means either (i) the sale, lease, license, transfer, conveyance or other disposition, in one transaction or a series of related transactions, of all or substantially all of the assets of Holdings LLC or (ii) a transaction or a series of related transactions (including by way of merger, consolidation, recapitalization, reorganization or sale of securities by the holders of securities of Holdings LLC) the result of which is that (A) the Unitholders immediately prior to such transaction or series of related transactions are (after giving effect to such transaction or series of related transactions) no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act), directly or indirectly through one or more intermediaries, of more than 50% of the voting power of the outstanding voting securities of Holdings LLC and (B) the Linden Investors are no longer entitled to appoint a majority of the Managers to the Board. Notwithstanding the foregoing, (a) no such transaction or series of related transactions (including by way of merger, consolidation, recapitalization, reorganization, sale of units or otherwise) in connection with a Public Offering of Holdings LLC (or a corporate successor thereto) shall be deemed a Sale of Holdings LLC and (b) a Sale of Holdings LLC shall not include any such transaction or series of related transactions effected by the issuance of voting securities by Holdings LLC, unless in connection with such issuance Holdings LLC either (x) redeems securities of Holdings LLC outstanding immediately prior to such issuance having a redemption price equal to more than 50% of the Holdings Total Equity Value immediately prior to such issuance or (y) makes a distribution upon the securities of Holdings LLC outstanding immediately prior to such issuance in an amount equal to more than 50% of the Holdings Total Equity Value immediately prior to such issuance payable otherwise than in cash out of earnings or earned surplus and other than a dividend payable solely in equity securities of Holdings LLC.

"Sale Notice" has the meaning set forth in Section 9.2(a).

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

"Specified Corporate Investment Vehicle" means the Linden Corporate Investment Vehicle to receive contributions in connection with a change in business form pursuant to Section 9.9 as designated or specified from time to time by the Majority Linden Investors, or a successor in interest, transferee or Affiliate thereof designated by such Person or a designee of such Person to be the Specified Corporate Investment Vehicle.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of Holdings LLC.

"Substituted Member" means a Person that is admitted as a Member to Holdings LLC pursuant to Section 10.1.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any transferee liability and any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"Tax Distribution" has the meaning set forth in Section 4.1(a).

"Tax Matters Partner" means the "tax matters partner" (within the meaning of Section 6231(a)(7) of the Code as in effect prior to the enactment of the Bipartisan Budget Act of 2015) for periods prior to the effectiveness with respect to Holdings LLC of the New Partnership Audit Rules and thereafter the "partnership representative" as such term is defined in Section 6223(a) of the Code.

"Taxable Year" means Holdings LLC's accounting period for federal income tax purposes determined pursuant to Section 8.2.

"Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof, but excluding conversions and redemptions or repurchases of Units or stock by Holdings LLC or the Company made in accordance with this Agreement. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Transferring Unitholder" has the meaning set forth in Section 9.2(a).

"Treasury Regulations" means the income tax regulations promulgated under the Code, as amended from time to time.

"Unit" means a Unit of a Member or an Assignee in Holdings LLC representing a fractional part of the interests in Profits, Losses and Distributions of Holdings LLC held by all Members and Assignees

and shall include, without limitation, Preferred Units and Common Units; provided that any class, group or series of Units issued shall have the relative rights, powers and obligations set forth in this Agreement.

"Unitholder" means any owner of one or more Units as reflected on Holdings LLC's books and records.

"Unpaid Preferred Return" of any Preferred Unit means, as of any date of determination, an amount equal to the excess, if any, of (i) the aggregate Preferred Return accrued on such Preferred Unit prior to such date over (ii) the aggregate amount of prior Distributions made by Holdings LLC with respect to such Preferred Unit pursuant to Section 4.1(b)(i) or in accordance with Section 4.1(b)(i) pursuant to Section 12.2(c).

"Unreturned Capital" means, with respect to any Preferred Unit, an amount equal to the excess, if any, of (i) the aggregate amount of Capital Contributions made with respect to such Preferred Unit, over (ii) the aggregate amount of prior Distributions made by Holdings LLC with respect to such Preferred Unit pursuant to Section 4.1(b)(ii) or in accordance with Section 4.1(b)(ii) pursuant to Section 12.2(c).

"Unvested Common Units" means any Common Units other than Vested Common Units.

"Vested Common Units" means, with respect to any Common Units that are subject to vesting pursuant to any Equity Agreement, Common Units that have vested in accordance with the terms of any such Equity Agreement, and with respect to all other Common Units, all such Common Units. For the avoidance of doubt, all Common Units constituting Linden Equity, Rollover Equity and Lender Equity shall be deemed Vested Common Units.

"Wholly-Owned Subsidiary" means, with respect to any Person, a Subsidiary of which all of the outstanding capital stock or other ownership interests are owned by such Person or another Wholly-Owned Subsidiary of such Person.

## ARTICLE II

## ORGANIZATIONAL MATTERS

2.1     Formation of Holdings LLC. Holdings LLC was formed on September 26, 2016 pursuant to the provisions of the Delaware Act.

2.2     Limited Liability Company Agreement. The Members hereby execute this Agreement for the purpose of establishing the affairs of Holdings LLC and the conduct of its business in accordance with the provisions of the Delaware Act. The Members hereby agree that during the term of Holdings LLC set forth in Section 2.6 the rights, powers and obligations of the Unitholders with respect to Holdings LLC will be determined in accordance with the terms and conditions of this Agreement and, except where the Delaware Act provides that such rights, powers and obligations specified in the Delaware Act shall apply "unless otherwise provided in a limited liability company agreement" or words of similar effect and such rights, powers and obligations are set forth in this Agreement, the Delaware Act; provided that, notwithstanding the foregoing, Section 18-210 of the Delaware Act (entitled "Contractual Appraisal Rights") and Section 18-305(a) of the Delaware Act (entitled "Access to and Confidentiality of Information; Records") shall not apply or be incorporated into this Agreement (but with it being understood that this proviso shall not affect the obligations of Holdings LLC under Section 7.2 and Section 7.4).

12

2.3     <u>Name</u>. The name of Holdings LLC shall be "ProPharma Group Topco, LLC." The Board may change the name of Holdings LLC at any time and from time to time. Notification of any such change shall be given to all Unitholders. Holdings LLC's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

2.4     <u>Purpose</u>. The purpose and business of Holdings LLC shall be (i) to purchase and hold (including through one or more Subsidiaries) the equity securities of the Company and its Affiliates and to perform such other obligations and duties as are imposed upon Holdings LLC under this Agreement, the Acquisition Agreement, the Equity Agreements and the other agreements, instruments or documents contemplated hereby and thereby, as the same may be amended or modified from time to time, (ii) to exercise all rights and powers granted to Holdings LLC (whether as a holder of the Company's equity securities or otherwise) under the Company's constituent documents, the Acquisition Agreement, the Equity Agreements and the other agreements, instruments or documents contemplated hereby and thereby, as the same may be amended or modified from time to time, (iii) to manage and direct the business operations and affairs of the Company and its Subsidiaries (including, without limitation, the development, adoption and implementation of strategies, business plans, and policies concerning the conduct of the Company's and its Subsidiaries' business), and (iv) to engage in any other lawful acts or activities for which limited liability companies may be organized under the Delaware Act.

2.5     <u>Principal Office; Registered Office</u>. The principal office of Holdings LLC shall be located at 8717 W 110th St #300, Overland Park, Kansas 66210, or at such other place as the Board may from time to time designate, and all business and activities of Holdings LLC shall be deemed to have occurred at its principal office. Holdings LLC may maintain offices at such other place or places as the Board deems advisable. Notification of any such change shall be given to all Unitholders. The address of the registered office of Holdings LLC in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of Holdings LLC) as the Board may designate from time to time in the manner provided by applicable law, and the registered agent for service of process on Holdings LLC in the State of Delaware at such registered office shall be the registered agent named in the Certificate or such Person or Persons as the Board may designate from time to time in the manner provided by applicable law.

2.6     <u>Term</u>. The term of Holdings LLC commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the provisions of <u>Article XII</u>.

2.7     <u>No State-Law Partnership</u>. The Unitholders intend that Holdings LLC not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Unitholder be a partner or joint venturer of any other Unitholder by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this <u>Section 2.7</u>, and neither this Agreement nor any other document entered into by Holdings LLC or any Unitholder relating to the subject matter hereof shall be construed to suggest otherwise. Subject to <u>Section 9.9</u>, the Unitholders intend that Holdings LLC shall be treated as a partnership for federal and, as applicable, state or local income tax purposes, and that each Unitholder and Holdings LLC shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

ARTICLE III

<u>CAPITAL CONTRIBUTIONS</u>

3.1     <u>Unitholders</u>.

13

(a)     Capital Contributions; Schedule of Unitholders. Each Unitholder named on the Schedule of Unitholders attached hereto has made a Capital Contribution on the date specified thereon to Holdings LLC as set forth on the Schedule of Unitholders in exchange for the Units specified thereon. Any reference in this Agreement to the Schedule of Unitholders shall be deemed a reference to the Schedule of Unitholders as amended and in effect from time to time. Holdings LLC may (but need not) issue certificates representing the Units ("Certificated Units"). Holdings LLC may issue fractional Units. The Board may, in its discretion provide any Member with the Schedule of Unitholders in summary form and may omit the amount of Capital Contributions made by and the Units held by each other Member (provided that the Lender Investor may request such information to be included for the Lender Investors). The ownership by a Member of Preferred Units and/or Common Units shall entitle such Unitholder to allocations of Profits and Losses and other items and Distributions of cash and other property as set forth in Article IV.

(b)     Issuance of Additional Units and Interests. Subject to compliance with Sections 3.1(c) (only to the extent applicable) and 5.1(d), the Board shall have the right at any time and from time to time to authorize and cause Holdings LLC to create and/or issue Equity Securities of Holdings LLC, in which event, (i) all Unitholders shall be diluted in an equal manner with respect to such issuance, subject to differences in rights and preferences of different classes, groups and series of Equity Securities, and (ii) the Board shall have the power to amend this Agreement and/or the Schedule of Unitholders to reflect such additional issuances and dilution and to make any such other amendments as it deems necessary or desirable to reflect such additional issuances (including, without limitation, amending this Agreement to increase the number of Equity Securities of any class, group or series, to create and authorize a new class, group or series of Equity Securities and to add the terms of such new class, group or series including economic and governance rights which may be different from, senior to or more favorable than the other existing Equity Securities), in each case without the approval or consent of any other Person. Any Person who acquires Equity Securities may be admitted to Holdings LLC as a Member pursuant to the terms of Section 10.2. In connection with any issuance of Units, the Person who acquires such Units shall execute a counterpart to this Agreement, accepting and agreeing to be bound by all terms and conditions hereof, and shall enter into such other documents, instruments and agreements to effect such purchase and evidence the terms and conditions thereof (including transfer restrictions, vesting and forfeiture or buyback provisions) as are required by the Board (each, an "Equity Agreement"). Each Person who acquires Units shall in exchange for such Units make a Capital Contribution to Holdings LLC in accordance with such Person's Equity Agreement or, if none, in an amount to be determined by the Board in its sole discretion (which amount may be zero).

(c)     Preemptive Rights.

(i)     Except for issuances of:

(A)     Preferred Units and Common Units set forth on the Schedule of Unitholders as of the date hereof;

(B)     Equity Securities issued in connection with debt financings, refinancings, restructurings or similar transactions approved by the Board (other than any such transaction in which any Linden Investor or any of its Affiliates is issued Equity Securities);

(C)     Equity Securities issued upon exercise or conversion or exchange of debt securities, the Preferred Units, other Equity Securities which were issued in compliance with this Section 3.1(c) or Equity Securities which were issued in an issuance which is exempt from this Section 3.1(c);

14

(D)     Equity Securities issued pursuant to a Corporate Conversion effected in accordance with Section 9.9 of this Agreement or otherwise pursuant to a Public Offering;

(E)     Equity Securities issued in connection with any transactions involving Holdings LLC or the Company or any of its Subsidiaries and other Persons (excluding the Linden Investors or any of their respective Affiliates) that are deemed "strategic" transactions by the Board (including, without limitation, Equity Securities issued in connection with joint ventures and similar arrangements or as consideration in connection with an acquisition transaction) that are approved by the Board;

(F)     Equity Securities issued to officers, directors, consultants, employees or other service providers (in each case, excluding any Linden Manager who is an investment professional at Linden Capital Partners or its Affiliates, the Linden Investors or any of their respective Affiliates, officers, directors or investment professionals or their Affiliates (collectively, the "Linden Interested Parties") but including any operating partners, consultants or service providers of the Linden Investors or their Affiliates to the extent such parties are not also Linden Interested Parties) to Holdings LLC or the Company or any of its Subsidiaries pursuant to incentive or other compensation plans (including the Management Incentive Plan) or any other arrangements that are approved by the Board; or

(G)     Units issued in connection with any Unit split, Unit dividend or recapitalization of Holdings LLC or the Company;

if Holdings LLC sells or offers to sell any Equity Securities (including Preferred Units or Common Units), or any of its Subsidiaries sells or offers to sell any equity securities, to the Linden Investors, Holdings LLC shall offer to sell to each Unitholder (other than Excluded Unitholders (as defined below)) the number of Equity Securities equal to the quotient obtained by dividing (1) the aggregate Capital Contributions made to Holdings LLC by such Unitholder (but not Capital Contributions in respect of any Unvested Common Units), by (2) the aggregate Capital Contributions made to Holdings LLC by all Unitholders (but not Capital Contributions in respect of any Unvested Common Units) (such Unitholder's "Proportional Share"); provided that no Unitholder who either (x) is entitled to purchase less than $10,000 of such Equity Securities after determination of such holder's Proportional Share, or (y) is not an "accredited investor" as such term is defined under the Securities Act and the rules and regulations promulgated thereunder (any such Unitholder, an "Excluded Unitholders") shall have any rights under this Section 3.1(c); provided, that the foregoing clause (x) shall not apply to the Lender Investors. Each such Unitholder (other than Excluded Unitholders) shall be entitled to purchase such Equity Securities at the most favorable price and on the most favorable terms as such Equity Securities are to be offered; provided that if all Persons entitled to purchase or receive such Equity Securities are required to also purchase other securities of Holdings LLC, the Unitholders exercising their rights pursuant to this Section 3.1(c) shall also be required to purchase the same strip of securities (on the same terms and conditions) that such other Persons are required to purchase. The purchase price for all securities offered to such Unitholders hereunder shall be payable in the same form as shall be paid by any proposed purchaser. Any Linden Investor may assign all or any portion of its preemptive rights granted pursuant to this Section 3.1(c) to any Person as may be designated by such Linden Investor in its sole discretion and any Lender Investor may assign all or any portion of its preemptive rights granted pursuant to this Section 3.1(c) to any Affiliate as may be designated by such Lender Investor in its sole discretion,

15

provided that in each case such designee agrees to be bound by the terms of this Agreement and complies with the provisions set forth in this Section 3.1(c).

(ii)       In order to exercise its purchase rights hereunder, a Unitholder must within 10 calendar days after receipt of written notice from Holdings LLC describing in reasonable detail the securities being offered, the purchase price thereof, the payment terms and such Unitholder's Proportional Share, deliver a written notice to Holdings LLC describing such Unitholder's election hereunder. No later than five (5) calendar days following the expiration of such 10 day period, Holdings LLC shall notify each Lender Investor and Rollover Investor in writing of the number of new securities that each such Lender Investor or Rollover Investor (as applicable) has agreed to purchase (including, for the avoidance of doubt, where such number is zero).

(iii)       Upon the expiration of the offering periods described above, Holdings LLC shall be entitled to sell such securities which such Unitholders have not elected to purchase during the 180 calendar days following such expiration at a price not less than, and on other terms and conditions no more favorable to the purchasers thereof than, that offered to such Unitholders. Any securities offered or sold by Holdings LLC after such 180-day period must be reoffered to such Unitholders pursuant to the terms of this Section 3.1(c).

(iv)       Notwithstanding anything to the contrary set forth herein, in lieu of offering any securities to the Unitholders at the time such securities are offered to any Linden Investor and/or any of its Affiliates, Holdings LLC may comply with the provisions of this Section 3.1(c) by making an offer to sell to the Unitholders (other than Excluded Unitholders) their Proportional Share of such securities promptly after a sale to any Linden Investor and/or any of its Affiliates is effected. In such event, for all purposes of this Section 3.1(c), each Unitholder's Proportional Share shall be determined taking into consideration the actual number of securities sold to any other Person so as to achieve the same economic effect as if such offer would have been made prior to such sale.

(v)       The rights of the Unitholders under this Section 3.1(c) shall terminate upon the consummation of the first to occur of (A) a Public Offering and (B) a Liquidity Event.

(d)       Certain Representations and Warranties. By executing this Agreement (or, after the date hereof, any counterpart or joinder to this Agreement) and in connection with the issuance of Equity Securities to such Unitholder, each Unitholder represents and warrants to Holdings LLC as follows:

(i)       The Equity Securities being acquired by such Unitholder pursuant to this Agreement or otherwise will be acquired for such Unitholder's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act or any applicable state securities laws, and the Equity Securities will not be disposed of in contravention of the Securities Act or any applicable state securities laws.

(ii)       Such Unitholder is sophisticated in financial matters and is able to evaluate the risks and benefits of decisions respecting the investment in the Equity Securities and is either (A) an executive officer of Holdings LLC or a Subsidiary or Affiliate thereof or is a service provider knowledgeable about Holdings LLC and its Subsidiaries or (B) an "accredited investor" as such term is defined under the Securities Act and the rules and regulations promulgated thereunder.

16

(iii)    Such Unitholder is able to bear the economic risk of his, her or its investment in the Equity Securities for an indefinite period of time because the Equity Securities have not been registered under the Securities Act or applicable state securities laws and are subject to substantial restrictions on transfer set forth herein and, therefore, cannot be sold unless subsequently registered under the Securities Act and applicable state securities laws or an exemption from such registration is available and in compliance with such restrictions on transfer.

(iv)    Such Unitholder has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Equity Securities and has had full access to such other information concerning Holdings LLC, the Company and their respective Subsidiaries and Affiliates as he, she or it has requested.

(v)    Such Unitholder has received and carefully read a copy of this Agreement. This Agreement and each of the other agreements contemplated hereby to be executed by such Unitholder (including any Employment Agreement or Equity Agreement) constitute the legal, valid and binding obligation of such Unitholder, enforceable in accordance with their terms, and the execution, delivery and performance of this Agreement and such other agreements do not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which such Unitholder is a party or any judgment, order or decree to which such Unitholder is subject or create any conflict of interest with Holdings LLC, the Company, or any of their respective Subsidiaries or Affiliates, or any of their present or former customers.

(vi)    Such Unitholder is a resident of the state, or has its principal place of business in the state, set forth under his or her name on the Schedule of Unitholders attached hereto.

(vii)    Such Unitholder has been given the opportunity to consult with independent legal counsel regarding his, her or its rights and obligations under this Agreement and has consulted with such independent legal counsel regarding the foregoing (or, after carefully reviewing this Agreement, has freely decided not to consult with independent legal counsel), fully understands the terms and conditions contained herein and therein and intends for such terms to be binding upon and enforceable against him, her or it.

3.2    Capital Accounts.

(a)    Maintenance of Capital Accounts. Holdings LLC shall maintain a separate Capital Account for each Unitholder according to the rules of Treasury Regulations Section 1.704-1(b)(2)(iv). For this purpose, the Board may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Holdings LLC property. Without limiting the foregoing, each Unitholder's Capital Account shall be adjusted:

(i)    by adding any additional Capital Contributions made by such Unitholder in consideration for the issuance of Units;

(ii)    by deducting any amounts paid to such Unitholder in connection with the redemption or other repurchase by Holdings LLC of Units;

(iii)    by adding any Profits allocated to such Unitholder and subtracting any Losses allocated to such Unitholder; and

17

(iv)     by deducting any distributions paid in cash or other assets to such Unitholder by Holdings LLC.

(b)     <u>Computation of Income, Gain, Loss and Deduction Items</u>. For purposes of computing the amount of any item of Holdings LLC income, gain, loss or deduction to be allocated pursuant to <u>Article IV</u> and to be reflected in the Capital Accounts, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose); <u>provided</u> <u>that</u>:

(i)     The computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(1)(B) or Code Section 705(a)(2)(B) and Treasury Regulations Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income tax purposes.

(ii)     If the Book Value of any Holdings LLC property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

(iii)     Items of income, gain, loss or deduction attributable to the disposition of Holdings LLC property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the Book Value of such property.

(iv)     Items of depreciation, amortization and other cost recovery deductions with respect to Holdings LLC property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

(v)     To the extent an adjustment to the adjusted tax basis of any Holdings LLC asset pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

(vi)     To the extent that Holdings LLC distributes any asset in kind to the Members, Holdings LLC shall be deemed to have realized Profits or Losses thereon in the same manner as if Holdings LLC had sold such asset for an amount equal to the Fair Market Value of such asset or, if greater and otherwise required by the Code, the amount of debts to which such asset is subject.

3.3     <u>Negative Capital Accounts</u>. No Unitholder shall be required to pay to any other Unitholder or Holdings LLC any deficit or negative balance which may exist from time to time in such Unitholder's Capital Account (including upon and after dissolution of Holdings LLC).

3.4     <u>No Withdrawal</u>. No Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from Holdings LLC, except as expressly provided herein.

3.5     <u>Loans From Unitholders</u>. Loans by Unitholders to Holdings LLC shall not be considered Capital Contributions. If any Unitholder shall loan funds to Holdings LLC in excess of the amounts

required hereunder to be contributed by such Unitholder to the capital of Holdings LLC, the making of such loans shall not result in any increase in the amount of the Capital Account of such Unitholder. The amount of any such loans shall be a debt of Holdings LLC to such Unitholder and shall be payable or collectible in accordance with the terms and conditions upon which such loans are made.

3.6     Distributions In-Kind. To the extent that Holdings LLC distributes property in-kind to the Unitholders, Holdings LLC shall be treated as making a distribution equal to the Fair Market Value of such property for purposes of Section 4.1 and such property shall be treated as if it were sold for an amount equal to its Fair Market Value and any resulting gain or loss shall be treated as an item of Profits or Losses in accordance with Section 3.2(b)(vi).

3.7     Compliance with Section 1.704-1(b). The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by Holdings LLC or any Member), are computed in order to comply with such Treasury Regulations, the Board may make such modification.

3.8     Transfer of Capital Accounts. The original Capital Account established for each Substituted Member shall be in the same amount as the Capital Account of the Unitholder (or portion thereof) to which such Substituted Member succeeds, at the time such Substituted Member is admitted to Holdings LLC. The Capital Account of any Unitholder shall be increased or decreased by means of the transfer to it of all or part of the Units of another Unitholder. Any reference in this Agreement to a Capital Contribution of or Distribution to a Unitholder that has succeeded any other Unitholder shall include any Capital Contributions or Distributions previously made by or to the former Unitholder on account of the Units of such former Unitholder transferred to such Unitholder.

3.9     Management Incentive Units.

(a)     From time to time after the date hereof, the Board shall have the power and discretion to approve the issuance to any employee, officer, Manager, director, consultant or advisor of Holdings LLC or any of its Subsidiaries (each an "Eligible Service Provider") of authorized but unissued Units representing a fractional part of the interests in Profits, Losses and Distributions of the Members and having the rights and obligations specified with respect to Class B Common Units or such other class of Units as the Board may establish from time to time in this Agreement ("Management Incentive Units"). The Board shall have the power and discretion to establish a Management Incentive Plan setting forth such terms and conditions as the Board shall deem appropriate to facilitate the issuance of Management Incentive Units. The Board shall have the power and discretion to approve which Eligible Service Providers shall be offered and issued such Management Incentive Units, the number of Management Incentive Units to be offered and issued to each such Eligible Service Provider, the vesting, forfeiture and other restrictions, if any, governing such Management Incentive Units, the purchase price therefor, if any, and any such other terms and conditions as it shall deem appropriate. In connection with any approved issuance to any Eligible Service Provider of Management Incentive Units hereunder, such Eligible Service Provider shall execute a counterpart to this Agreement, or otherwise be deemed to have become a party to this Agreement by executing a Management Incentive Unit Agreement, accepting and agreeing to be bound by all terms and conditions hereof, and shall enter into such other documents and instruments to effect such purchase (including, without limitation, a Management Incentive Unit Agreement) as are required by the Board. This Section 3.9, together with any Management Incentive Plan and the Management Incentive Unit Agreements pursuant to which the Management Incentive Units are issued, are intended to qualify as a compensatory benefit plan within the meaning of Rule 701 of the Securities

Act and the issuance of Management Incentive Units pursuant hereto is intended to qualify for the exemption from registration under the Securities Act provided by Rule 701; provided that the foregoing shall not restrict or limit Holdings LLC's ability to issue any Management Incentive Units pursuant to any other exemption from registration under the Securities Act available to Holdings LLC.

(b)     As of the date of each grant of Management Incentive Units to an Eligible Service Provider, the Board shall establish an initial "Participation Threshold" amount with respect to each such Management Incentive Unit granted on such date. Unless otherwise determined by the Board or provided in the applicable Management Incentive Unit Agreement, the Participation Threshold with respect to a Management Incentive Unit shall be equal to or greater than the result of (i) the amount that would be distributed with respect to a Common Unit pursuant to Section 4.1(b)(iii) in a hypothetical transaction in which Holdings LLC sold all of its assets for Fair Market Value and distributed the proceeds therefrom in liquidation of Holdings LLC pursuant to Section 12.2 (as determined immediately prior to the issuance of such Management Incentive Unit, but taking into account all Capital Contributions, if any, with respect to a Common Unit issued as part of the issuance of such Management Incentive Unit) minus (ii) the total Capital Contributions (if any) made by the Eligible Service Provider receiving such Management Incentive Unit with respect to all Management Incentive Units received by such Eligible Service Provider as part of the same issuance; provided that, for the avoidance of doubt, no Capital Contributions shall be made by the Eligible Service Provider if and to the extent such Management Incentive Unit are intended for U.S. federal income tax purposes to be "profits interests" within the meaning of Internal Revenue Service Revenue Procedures 93-27 and 2001 43. The Board may designate a series number for Management Incentive Units that have the same Participation Threshold, which Participation Threshold may differ from the Participation Thresholds of other series of Management Incentive Units not included in such subset. If the Board elects to so designate Management Incentive Units, then the first Management Incentive Unit issued on or after the date hereof shall be designated a "Series 1 Management Incentive Unit".

(c)     Each Management Incentive Unit's Participation Threshold shall be adjusted (in the sole discretion and as determined by the Board) after the grant of such Management Incentive Unit in the following manner:

(i)     in the event of any Distribution with respect to a Common Unit pursuant to Section 4.1(b)(iii), the Participation Threshold of the applicable Management Incentive Unit outstanding at the time of such Distribution shall be reduced (but not below zero) by the amount of such Distribution; and

(ii)     in the event of any change in Holdings LLC's capital structure not addressed in Section 3.9(c)(i) above, the Board may (but shall not be obligated to) equitably adjust the Participation Thresholds of the outstanding Management Incentive Units to the extent necessary (in the Board's good faith judgment) to prevent such capital structure change from changing the economic rights represented by the Management Incentive Units in a manner that is disproportionately favorable or unfavorable in relation to the economic rights of other classes of outstanding Common Units; provided, however, that, no such adjustment shall be made if and to the extent that such Management Incentive Units are intended for U.S. federal income tax purposes to be "profits interests" within the meaning of Internal Revenue Service Revenue Procedures 93-27 and 2001-43 and the adjustment would cause the Management Incentive Units to cease to be treated as profits interests.

(d)     The grant of Management Incentive Units and the Participation Thresholds of each holder's Management Incentive Units shall be set forth on the Schedule of Unitholders, and the Schedule of Unitholders may be amended by the Board (without the requirement of an approval from any

Member) from time to time by Holdings LLC as necessary to reflect the grant of Management Incentive Units and any adjustments to the Participation Thresholds of outstanding Management Incentive Units required pursuant to this Section 3.9.

(e)     The Management Incentive Units issued to any Eligible Service Provider shall become vested in accordance with the vesting schedule set forth by the Board in connection with the issuance of such Management Incentive Units (and, if applicable, reflected in the relevant Management Incentive Unit Agreement).

(f)     The Management Incentive Units to be issued under this Agreement are intended for U.S. federal income tax purposes to be "profits interests" within the meaning of Internal Revenue Service Revenue Procedures 93-27 and 2001-43 and the provisions of this Agreement shall be interpreted and applied consistently therewith. Further, each Eligible Service Provider that is issued Management Incentive Units shall make and file with the Internal Revenue Service a "Section 83(b) Election" in such form as required by applicable Treasury Regulations. Any Section 83(b) Election shall be filed within thirty days of the grant date of a Management Incentive Unit to an Eligible Service Provider.

ARTICLE IV

DISTRIBUTIONS AND ALLOCATIONS;
REDEMPTION AND CONVERSIONS

4.1     Distributions.

(a)     Tax Distributions. So long as Holdings LLC is treated as a partnership for federal income tax purposes and to the extent funds of Holdings LLC may be available for distribution by Holdings LLC (as determined by the Board in its sole discretion or applicable law), the Board shall cause Holdings LLC to distribute to each Unitholder an amount of cash (a "Tax Distribution") which in the judgment of the Board equals the product of, if positive, (i) the Holdings Income Amount allocated to such Unitholder pursuant to this Agreement for such Taxable Year, multiplied by (ii) the Applicable Tax Rate with respect to the taxable income.

(i)     The "Holdings Income Amount" allocated to a Unitholder for a Taxable Year shall be an amount equal to the net taxable income of Holdings LLC for such Taxable Year allocated to the Unitholder (including any allocations under Code Section 704(c)) with respect to its Units pursuant to this Agreement (provided that in no event shall such calculation include any taxable income for any period prior to the effective date of this Agreement or any tax liability relating thereto or any accounts receivable from a period prior to the effective date reported on the cash receipts and disbursements method of accounting), minus any net taxable loss of Holdings LLC allocated to the Unitholder pursuant to this Agreement for any prior Taxable Year not previously taken into account for purposes of this Section 4.1(a), to the extent such losses would be available under the Code to offset income of the Unitholders (or, as appropriate, the direct or indirect partners or members of the Unitholder) determined as if income and loss from Holdings LLC was the only income and loss of such Unitholder (or, as appropriate, the direct or indirect partners or members of such Unitholder) in such Taxable Year and all prior Taxable Years, in each case, determined without taking into effect the adjustments to the basis pursuant to Section 743 of the Code with respect to the assets underlying any partnership interest owned by Holdings LLC.

(ii)     Tax Distributions shall be made to the Unitholders on an estimated basis quarterly as determined by the Board and subject to the conditions set forth in this Section 4.1(a).

21

The Board shall adjust subsequent Tax Distributions up or down to reflect any variation between such estimated quarterly Tax Distributions and the Tax Distributions that would have been computed under this Section 4.1(a) based on subsequent Tax information. In the event that the funds legally available for any Tax Distribution to be made hereunder are insufficient to pay the full amount of the Tax Distribution that would otherwise be required under this Section 4.1(a), the amount of funds legally available shall be distributed to the Unitholders on a pro rata basis (according to the amounts that would have been distributed to each Unitholder pursuant to this Section 4.1(a) if legally available funds existed in a sufficient amount to make such Distribution in full). At any time thereafter when additional funds of Holdings LLC are legally available for Distribution, such funds shall be immediately distributed to the Unitholders on a pro rata basis (according to the amounts that would have been distributed to each Unitholder pursuant to this Section 4.1(a) if legally available funds would have existed in a sufficient amount to make such Tax Distribution in full). The Board, in its discretion, may adjust the amount of Tax Distributions made under this Section 4.1(a) consistent with the purposes of this provision, which is to provide the Unitholders with sufficient liquidity to fund their tax liabilities incurred as a result of ownership of the Company.

(iii)     Except as provided in the following sentence, Tax Distributions shall not be considered advance Distributions to Unitholders under Section 4.1(b)(ii) but shall be considered advance Distributions to Unitholders under Section 4.1(b)(i) and (b)(iii) (in accordance with the Distribution provision to which the allocation of taxable income is attributable). To the extent any Unitholder receives Tax Distributions that are attributable to items of income or gain allocated in accordance with, or in the same manner as, Code Section 704(c), such Tax Distributions shall be treated as advance Distributions to such Unitholder in the order of priority set forth in Section 4.1(b).

(b)     Other Distributions. Except as otherwise set forth in Section 4.1(a), the Board may (but shall not be obligated to) make Distributions at any time or from time to time, but each such Distribution shall be made only in the following order of priority:

(i)     first, to the holders of Preferred Units (ratably among such holders based upon the aggregate Unpaid Preferred Return with respect to all outstanding Preferred Units held by each such holder immediately prior to such Distribution), until the aggregate Unpaid Preferred Return with respect to each such holder's Preferred Units has been reduced to zero;

(ii)     second, to the holders of the Preferred Units (ratably among such holders based upon the aggregate Unreturned Capital with respect to all outstanding Preferred Units held by each such holder immediately prior to such Distribution), until the aggregate Unreturned Capital with respect to each such holder's Preferred Units has been reduced to zero; and

(iii)     third, to the holders of Vested Common Units (ratably among such holders based upon the number of Vested Common Units held by each such holder immediately prior to such Distribution); provided that, any Vested Common Unit that is otherwise a Management Incentive Unit will not be treated as a Vested Common Unit for purposes of this Section 4.1(b)(iii) until such time as the Participation Threshold with respect to such Management Incentive Unit is equal to zero (taking into account any adjustments described in Section 3.9(c)).

(c)     Distributions upon a Sale of Holdings LLC. In the event of a Sale of Holdings LLC, each Unitholder shall receive in exchange for the Units held by such Unitholder the same portion of the aggregate consideration from such transaction that such Unitholder would have received if such aggregate consideration had been distributed by Holdings LLC in accordance with the provisions of

Section 4.1(b) (and with it being understood that determinations regarding the timing and amount of Distributions in connection with a Sale of Holdings LLC shall be made by the Board). Each Unitholder shall take all necessary or desirable actions in connection with the distribution of the aggregate consideration from any such transaction as requested by the Board.

4.2     Allocations. Except as otherwise provided in Section 4.3, Profits and Losses for any Taxable Year shall be allocated among the Unitholders in such a manner that, as of the end of such Taxable Year, (a) the sum of (i) the Capital Account of each Unitholder, (ii) such Unitholder's share of Minimum Gain, and (iii) such Unitholder's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(2)) shall be equal to (b) the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to Holdings LLC under the Delaware Act, determined as if Holdings LLC were to (i) liquidate the assets of Holdings LLC for an amount equal to their Book Value and (ii) distribute the proceeds of liquidation pursuant to Section 12.2..

4.3     Special Allocations.

(a)     Partner Nonrecourse Debt Minimum Gain Chargeback. Losses attributable to partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). If there is a net decrease during a Taxable Year in partner nonrecourse debt minimum gain (as determined pursuant to Treasury Regulations Section 1.704-2(i)(3)), each Unitholder that has a share of such partner nonrecourse debt minimum gain shall be specially allocated Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) in an amount equal to that Unitholder's share of the net decrease in partnership nonrecourse debt minimum gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.3(a) is intended to comply with the minimum gain chargeback requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(b)     Nonrecourse Deductions and Minimum Gain Chargeback. Holdings LLC nonrecourse deductions (as determined according to Treasury Regulations Section 1.704-2(b)(1)) for any Taxable Year shall be allocated to each Unitholder ratably among such Unitholders based upon the manner in which Profits are allocated among the Unitholders for such Taxable Year. Unitholder nonrecourse deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Section 4.3(a), if there is a net decrease in the Minimum Gain during any Taxable Year, each Unitholder shall be specially allocated Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) in an amount equal to such Unitholder's share of the net decrease in the Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.3(b) is intended to be a Minimum Gain chargeback provision that complies with the requirements of Treasury Regulations Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c)     Qualified Income Offset. If any Unitholder that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of Sections 4.3(a) and 4.3(b) but before the application of any other provision of this Article IV, then Profits for such Taxable Year shall be allocated to such Unitholder in proportion to, and to the extent of, such Adjusted Capital Account Deficit. This Section 4.3(c) is intended to be a qualified income offset provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d)      Allocation of Certain Profits and Losses. Profits and Losses described in Section 3.2(b)(v) shall be allocated in a manner consistent with the manner that the adjustments to the Capital Accounts are required to be made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

(e)      Regulatory Allocations. The allocations set forth in Sections 4.3(a)-(d) (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may not be consistent with the manner in which the Unitholders intend to allocate Profit and Loss of Holdings LLC or make Distributions. Accordingly, notwithstanding the other provisions of this Article IV, but subject to the Regulatory Allocations, Profits and Losses shall be reallocated among the Unitholders so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Unitholders to be in the amounts (or as close thereto as possible) they would have been if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Unitholders anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Unitholders so that the net amount of the Regulatory Allocations and such special allocations to each such Unitholder is zero. In addition, if in any Taxable Year there is a decrease in Minimum Gain, or in partner nonrecourse debt minimum gain, and application of the minimum gain chargeback requirements set forth in Section 4.3(a) or Section 4.3(b) would cause a distortion in the economic arrangement among the Unitholders, the Unitholders may, if they do not expect that Holdings LLC will have sufficient other income to correct such distortion, request the Internal Revenue Service to waive either or both of such minimum gain chargeback requirements. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such minimum gain chargeback requirement.

(f)      Forfeiture Allocations. The Unitholders acknowledge that allocations like those described in Proposed Treasury Regulation Section 1.704-1(b)(4)(xii)(c) ("Forfeiture Allocations") may result from the allocations of Profits and Losses provided for in this Agreement. For the avoidance of doubt, Holdings LLC is entitled to make Forfeiture Allocations and, once required by applicable final or temporary guidance, allocation of Profits and Losses will be made in accordance with Proposed Treasury Regulation Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

(g)      Excess Nonrecourse Liabilities. For purposes of determining a Member's share of the "excess nonrecourse liabilities" of Holdings LLC within the meaning of Treasury Regulations Section 1.752-3(a)(3), except as otherwise determined by the Board, the Unitholder's share of Profits will be deemed to be in proportion to such Unitholder's ownership of Common Units (excluding any Management Incentive Units with a Participation Threshold greater than zero).

4.4      Offsetting Allocations. If, and to the extent that, any Unitholder is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Unitholder and Holdings LLC pursuant to Sections 83, 482, or 7872 of the Code or any similar provision now or hereafter in effect, the Board may, if permitted by applicable law, allocate any corresponding Profit or Loss to the Unitholder who recognizes such item in order to reflect the Unitholders' economic interest in Holdings LLC.

4.5      Tax Allocations.

(a)      Allocations Generally. Except as provided in Section 4.5(b), the income, gains, losses and deductions of Holdings LLC will be allocated for federal, state and local income tax purposes among the Unitholders in accordance with the allocation of such income, gains, losses and deductions among the Unitholders for computing their Capital Accounts; except that if any such allocation is not permitted by the Code or other applicable law, Holdings LLC's subsequent income, gains, losses,

deductions and credits will be allocated among the Unitholders so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)        Code Section 704(c) Allocations. Items of Holdings LLC taxable income, gain, loss and deduction with respect to any property contributed to the capital of Holdings LLC shall be allocated among the Unitholders in accordance with Code Section 704(c) and the Treasury Regulations thereunder so as to take account of any variation between the adjusted basis of such property to Holdings LLC for federal income tax purposes and its initial Book Value under the remedial method of Treasury Regulation Section 1.704-3(d), except as otherwise determined by the Board. In addition, if the Book Value of any Holdings LLC asset is adjusted, then subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value under the remedial method of Treasury Regulation Section 1.704-3(d), except as otherwise determined by the Board.

(c)        Allocation of Tax Credits, Tax Credit Recapture, Etc. Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Unitholders according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Sections 1.704-1(b)(4)(ii) and 1.704-1(b)(4)(viii).

(d)        Effect of Allocations. Allocations pursuant to this Section 4.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Unitholder's Capital Account or share of Profits, Losses, Distributions (other than Distributions pursuant to Section 4.1(a)) or other Holdings LLC items pursuant to any provision of this Agreement.

4.6        Indemnification and Reimbursement for Payments on Behalf of a Unitholder. If Holdings LLC is required by law to make any payment to a Governmental Entity (including any Tax) that is specifically attributable to a Unitholder (including, in the event that Holdings LLC becomes liable for any taxes, interest or penalties under Section 6225 of the Code, as amended by the Bipartisan Budget Act of 2015 (following a final determination of such liability by the relevant governmental authority), such Unitholder's allocable share of the amount of such tax liability, including any interest and penalties associated therewith, as reasonably determined by the Board in accordance with the Code) or a Unitholder's status as such (including, without limitation, federal withholding taxes, state personal property taxes, and state unincorporated business taxes), then such Unitholder shall indemnify and contribute to Holdings LLC in full for the entire amount paid (including interest, penalties and related expenses). The Board may offset Distributions to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify Holdings LLC under this Section 4.6. A Unitholder's obligation to indemnify and make contributions to Holdings LLC under this Section 4.6 shall survive the termination, dissolution, liquidation and winding up of Holdings LLC, and for purposes of this Section 4.6, Holdings LLC shall be treated as continuing in existence. Holdings LLC may pursue and enforce all rights and remedies it may have against each Unitholder under this Section 4.6, including instituting a lawsuit to collect such indemnification and contribution, with interest calculated at a rate equal to the Base Rate plus three percentage points per annum (but not in excess of the highest rate per annum permitted by law), compounded on the last day of each Fiscal Quarter.

4.7        Preferred Unit Redemptions.

(a)        Redemption Upon a Public Offering. Subject to Section 4.8, upon a Public Offering, Holdings LLC shall, at the request of the Majority Linden Investors by delivery of written notice to Holdings LLC prior to such Public Offering, to the extent that funds are available therefor as determined by the Board in its sole discretion (after consultation with the underwriters) and would not be

prohibited by the terms of any of Holdings LLC's or its Subsidiaries' outstanding Indebtedness, apply the net cash proceeds from such Public Offering remaining after deduction of all discounts, underwriters' commissions and other reasonable expenses and the payment of all other obligations to the extent required under Holdings LLC's and its Subsidiaries' then existing Indebtedness to redeem all or any portion of the outstanding Preferred Units on a pro rata basis from the holders thereof (based upon the aggregate Preferred Redemption Price of all outstanding Preferred Units held by each such holder) at the Preferred Redemption Price; provided that if the funds of Holdings LLC available for redemption of Preferred Units as determined by the Board in its sole discretion (after consultation with the underwriters) are insufficient to redeem all of the Preferred Units requested to be redeemed, then such Preferred Units which are not to be redeemed may be converted at the election of the Majority Linden Investors into Conversion Units pursuant to <u>Section 4.8</u>. Such redemption shall take place on a date fixed by Holdings LLC, which date shall be not more than fifteen calendar days after Holdings LLC's receipt of such proceeds.

(b)     <u>Closing of Redemption</u>. At the closing of any redemption hereunder, Holdings LLC shall purchase and each holder of Preferred Units shall sell the applicable Preferred Units, and each holder of Preferred Units shall deliver to Holdings LLC duly executed instruments transferring title to the applicable Preferred Units to Holdings LLC free and clear of all liens and encumbrances, against payment of the Preferred Redemption Price by cashier's or certified check payable to such holder or by wire transfer of immediately available funds to an account designated by such holder.

(c)     <u>Redeemed Units</u>. No Preferred Unit is entitled to any Preferred Return accruing after the date on which the Preferred Redemption Price for such Preferred Unit is paid to the holder thereof in full. On such date all rights of the holder of such Preferred Unit shall cease, and such Preferred Unit shall not be deemed to be outstanding. Any Preferred Units which are redeemed by Holdings LLC shall be canceled and such Preferred Units will not be considered outstanding for any purpose.

4.8     <u>Conversion of Preferred Units</u>.

(a)     <u>Conversion Right</u>. The Majority Linden Investors shall have the right (but not the obligation) to cause all or any portion (on a pro rata basis (based on the number of Preferred Units held by all Unitholders)) of the outstanding Preferred Units to be converted to Conversion Units as provided herein in connection with a Public Offering by delivering written notice to Holdings LLC (the "<u>Conversion Notice</u>").

(b)     <u>Conversion Procedure</u>.

(i)     Upon delivery of the Conversion Notice, each outstanding Preferred Unit (including any fraction thereof) shall automatically, and without further required action of any kind, convert into a number of Conversion Units computed by dividing the sum of the Unreturned Capital of such Preferred Unit plus the Unpaid Preferred Return with respect to such Preferred Unit by the Offering Price of a Conversion Unit in connection with such Public Offering.

(ii)     The conversion of Preferred Units shall be deemed to have been effected as of the date of delivery of the Conversion Notice but shall be conditioned upon the consummation of the Public Offering. Upon effectiveness of such conversion, but subject to the consummation of the Public Offering, the rights of the holder of such Preferred Units as a holder of Preferred Units shall cease, and such holder shall be deemed to have become the holder of record of the Conversion Units issuable with respect to such holder's Preferred Units upon conversion as provided in <u>Section 4.8(b)(i)</u>.

(iii)     If any fractional interest in a Conversion Unit would, except for the provisions of this Section 4.8(b)(iii), be issuable or deliverable upon any conversion of the Preferred Units, Holdings LLC, in lieu of issuing or delivering the fractional interest therefor, may elect to pay an amount to the holder thereof equal to the Offering Price multiplied by a fraction representing such fractional interest as of the date of conversion.

ARTICLE V

MANAGEMENT

5.1     Authority of Board.

(a)     Sole Authority. Except for situations in which the approval of one or more of the Members is expressly and specifically required by the express terms of this Agreement, and subject to the provisions of this Section 5.1, (i) the Board shall conduct, direct and exercise full control over all activities of Holdings LLC (including, subject to Sections 3.1(c) and 5.1(d), all decisions relating to the issuance of additional Equity Securities and the voting and sale of, and the exercise of other rights with respect to, the equity securities of its Subsidiaries), (ii) all management powers over the business and affairs of Holdings LLC shall be exclusively vested in the Board, and (iii) the Board shall have the sole power to bind or take any action on behalf of Holdings LLC, or to exercise any rights and powers (including, without limitation, the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to Holdings LLC under this Agreement or any other agreement, instrument, or other document to which Holdings LLC is a party.

(b)     Certain Actions. Without limiting the generality of the foregoing:

(i)     the Board shall exercise all rights and powers of Holdings LLC (whether such rights and powers are expressly and specifically granted to Holdings LLC under the terms of an agreement to which Holdings LLC is a party, or arise as a result of Holdings LLC's ownership of securities or otherwise) to amend or consent to an amendment, modification, or waiver of the Equity Agreements or the Company's certificate of formation and limited liability company agreement and to take actions, give or withhold consents or approvals, waive or require the satisfaction of conditions, or make determinations, opinions, judgments, or other decisions which are granted to Holdings LLC under the Equity Agreements or the Company's certificate of formation and limited liability company agreement;

(ii)     subject only to the provisions of Section 9.3, the Board shall have sole discretion and right to enter into any agreement regarding, and have sole authority to approve on behalf of Holdings LLC and all of the Members, a Sale of Holdings LLC, a Sale of the Company, or any merger, consolidation or other transaction involving Holdings LLC or the Company; and

(iii)     the Board shall have the right to determine the timing and amount of any equity investment in Holdings LLC and to effect amendments to this Agreement in order to effectuate such equity investments.

(c)     Actions Under Acquisition Agreement. The Board shall exercise all rights and powers of Holdings LLC and/or the Company (including all rights and powers to take actions, give or withhold consents or approvals, waive or require the satisfaction of conditions, or make determinations, opinions, judgments, or other decisions) which are expressly and specifically granted to Holdings LLC and/or the Company under the Acquisition Agreement or the agreements, instruments or documents

contemplated thereby. For the avoidance of doubt, Executive Manager shall have no rights, power or authority with respect to the Acquisition Agreement or the agreements, instruments or documents contemplated thereby.

(d)     Restrictive Covenants. Holdings LLC shall not, and shall not permit any Subsidiary to, without the prior written consent of the Majority Linden Investors:

(i)     directly or indirectly declare or pay any dividends or make any distributions (other than Tax Distributions) upon any of its units or other equity securities or directly or indirectly redeem, purchase or otherwise acquire any Units or other equity securities (including, without limitation, any warrants, options and other rights to acquire such Units or other equity securities);

(ii)     issue or sell, or authorize or enter into any agreement providing for the issuance or sale (contingent or otherwise) of (A) any notes or debt securities containing equity features (including, without limitation, any notes or debt securities convertible into or exercisable or exchangeable for Units or other equity securities, issued in connection with the issuance of Units or other equity securities or containing profit participation features), or (B) any Units or other equity securities (or any securities convertible into or exercisable or exchangeable for any Units or other equity securities);

(iii)     merge or consolidate with any Person (other than a merger between Wholly-Owned Subsidiaries) or sell, lease or otherwise dispose of more than 10% of the consolidated assets of Holdings LLC and its Subsidiaries (computed on the basis of book value, determined in accordance with GAAP, consistently applied, or fair market value, determined by the Board in its reasonable good faith judgment) in any transaction or series of related transactions;

(iv)     except with respect to a corporate conversion requested by the underwriter in connection with a Public Offering with respect to Holdings LLC pursuant to Section 9.9, liquidate, dissolve or effect a recapitalization or reorganization in any form of transaction (including, without limitation, making or permitting any change in the manner in which such entity is treated for federal income tax purposes);

(v)     acquire any interest in any Person or business (whether by a purchase of assets, purchase of stock, merger or otherwise), or enter into any joint venture or enter into the ownership, active management or operation of any business other than the Business or establish or acquire any Subsidiaries other than Wholly-Owned Subsidiaries;

(vi)     make any amendment to this Agreement, the Company's certificate of formation or limited liability company agreement or any other constituent document of any other Subsidiary;

(vii)     enter into, amend, modify or supplement any agreement, transaction, benefit plan, commitment or arrangement with any of Holdings LLC's or any Subsidiary's executive officers, managers, directors or Affiliates or with any individual related by blood, marriage or adoption to any such individual or with any entity in which any such Person or individual owns a beneficial interest, except for customary and reasonable employment arrangements and except as otherwise expressly contemplated by this Agreement;

28

(viii)   make any loans or advances to, guarantees for the benefit of, or Investments in, any Person (other than a Wholly-Owned Subsidiary), except for (A) reasonable advances to employees in the ordinary course of business, and (B) Investments having a stated maturity no greater than one year from the date Holdings LLC or Subsidiary makes such Investment in (1) obligations of the United States government or any agency thereof or obligations guaranteed by the United States government, (2) certificates of deposit of commercial banks having combined capital and surplus of at least $500 million or (3) commercial paper with a rating of at least "Prime-1" by Moody's Investors Service, Inc.;

(ix)   enter into the ownership, active management or operation of any business other than the Business;

(x)   become subject to (including, without limitation, by way of amendment to or modification of) any agreement or instrument which by its terms would (under any circumstances) restrict the right of Holdings LLC or any of its Subsidiaries to make loans or advances or pay dividends or make distributions to, transfer property to, or repay any Indebtedness owed to, any holders of Units or other equity securities of Holdings LLC or any other Subsidiary;

(xi)   hire or fire the chief executive officer, the president or the chief financial officer of the Company or other individuals exercising the authority and/or performing the functions customarily associated with such job titles, or any other executive officers;

(xii)   enter into or amend any management services agreement or other consulting arrangements (other than in the ordinary course of business);

(xiii)   establish or acquire any Subsidiaries other than Wholly-Owned Subsidiaries;

(xiv)   adopt, approve, amend or otherwise modify any annual budget;

(xv)   make any capital expenditures (including, without limitation, payments with respect to capitalized leases, as determined in accordance with GAAP consistently applied) exceeding $500,000 in the aggregate on a consolidated basis during any 12-month period (it being acknowledged and agreed that the Board will establish a budget with respect to capital expenditures and the management of Holdings LLC and its subsidiaries shall adhere to such budget);

(xvi)   file a voluntary bankruptcy or similar proceeding or fail to contest any bankruptcy or similar proceeding filed against Holdings LLC or any of its Subsidiaries;

(xvii)   create, incur, assume or suffer to exist Indebtedness on a consolidated basis in an aggregate outstanding principal amount in excess of $100,000, other than advances from time to time under the Company's or any of its Subsidiaries' revolving loan arrangements; provided that, subject to permissibility under the Credit Agreement, Holdings LLC or any of its Subsidiaries may enter into, amend, modify or comply with software license obligations, vehicle and office equipment financings and other capital lease obligations that are in place as of the date hereof in the ordinary course of business consistent with past practices;

(xviii)   issue, sell or otherwise transfer any equity securities of any Subsidiary of Holdings LLC to any Person other than one or more Wholly Owned Subsidiaries of Holdings LLC; or

(xix)   agree or commit to any of the foregoing.

5.2     <u>Composition of the Board</u>.

(a)     <u>Number and Appointment</u>.

(i)     <u>Holdings LLC Board</u>. The Board shall initially consist of up to eight (8) Managers. Thereafter, the number of Managers on the Board shall be established from time to time by the Majority Linden Investors; <u>provided</u> that, for so long as either Linden Capital Partners III, L.P. (the "<u>Linden III VCOC</u>") or Linden Capital Partners III-A, L.P. (the "<u>Linden III-A VCOC</u>" and, together with the Linden III VCOC, the "<u>Linden VCOC Investors</u>") holds a direct or indirect interest in Holdings LLC, each such Linden VCOC Investor shall have the direct independent right to designate one (1) Manager pursuant to Section 5.2(a)(i)(B). The following individuals shall be the initial members of the Board (together, the "<u>Managers</u>"):

(A)     The Chief Executive Officer of the Company shall be a Manager so long as he or she serves as the Chief Executive Officer of the Company ("<u>Executive Manager</u>");

(B)     Three (3) Managers designated by the Linden Investors (each a "<u>Linden Manager</u>"), one (1) of whom shall be directly designated by the Linden III VCOC (the "<u>Linden III VCOC Manager</u>"), who shall initially be Anthony Davis, one (1) of whom shall be directly designated by the Linden III-A VCOC (the "<u>Linden III-A VCOC Manager</u>", and collectively with the Linden III VCOC Manager, the "<u>Linden VCOC Managers</u>"), who shall initially be Michael Farah, and one (1) of whom shall be designated by the Linden Investors, who shall initially be Patrick Donnelly;

(C)     Three (3) Managers to be designated by the Linden Investors (each an "<u>Independent Manager</u>"), whom shall not be investment professionals employed by the Linden Investors; and

(D)     To the extent Hargroves is no longer the Executive Manager, Hargroves shall have the right to be a Manager (the "<u>Founder Manager</u>").

(ii)     <u>Sub Boards/Committees</u>. The number and composition of the board of managers or similar governing body of each of Holdings LLC's Subsidiaries (each a "<u>Sub Board</u>") shall be determined from time to time by the Board; <u>provided</u> that the Majority Linden Investors, at all times, shall have the right to designate a majority of the members of any such Sub Board which shall include the Linden VCOC Managers, or any committees thereof or any committees of the Board.

(b)     <u>Term</u>. Each Manager appointed shall serve until a successor is appointed in accordance with the terms hereof or his or her earlier resignation, death or removal. Any Linden Manager or Independent Manager will be removed from the Board, with or without cause, at the written request of the Linden Investors entitled to appoint such Linden Manager or Independent Manager pursuant to this <u>Section 5.2</u>. The Linden III VCOC Manager will be removed from the Board, with or without cause, only at the written request of the Linden III VCOC, and the Linden III-A VCOC Manager will be removed

30

from the Board, with or without cause, only at the written request of the Linden III-A VCOC. Executive Manager will be automatically removed from the Board upon his employment with the Company ceasing for any reason. The right granted pursuant to Section 5.2(a)(i)(D) is personal to Hargroves and is not assignable, and such right shall automatically terminate with no further action by or notice from Holding LLC, and the Founder Manager shall automatically be removed from the Board, the Sub Board and each committee thereof, upon the earlier of (i) such time as Hargroves and his Permitted Transferees collectively cease to hold directly or indirectly at least 50% or more of the Equity Securities directly or indirectly held by Hargroves as of the date hereof, (ii) the consummation of an Approved Sale, (iii) the consummation of a Public Offering, (iv) the date on which Hargroves no longer serves as a Manager due to his resignation, death or disability and (v) such time as Hargroves engages in any activity prohibited by Section 7 of the Hargroves Employment Agreement without regard to any applicable restrictive periods set forth therein (i.e., as if for purposes of this Section 5.2(b) only, the restrictive covenants set forth therein have a term that extends beyond the Employment Period (as defined therein) to the date Hargroves and his Permitted Transferees collectively cease to directly or indirectly hold any Equity Securities). In the event that the Founder Manager for any reason ceases to serve as a member of the Board, the position of the Founder Manager shall end and no vacancy shall result therefrom. A Manager may resign at any time upon written notice to Holdings LLC. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event. Holdings LLC and the Members acknowledge and agree that the Linden VCOC Investors are express third party beneficiaries of the terms of this Section 5.2.

        (c)    Vacancies. A vacancy in the Board because of resignation, death or removal of a Manager will be filled by the Person or Persons entitled to appoint such Manager pursuant to the terms of this Section 5.2. If any Person or Persons fail to appoint a Manager pursuant to the terms of this Section 5.2, such position in the Board shall remain vacant until such Person or Persons exercise their right to appoint a Manager as provided hereunder. Newly created managerships resulting from any increase in the authorized number of Managers may be filled by the Board or the Majority Linden Investors.

        5.3    Board Actions; Meetings. Unless another percentage is set forth herein or required by applicable law, any determination or action required to be taken by the Board shall be taken by a majority of the Managers then in office (through meetings of the Board or written consents pursuant to this Section 5.3). A majority of the Managers shall constitute a quorum sufficient for conducting meetings and making decisions; provided that, at least one Linden Manager must be present at any meeting of the Board or any committee thereof in order to constitute a quorum. The vote of a majority of Managers present at a meeting at which a quorum is present shall be an act of the Board; provided that, the Linden Managers present at such meeting shall collectively have a number of votes (the "Linden Manager Votes") on all matters to be voted on by the Board or such committee equal to the greater of (i) the number of Linden Managers present at such meeting and (ii) the sum of one plus the number of Managers or committee members, as the case may be, present at such meeting that are not Linden Managers (with each Linden Manager entitled to cast his proportionate share of the total Linden Manager Votes). Regular meetings of the Board may be held on such date and at such time and at such place as shall from time to time be determined by the Board. Special meetings of the Board may be called from time to time by any Linden Manager. Notice of each special meeting of the Board stating the date, place and time of such meeting shall be given to each Manager by hand, telephone, telecopy, electronic mail, overnight courier or the U.S. mail at least twenty-four (24) hours prior to any meeting of the Board. Notice may be waived before or after a meeting or by attendance without protest at such meeting. Any action to be taken by the Board may be taken at a meeting of the Board or by a written consent executed by at least one Linden Manager and the Managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting. Prompt notice of the taking of any action by the Board without a meeting by less than unanimous written consent shall be given to those Managers who did not consent

in writing to the action. Managers may participate in a meeting of the Board by means of telephone conference or similar communications equipment by which all Persons participating in the meeting can communicate with each other and such participation in a meeting shall constitute presence in person at the meeting. Any Manager unable to attend a meeting of the Board may designate another Manager as his or her proxy. The Board may adopt such other procedures governing meetings and the conduct of business at such meetings as it shall deem appropriate.

5.4     Delegation of Authority. The Board may, from time to time, delegate to one or more Persons (including any Member and including through the creation and establishment of one or more other committees) such authority and duties as the Board may deem advisable. Any delegation pursuant to this Section 5.4 may be revoked at any time by the Board.

5.5     Purchase of Units. Subject to the provisions of Section 5.1(d), the Board may cause Holdings LLC to purchase or otherwise acquire Units; provided that this provision shall not in and of itself obligate any Unitholder to sell any Units to Holdings LLC. So long as any such Units are owned by Holdings LLC such Units will not be considered outstanding for any purpose.

5.6     Limitation of Liability.

(a)     Waiver of Liability. Except as otherwise provided herein or in any agreement entered into by such Person and Holdings LLC or the Company and to the maximum extent permitted by the Delaware Act, no present or former Manager nor any such Manager's Affiliates, employees, agents or representatives shall be liable to Holdings LLC or to any Member for any act or omission performed or omitted by such Person in its capacity as Manager; provided that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's willful misconduct or knowing violation of law as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected). Each Manager shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by such Manager in good faith reliance on such advice shall in no event subject such Manager or any of such Manager's Affiliates, employees, agents or representatives to liability to Holdings LLC or any Member.

(b)     Board Discretion. Whenever in this Agreement or any other agreement contemplated herein the Board is permitted or required to take any action or to make a decision or determination, the Board shall take such action or make such decision or determination in its sole discretion, unless another standard is expressly set forth herein or therein. Except as otherwise set forth herein, whenever in this Agreement or any other agreement contemplated herein the Board is permitted or required to take any action or to make a decision or determination in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, each Manager shall be entitled to consider such interests and factors as such Manager desires.

(c)     Good Faith and Other Standards. Whenever in this Agreement or any other agreement contemplated herein the Board is permitted or required to take any action or to make a decision or determination in its "good faith" or under another express standard, each Manager shall act under such express standard and, to the extent permitted by applicable law, shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein, and, notwithstanding anything contained herein to the contrary, so long as such Manager acts in good faith (as contemplated herein), the resolution, action or terms so made, taken or provided by the Board shall not constitute a breach of this Agreement or any other agreement contemplated herein or impose liability upon such Manager or any of such Manager's Affiliates, employees, agents or representatives.

(d)     <u>Designation and Duties of Officers</u>. The Board may from time to time designate individuals as officers of Holdings LLC, and any such officers shall have such authority and perform such duties as the Board may from time to time delegate to them and shall serve at the will of the board. The officers of Holdings LLC and its Subsidiaries, in the performance of their duties as such, shall owe to Holdings LLC and its Subsidiaries fiduciary duties (including of loyalty and due care) of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware.

(e)     <u>Effect on Other Agreements</u>. This <u>Section 5.6</u> shall not in any way affect, limit or modify any Person's liabilities or obligations under any employment agreement, consulting agreement, management services agreement, confidentiality agreement, noncompete agreement, nonsolicit agreement or any similar agreement with Holdings LLC or any of its Subsidiaries.

5.7     <u>Lending Agreements</u>. Each Member hereby consents in all respects (including to the extent any such consent is required by this Agreement) to the execution and delivery by Holdings LLC and its Subsidiaries of the Credit Agreement and the performance by Holdings LLC and its Subsidiaries of their respective obligations under the Credit Agreement.

ARTICLE VI

<u>RIGHTS AND OBLIGATIONS OF UNITHOLDERS AND MEMBERS</u>

6.1     <u>Limitation of Liability</u>. Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of Holdings LLC, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of Holdings LLC, and no Unitholder, Member or Manager shall be obligated personally for any such debt, obligation or liability of Holdings LLC solely by reason of being a Unitholder or acting as a Member or Manager of Holdings LLC, other than such Unitholder's obligation to make Capital Contributions to Holdings LLC pursuant to the terms and conditions hereof, any Equity Agreement or any other agreement respecting the issuance and sale or grant of Equity Securities; <u>provided that</u> a Unitholder shall be required to return to Holdings LLC any Distribution made to it in clear and manifest accounting or similar error. The immediately preceding sentence shall constitute a compromise to which all Unitholders have consented within the meaning of the Delaware Act. Notwithstanding anything contained herein to the contrary, the failure of Holdings LLC to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Unitholders, Members or Managers for liabilities of Holdings LLC, except to the extent constituting fraud or willful misconduct by such Unitholders, Members or Managers.

6.2     <u>Lack of Authority</u>. No Unitholder or Member in its capacity as such has the authority or power to act for or on behalf of Holdings LLC in any manner or way, to bind Holdings LLC, or do any act that would be (or could be construed as) binding on Holdings LLC, in any manner or way, or to make any expenditures on behalf of Holdings LLC, unless such specific authority has been expressly granted to and not revoked from such Member by the Board, and the Unitholders and Members hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

6.3     <u>No Right of Partition</u>. No Unitholder or Member shall have the right to seek or obtain partition by court decree or operation of law of any Holdings LLC property, or the right to own or use particular or individual assets of Holdings LLC.

6.4     <u>Indemnification</u>.

(a)      Generally. Subject to Section 4.6, Holdings LLC hereby agrees to indemnify and hold harmless any Person (each an "Indemnified Person") to the fullest extent permitted under the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits Holdings LLC to provide broader indemnification rights than Holdings LLC is providing immediately prior to such amendment), against all expenses, liabilities and losses (including attorney fees, judgments, fines, excise taxes or penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was a Unitholder or Member or is or was serving as a Manager, officer, director, principal or member of Holdings LLC or is or was serving at the request of Holdings LLC as a managing member, manager, officer, director, principal or member of another corporation, partnership, joint venture, limited liability company, trust or other enterprise; provided that no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' (excluding, for purposes hereof, Holdings LLC's and its Subsidiaries') willful misconduct or knowing violation of law as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected) or for any present or future breaches of any representations, warranties or covenants by such Indemnified Person or its Affiliates' (excluding, for purposes hereof, Holdings LLC's and its Subsidiaries'), employees, agents or representatives contained herein or in any other agreement with Holdings LLC or the Company or its Subsidiaries. Expenses, including attorneys' fees and expenses, incurred by any such Indemnified Person in defending a proceeding shall be paid by Holdings LLC in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by Holdings LLC.

(b)      Nonexclusivity of Rights. The right to indemnification and the advancement of expenses conferred in this Section 6.4 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, law, vote of the Board or otherwise. The Board may grant any rights comparable to those set forth in this Section 6.4 to any employee, agent or representative of Holdings LLC or such other Persons as it may determine.

(c)      Insurance. Holdings LLC shall maintain insurance in a minimum amount of $2,000,000, at its expense, to protect any Indemnified Person against any expense, liability or loss described in Section 6.4(a) whether or not Holdings LLC would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this Section 6.4.

(d)      Limitation. Notwithstanding anything contained herein to the contrary (including in this Section 6.4), any indemnity by Holdings LLC relating to the matters covered in this Section 6.4 shall be provided out of and to the extent of Holdings LLC assets only, and no Unitholder (unless such Unitholder otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of Holdings LLC (except as expressly provided herein).

(e)      Savings Clause. If this Section 6.4 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then Holdings LLC shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 6.4 to the fullest extent permitted by any applicable portion of this Section 6.4 that shall not have been invalidated and to the fullest extent permitted by applicable law.

6.5      Members Right to Act.

34

(a)     For situations for which the approval of the Members generally (rather than the approval of the Board or a particular group of Members) is specifically and expressly required by this Agreement or by non-voting provisions of applicable law, the Members shall act through meetings and written consents as described in this <u>Section 6.5</u>. Except as otherwise provided herein and as otherwise required by applicable law, (i) the Members holding Preferred Units shall have no voting rights with respect to such Preferred Units under this Agreement or the Delaware Act, (ii) the Members holding Class B Common Units shall have no voting rights with respect to such Class B Common Units under this Agreement or the Delaware Act and (iii) the Members holding Class A Common Units that are Vested Common Units shall be entitled to one vote per Vested Common Unit on all matters to be voted on by the Members. The actions by the Members permitted hereunder may be taken at a meeting called by the Board or by Members holding at least a majority of the Units entitled to vote or consent on the matter on at least five days' prior written notice to the other Members entitled to vote or consent thereon, which notice shall state the purpose or purposes for which such meeting is being called. The actions taken by the Members entitled to vote or consent at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, the Members entitled to vote or consent as to whom it was improperly held signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof. The actions by the Members entitled to vote or consent may be taken by Members by written consent (without a meeting and without a vote) so long as such consent is signed by the Members having not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Prompt notice of the action so taken without a meeting shall be given to those Members entitled to vote or consent who have not consented in writing. Any action taken pursuant to such written consent of the Members shall have the same force and effect as if taken by the Members at a meeting thereof.

(b)     To the fullest extent permitted by law, the holders of the Class B Common Units hereby waive any rights to vote on any matters as a separate class and agree that the holders of the Class B Common Units shall not vote separately on any matters submitted to the Unitholders, but instead any matters requiring a vote of the holders of the Class B Common Units as a separate class shall be determined by the holders of all Common Units voting as a single class. To the fullest extent permitted by law, the holders of the Class B Common Units hereby agree to vote their Class B Common Units as directed by the Majority Linden Investors with respect to any matters on which the Class B Common Units shall be entitled to vote as a class separate from the holders of the Class A Common Units, and the holders of the Class B Common Units hereby grant the Majority Linden Investors an irrevocable proxy, which shall be deemed coupled with an interest, to vote such holders' Class B Common Units in such a manner to give effect to the obligations of the holders of the Class B Common Units pursuant to this sentence.

6.6     <u>Investment Opportunities and Conflicts of Interest</u>. Each Rollover Investor and Management Investor shall, and shall cause each of their Affiliates to, bring all investment or business opportunities to Holdings LLC of which any of the foregoing become aware and which they believe are, or may be, within the scope and investment objectives related to the Business, which would or may be beneficial to the Business, or are otherwise competitive with the Business. The Unitholders expressly acknowledge and agree that, subject to the terms of any other agreement to which they may be bound, (i) the Linden Investors and the Lender Investors are permitted to have, and may presently or in the future have, investments or other business relationships with entities engaged in the Business other than through Holdings LLC or the Company or any of their respective Subsidiaries (an "<u>Other Business</u>"), (ii) the Linden Investors and the Lender Investors have and may develop a strategic relationship with businesses that are and may be competitive or complementary with Holdings LLC, the Company or any of their respective Subsidiaries, (iii) none of the Linden Investors and none of the Lender Investors will be prohibited by virtue of their respective investments in Holdings LLC, the Company or their respective

Subsidiaries or their service as Manager or service on the Company's or their respective Subsidiaries' board of managers or directors from pursuing and engaging in any such activities, (iv) none of the Linden Investors and none of the Lender Investors will be obligated to inform or present Holdings LLC, the Company or their respective Subsidiaries or the Board of any such opportunity, relationship or investment, (v) the other Unitholders will not acquire or be entitled to any interest or participation in any Other Business as a result of the participation therein of any of the Linden Investors or any of the Lender Investors, and (vi) the involvement of the Linden Investors or the Lender Investors in any Other Business will not constitute a conflict of interest by such Persons with respect to Holdings LLC or its Unitholders or any of Holdings LLC's Subsidiaries.

      6.7    No Impairment of Rights. Notwithstanding anything herein contained to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any Lender Investor or any Affiliate of any Lender Investor in its capacity as an administrative agent or a lender to Holdings LLC or any of its Subsidiaries or pursuant to the Credit Agreement.

ARTICLE VII

BOOKS, RECORDS, ACCOUNTING AND REPORTS; INSPECTION

      7.1    Records and Accounting. Holdings LLC shall keep, or cause to be kept, appropriate books and records with respect to Holdings LLC's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 7.2 or pursuant to applicable laws. All matters concerning (i) the determination of the relative amount of allocations and distributions among the Unitholders pursuant to Article III and Article IV and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board, whose determination shall be final and conclusive as to all of the Unitholders absent manifest clerical error.

      7.2    Tax Reports. Holdings LLC shall use reasonable efforts to deliver or cause to be delivered, to each Person who was a Unitholder at any time during such Fiscal Year (a) within 90 days after the end of each Taxable Year, an estimate of all information necessary for the preparation of such Person's United States federal, state and other tax returns, and (b) within 180 days after the end of each Taxable Year, all information necessary for the preparation of such Person's United States federal and state income tax returns.

      7.3    Transmission of Communications. Each Person that owns or controls Units on behalf of, or for the benefit of, another Person or Persons shall be responsible for conveying any report, notice or other communication received from Holdings LLC to such other Person or Persons.

      7.4    Financial Statements. Each holder of Linden Equity, each holder of Lender Equity and each Rollover Investor (so long as the Rollover Investor (i) holds in the aggregate at least 50% of the total outstanding Common Units held by the Rollover Investor as of the date hereof and (ii) has not violated any restrictive covenant set forth in any agreement between any Rollover Investor and/or its Affiliates and Holdings and/or any of its Subsidiaries) shall have the right to receive all of the following information from Holdings LLC (to the extent prepared by management in the ordinary course of business):

      (a)    as soon as available but in any event within 45 days after the end of each fiscal month: unaudited consolidated statements of income and cash flows of Holdings LLC and its Subsidiaries (the "Unaudited Financial Statements") for such fiscal month and for the period from the beginning of the fiscal year to the end of such fiscal month, and unaudited consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal month and all such statements shall be prepared in accordance

36

with GAAP (subject to the absence of footnote disclosures and to changes resulting from normal year-end adjustments for recurring accruals) compared against projections; and

(b) within 120 days after the end of each fiscal year, consolidated statements of income and cash flows of Holdings LLC and its Subsidiaries for such fiscal year, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the Company's annual budget and to the preceding fiscal year, all prepared in accordance with GAAP, consistently applied.

Notwithstanding the foregoing requirements to deliver certain financial statements, the delivery of any such financial statements by the Company or any of its Subsidiaries to any Member or any of its Affiliates pursuant to any other agreement or arrangement (including the Credit Agreement) between the Company or any of its Subsidiaries and such Member or any of its Affiliates shall be deemed to satisfy the Company's obligations to such Member hereunder.

ARTICLE VIII

TAX MATTERS

8.1     <u>Tax Returns</u>. Holdings LLC shall prepare and file all necessary federal, state, local and non-U.S. tax returns, including making the elections described in <u>Section 8.2</u>. Each Unitholder shall furnish to Holdings LLC all pertinent information in its possession relating to Holdings LLC's operations that is necessary to enable Holdings LLC's income tax returns to be prepared and filed.

8.2     <u>Tax Elections</u>. The Taxable Year shall be the Fiscal Year unless the Board shall determine otherwise in accordance with applicable law or unless required by the Code. Holdings LLC, with approval of the Board, shall make any election Holdings LLC, or the Board, may deem appropriate and in the best interests of the Unitholders. Each Unitholder will upon request supply any information necessary to give proper effect to such election.

8.3     <u>Tax Controversies</u>. A Member selected by the Board shall be the Tax Matters Partner and, as such, shall be authorized to represent Holdings LLC (at Holdings LLC's expense) in connection with all examinations of Holdings LLC's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Holdings LLC funds for professional services and incurred in connection therewith and to be reimbursed by Holdings LLC for any reasonable out-of-pocket expenses in connection with acting as the Tax Matters Partner. Each Unitholder agrees to cooperate with the Tax Matters Partner and Holdings LLC and to do or refrain from doing any or all things reasonably requested by the Tax Matters Partner or Holdings LLC with respect to the conduct of such proceedings. The Tax Matters Partner will not agree to enter into any settlement or similar agreement for a taxable year that binds the Linden Investors or agree to extend the period for assessing any Tax imposed by the Code with respect to the Linden Investors that is attributable to any partnership item (or affected items) of the Company, without the consent of the Linden Investors.

8.4     <u>New Partnership Audit Rules</u>. As and to the extent required by the New Partnership Audit Rules, the Board shall designate any Member (or other person) as the "partnership representative" (as defined in Code Section 6223(a)). Unless otherwise determined by the Board, Holdings LLC shall not elect to apply the New Partnership Audit Rules prior to the effective date described in Code Section 6241(g)(1). The Board, in its sole discretion, shall determine (A) whether or not Holdings LLC should make the election under Code Section 6221(b) with respect to determinations of adjustments at the Holdings LLC level and (B) if the election described in clause (A) is not made or is not available, to the extent applicable, whether or not Holdings LLC should make the election under Code Section 6226(a)

37

with respect to the alternative to payment of imputed underpayment by Holdings LLC and, in each such case if such election is made, Holdings LLC, the Board and the partnership representative, as applicable, shall take any other action such as filings, disclosures and notifications necessary to effectuate such election. Notwithstanding the foregoing, the Board, Holdings LLC and the partnership representative are each authorized, in its sole discretion, to make any available election related to Code Sections 6221 through 6241 of the Code and take any action it deems necessary or appropriate to comply with the requirements of the Code and conduct the Holdings LLC's affairs under Code Sections 6221 through 6241. Each Member shall cooperate with Holdings LLC in order to make any election or to otherwise comply with the New Partnership Audit Rules, including the provision of any necessary information, documents or forms.

8.5    Code Section 83 Safe Harbor Election.

(a)    By executing this Agreement, each Unitholder authorizes and directs Holdings LLC to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in the Internal Revenue Service Notice 2005-43 (the "IRS Notice"), or any successor guidance or provision, apply to any interest in Holdings LLC transferred to a service provider by Holdings LLC in connection with services provided to Holdings LLC on or after the effective date of such Revenue Procedure. For purposes of making such Safe Harbor election, the Tax Matters Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by Holdings LLC and, accordingly, execution of such Safe Harbor election by the Tax Matters Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. Holdings LLC and each Unitholder hereby agrees to comply with all requirements of the Safe Harbor described in the IRS Notice, including, without limitation, the requirement that each Unitholder shall prepare and file all federal income tax returns reporting the income tax effects of each Unit issued by Holdings LLC that qualifies for the Safe Harbor in a manner consistent with the requirements of the IRS Notice. A Unitholder's obligations to comply with the requirements of this Section 8.5 shall survive such Unitholder's ceasing to be a Unitholder of Holdings LLC and/or the termination, dissolution, liquidation and winding up of Holdings LLC, and, for purposes of this Section 8.5, Holdings LLC shall be treated as continuing in existence.

(b)    Each Unitholder authorizes the Tax Matters Partner to amend this Section 8.5 to the extent necessary to achieve substantially the same or similar tax treatment with respect to any interest in Holdings LLC transferred to a service provider by Holdings LLC in connection with services provided to Holdings LLC as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent Internal Revenue Service guidance); provided that such amendment does not result in disproportionately adverse treatment of any other Unitholder as compared to the treatment of a Unitholder holding similar Units.

ARTICLE IX

TRANSFER OF UNITS; REPURCHASE OF UNITS

9.1    Transfer Restrictions. No Unitholder shall Transfer any interest in any Units except as follows: (a) pursuant to Sections 9.2 (but not as a Transferring Unitholder) or 9.3; (b) pursuant to the forfeiture and repurchase provisions set forth in any applicable Employment Agreement and/or Equity Agreement; (c) to their respective Permitted Transferees; (d) in the case of holders of Linden Equity, to any Person; provided that such holders of Linden Equity (i) have not elected to exercise their rights pursuant to Section 9.3, and (ii) comply with Section 9.2; or (e) in the case of holders of Linden Equity, to any Persons in any Approved Sale in accordance with Section 9.3 (collectively, the "Exempt Transfers"). The restrictions contained in this Sections 9.1, 9.2 and 9.3 will terminate when Holdings LLC (or its corporate successor) has sold its common securities pursuant to a Public Offering or upon the

38

consummation of a Sale of Holdings LLC or a Sale of the Company. If any Person acquires Units pursuant to clause (c) above as a Permitted Transferee by virtue of (x) such Person's qualification as a member of a transferor's "Family Group" under clauses (ii) or (iii) of the definition of "Family Group" or (y) such Person's qualification as an affiliated investment fund of a transferor, and such Person shall, at any time, cease to be either a member of such transferor's Family Group or an affiliated investment fund of such transferor (as applicable), then such Person shall transfer such Person's Units to a Person that does qualify at the time of such required transfer as either a member of the original transferor's Family Group or as an affiliated investment fund of the original transferor.

9.2     <u>Tag Along Rights</u>.

(a)     <u>Participation Right</u>. At least 15 days prior to any Transfer by any holder of Linden Equity of any Units (other than one or more Transfers (i) pursuant to a Corporate Conversion or (ii) that are Exempt Transfers (other than pursuant to <u>Section 9.1(d)</u> or <u>Section 9.1(e)</u>), each such Person making such Transfer (the "<u>Transferring Unitholder</u>"), shall deliver a written notice (the "<u>Sale Notice</u>") to Holdings LLC and to the other Members (the "<u>Other Members</u>"), specifying in reasonable detail the identity of the prospective Transferee(s), the number and class of Units to be Transferred, the purchase price of each Unit to be sold, the date that such proposed sale is expected to be consummated and other material terms and conditions of the Transfer. The Other Members which hold the same class of Units (Common Units or Preferred Units, as the case may be) may elect to participate in the contemplated Transfer with Units of the same class by delivering written notice to the Transferring Unitholder within 10 days after delivery of the Sale Notice. Such participation shall be based upon the Pro Rata Share represented by the Units requested to be included by each Unitholder relative to the Pro Rata Share of all Units held by the Unitholders participating in such Transfer (including the Transferring Unitholder); <u>provided</u> that no Other Member shall be entitled to Transfer Unvested Common Units pursuant to this <u>Section 9.2</u>. If the Transferring Unitholder is transferring a strip of Preferred Units and Common Units, each Other Member which holds both Preferred Units and Common Units may elect to participate in such Transfer only if such Person also Transfers the same strip of Preferred Units and Common Units. If the Other Members have not elected to participate in the contemplated Transfer (through notice to such effect or expiration of the 10-day period after delivery of the Sale Notice), then the Transferring Unitholder may Transfer the Units specified in the Sale Notice at a price and on terms no more favorable to the Transferee(s) thereof than specified in the Sale Notice during the 120-day period immediately following the date of the delivery of the Sale Notice. Any Transferring Unitholder's Units not Transferred within such 120-day period shall be subject to the provisions of this <u>Section 9.2</u> upon subsequent Transfer.

(b)     <u>Participation Procedure; Conditions</u>. With respect to any Transfer subject to <u>Section 9.2(a)</u>, each Transferring Unitholder shall use its commercially reasonable efforts to obtain the agreement of the prospective Transferee(s) to the participation of the Other Members who have elected to participate in any contemplated Transfer, and no Transferring Unitholder shall Transfer any of its Units to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of the Other Members, unless in connection with such Transfer, one or more of the Transferring Unitholders or their Affiliates purchase (on the same terms and conditions on which such Units were sold to the Transferee(s)) the number and class of Units (or pursuant to the following sentence the applicable portion of equity and debt securities of each respective Corporate Investment Vehicle) from each Other Member which such Other Member would have been entitled to sell pursuant to <u>Section 9.2(a)</u>. Holders of debt or equity securities of Corporate Investment Vehicles shall be entitled to Transfer that portion of the outstanding debt and equity securities of their respective Corporate Investment Vehicles which corresponds to the portion of Units such Corporate Investment Vehicles are electing and entitled to Transfer hereunder at the same consideration (or choice of consideration) per Common Unit and/or Preferred Unit (such consideration to be determined in a manner consistent with <u>Section 9.3(e)</u>), as the case may be, paid or payable to Members Transferring Common Units and/or Preferred Units, in lieu of a

Transfer of such Units by such Corporate Investment Vehicles. Each Unitholder Transferring Units pursuant to this Section 9.2 shall pay its pro rata share (based on each such holder's share of the aggregate proceeds paid with respect to its Units) of the expenses incurred by the Transferring Unitholder in connection with such Transfer and shall be obligated to join based on its pro rata share (based on each such holder's share of the aggregate proceeds paid with respect to its Units) in any indemnification or other obligations that the Transferring Unitholder agrees to provide in connection with such Transfer (other than any such obligations that relate specifically to a particular Unitholder such as indemnification with respect to representations and warranties given by a Unitholder regarding such Unitholder's title to and ownership of Units); provided that unless a prospective Transferee permits a Unitholder or seller of debt or equity securities of a Corporate Investment Vehicle to give a guarantee, letter of credit or other mechanism (which shall be dealt with on an individual basis), any escrow or holdback of proceeds of any such transaction shall be withheld on a pro rata basis among all Unitholders and sellers of debt or equity securities of a Corporate Investment Vehicle (based on each such holder's share of the aggregate proceeds paid with respect to its Units and debt or equity securities sold); provided further that, in no event shall any Unitholder's or any seller of debt or equity securities of a Corporate Investment Vehicle's aggregate liability for any indemnification obligations exceed the net proceeds actually received by such Unitholder; provided further that, none of the Lender Investors shall be required to enter into any non-competition or non-solicitation agreement or any other agreement of similar import in connection with the participation by such Lender Investor in any Transfer made pursuant to this Section 9.2 which are more burdensome than those executed by the Linden Investors or their Affiliates.

   9.3   Approved Sale; Drag Along Obligations.

      (a)   Approved Sale.

         (i)   If the Majority Linden Investors approve a Sale of the Company or a Sale of Holdings LLC (an "Approved Sale"") other than to an Affiliate of the Linden Investors, each Member and each Unitholder (and each Person that retains voting control of any Units Transferred to a Permitted Transferee) shall vote for (whether at a meeting of Unitholders or by written consent), consent to and raise no objections against, and not otherwise impede or delay, such Approved Sale. In furtherance of the foregoing, if the Approved Sale is structured as a (x) merger or consolidation, each Member and Unitholder shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (y) sale of Units, each Member and Unitholder shall agree to sell, and shall sell, all of his, her or its Units and rights to acquire Units (or, if less than all, than the same percentage or his, her or its Units or rights as the Majority Linden Investors are selling) on the terms and conditions approved by the Majority Linden Investors.

         (ii)   Each Member and Unitholder shall take all necessary or desirable actions in connection with the consummation of the Approved Sale as requested by the Majority Linden Investors (including, without limitation, executing and delivering any and all agreements, instruments and other documents executed by the Linden Investors, including any applicable purchase agreement, stockholders agreement and/or indemnification and/or contribution agreement and, only in the case of Unitholders and their Affiliates who are also employees of Holdings LLC or any of its Subsidiaries, executing and delivering non-competition and non-solicitation agreements and/or "rollover" agreements, in each case, whether or not executed by the Linden Investors and otherwise cooperating with the Majority Linden Investors, the prospective buyer and their respective representatives with such Approved Sale; it being understood that none of the Institutional Investors shall be obligated to enter into any non-competition, non-solicitation agreement or the like which are more burdensome than those executed by the Linden Investors or their Affiliates); provided, however, that in no event shall the

Lender Investors be obligated to enter into any non-competition/non-investment, non-solicitation agreement or the like.

(iii)    In connection with any Approved Sale, each Member, Unitholder and the Company shall (and the Company shall cause each of its Subsidiaries and each of its and their respective officers, directors, employees, financial advisors, consultants, attorneys and other agents and representatives to) take all necessary or desirable actions in connection with the consummation of the Approved Sale and any related transactions (including any auction or competitive bid process in connection with or preceding such Approved Sale) as reasonably requested by the Majority Linden Investors, including (A) retaining investment bankers and other advisors approved by the Majority Linden Investors; (B) participating in management meetings and preparing pitchbooks and confidential information memorandums, (C) furnishing information and copies of documents, (D) preparing and making filings with governmental authorities; (E) providing assistance with legal, accounting, tax, financial, benefits and other due diligence; and (F) otherwise cooperating with the Majority Linden Investors, the prospective buyer(s), any investment bankers, consultants or other professional advisors who have been retained in connection with such Approved Sale and their respective representatives.

(b)    Condition. The obligations of the Members and Unitholders with respect to the Approved Sale and the right of the Majority Linden Investors to engage in an Approved Sale are subject to the satisfaction of the following conditions: (i) such Approved Sale is to an Independent Third Party; (ii) that each Unitholder shall receive in exchange for the Units held by such Unitholder the same portion of the aggregate consideration from such transaction that such Unitholder would have received with respect to such Units if such aggregate consideration had been distributed by Holdings LLC in accordance with the provisions of Section 4.1(b) and (iii) all holders of a particular series of Units will receive the same form of consideration as all other holders of the same series of Units or if any holder of a particular series of Units is given an option as to the form and amount of consideration to be received, all holders of such series of Units will be given the same option with respect to such consideration; provided, however, that nothing in this Section 9.3(b) shall entitle any Member to receive (x) any form of consideration that a Member would be ineligible to receive as a result of such Member's failure to satisfy any condition, requirement or limitation that is generally applicable to the Members or (y) any rollover securities received by the Linden Investors or any other Member in lieu of cash consideration in such Approved Sale.

(c)    Indemnification; Expenses. The Unitholders shall be severally, but not jointly, obligated to join on a pro rata basis (as if such indemnification obligations reduced the aggregate proceeds available for distribution or payment to the Unitholders in such Approved Sale) in any indemnification obligation the Majority Linden Investors, as the case may be, have agreed to in connection with such Approved Sale (other than any such obligations that relate specifically to a particular Unitholder, such as indemnification with respect to representations and warranties given by a Unitholder regarding such Unitholder's title to and ownership of Units); provided that unless a prospective Transferee permits a Unitholder to give a guarantee, letter of credit or other mechanism (which shall be dealt with on an individual basis), any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all Unitholders (as if such escrow reduced the aggregate proceeds available for distribution or payment to the Unitholders in such Approved Sale). Each Unitholder shall pay its pro rata share (as if such expenses reduced the aggregate proceeds available for distribution or payment to the Unitholders in such Approved Sale) of the expenses incurred by the Unitholders pursuant to an Approved Sale to the extent such expenses are incurred for the benefit of all Unitholders (as determined by the Board). Expenses incurred by any Unitholder on its own behalf (including the fees and disbursements of counsel, advisors and other Persons retained by such holder in connection with the Approved Sale as determined by the Board) will not be considered costs incurred for the benefit of all Unitholders and, to the extent not

41

paid by Holdings LLC, will be the responsibility of such Unitholder. Subject to the last sentence of Section 9.2(b), each Unitholder shall enter into any other agreement that the Majority Linden Investors approve and (other than non-competition and non-solicitation agreements to be entered into by Unitholders who are also employees of Holdings LLC or any of its Subsidiaries) enter into on the same terms and conditions (other than as differences in such terms and conditions might result from holdings of different classes of Units). Without limiting the immediately prior sentence, each Unitholder shall enter into, on a several but not joint basis, any indemnification, contribution or unitholder representative agreement requested by the Majority Linden Investors to ensure compliance with this Section 9.3(c). Notwithstanding anything to the contrary contained herein, in the event that any indemnification obligations are incurred in connection with the Approved Sale, each Unitholder's obligations pursuant thereto shall not exceed the net proceeds received by such Unitholder pursuant to such Approved Sale.

(d)     Purchaser Representative. If the Company, Holdings LLC and/or the Linden Investors enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the other Unitholders shall, at the request of the Company, Holdings LLC or the Majority Linden Investors, as the case may be, appoint a "purchaser representative" (as such term is defined in Rule 501 promulgated under the Securities Act) designated by Holdings LLC and reasonably acceptable to the Linden Investors. If any Unitholder so appoints a purchaser representative, Holdings LLC shall pay the fees of such purchaser representative. However, if any Unitholder declines to appoint the purchaser representative designated by Holdings LLC, such Unitholder shall appoint another purchaser representative (reasonably acceptable to Holdings LLC and the Majority Linden Investors), and such Unitholder shall be responsible for the fees of the purchaser representative so appointed.

(e)     Structure for a Sale of Holdings LLC. Without limiting the generality of the foregoing or any other provision of this Agreement (including the requirements of the conditions specified in Section 9.3(b) above), it is understood and agreed that the following structure for a Sale of Holdings LLC (whether such Sale of Holdings LLC is initiated or classified as an Approved Sale or otherwise) shall be utilized by Holdings LLC and approved by the Board and each Unitholder if so requested by any Linden Corporate Investment Vehicle: a Sale of Holdings LLC in which the purchaser or purchasers acquire(s) separately each of the following: (i) all Units of Holdings LLC other than Units held directly or indirectly by Corporate Investment Vehicles (assuming a distribution by Linden Splitter of the Units it holds to its partners prior to the consummation of such transaction); and (ii) all outstanding capital stock, other equity interests and all outstanding indebtedness of the Corporate Investment Vehicles and/or all of the options, warrants and/or other rights to acquire equity interests in the Corporate Investment Vehicle issued by the Corporate Investment Vehicles (collectively, the "CIV Securities") (which options, warrants or rights to acquire equity interests the purchaser or purchasers will then exercise) and, in such a sale, the holders of CIV Securities of each Corporate Investment Vehicle shall, in the aggregate, be entitled to the same consideration (taking into account the exercise price for such options, warrants or rights to acquire equity interests to be paid by the purchaser or purchasers) for the transfer of such CIV Securities that such Corporate Investment Vehicles would have received if such Corporate Investment Vehicle had transferred the Units held by such Corporate Investment Vehicle directly and such transfer shall be on the same terms and conditions as the sale pursuant to clause (i); and such amount paid for the CIV Securities (taking into account the exercise price for such options, warrants or rights to acquire equity interests to be paid by the purchaser or purchasers) shall be allocated amongst such CIV Securities based on the terms and conditions of such CIV Securities as determined by the applicable Corporate Investment Vehicle. In connection with any Transfer of Units held by such Corporate Investment Vehicle, including pursuant to the terms of this Section 9.3 or in connection with any other change of control transaction or liquidity event, each Member of the Company other than such Corporate Investment Vehicle shall consent to and raise no objections to any Person against, and shall

cooperate fully with, any such transfer of the CIV Securities. Notwithstanding anything to the contrary set forth herein, if no CIV Securities of any Linden Corporate Investment Vehicle are acquired by the purchaser or purchasers in connection with a Sale of Holdings LLC, then (x) no Person (including Holdings LLC and any holder of CIV Securities) shall be required to cause the sale of any CIV Securities in connection with such Sale of Holdings LLC and (y) such Sale of Holdings LLC may be consummated by the sale of all Units (and only Units) of Holdings LLC (including those Units held directly or indirectly by Corporate Investment Vehicles).

(f)     No Grant of Dissenters Rights or Appraisal Rights. In no manner shall this Section 9.3 be construed to grant to any Member or Unitholder any dissenters rights or appraisal rights or give any Member or Unitholder any right to vote in any transaction structured as a merger or consolidation (it being understood that the Members hereby expressly waive rights under Section 18-210 of the Delaware Act (entitled "Contractual Appraisal Rights") in all circumstances and grant to the Board and the Majority Linden Investors the sole right to approve or consent to a merger or consolidation of Holdings LLC without approval or consent of the Members or the Unitholders).

9.4     Effect of Assignment.

(a)     Termination of Rights. Any Member who shall assign any Units or other interest in Holdings LLC shall cease to be a Member with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest, except as provided in Section 9.1.

(b)     Deemed Agreement. Any Person who acquires in any manner whatsoever any Units or other interest in Holdings LLC, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in Holdings LLC of such Person was subject to or by which such predecessor was bound.

9.5     Additional Restrictions on Transfer.

(a)     Execution of Counterpart. Except in connection with an Approved Sale, each Transferee of Units or other interests in Holdings LLC (including any Permitted Transferee) shall, as a condition prior to such Transfer, execute and deliver to Holdings LLC a counterpart to this Agreement pursuant to which such Transferee shall agree to be bound by the provisions of this Agreement.

(b)     Notice. In connection with the Transfer of any Units, the holder of such Units will deliver written notice to Holdings LLC describing in reasonable detail the Transfer or proposed Transfer.

(c)     Legal Opinion. No Transfer of Units or any other interest in Holdings LLC (other than to a Permitted Transferee) may be made unless in the opinion of counsel, satisfactory in form and substance to the Board (which opinion may be waived by the Board), such Transfer would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to Holdings LLC or the interest to be Transferred, or cause Holdings LLC to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended. Such opinion of counsel shall be delivered in writing to Holdings LLC prior to the date of the Transfer.

(d)    No Avoidance of Provisions. No Unitholder (other than the Lender Investors) shall directly or indirectly (i) permit the Transfer of all or any portion of the direct or indirect equity or beneficial interest in such Unitholder or (ii) otherwise seek to avoid the provisions of this Agreement by issuing, or permitting the issuance of, any direct or indirect equity or beneficial interest in such Unitholder, in any such case in a manner which would fail to comply with this Article IX if such Unitholder had Transferred Units directly.

(e)    Code Section 7704 Safe Harbor. In order to permit Holdings LLC to qualify for the benefit of a "safe harbor" under Code Section 7704, notwithstanding anything to the contrary in this Agreement, no Transfer of any Unit or economic interest shall be permitted or recognized by Holdings LLC or the Board (within the meaning of Treasury Regulation Section 1.7704-1(d)) if and to the extent that such Transfer would cause Holdings LLC to have more than 100 partners (within the meaning of Treasury Regulation Section 1.7704-1(h), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3)).

9.6    Legend. In the event that Certificated Units are issued, such Certificated Units will bear the following legend:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____ ___,_____, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN AN AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, DATED AS OF SEPTEMBER 30, 2016 AS AMENDED AND MODIFIED FROM TIME TO TIME, GOVERNING THE ISSUER (THE "COMPANY"), AND BY AND AMONG CERTAIN INVESTORS (THE "LLC AGREEMENT"). THE UNITS REPRESENTED BY THIS CERTIFICATE MAY ALSO BE SUBJECT TO ADDITIONAL TRANSFER RESTRICTIONS, CERTAIN VESTING PROVISIONS, REPURCHASE OPTIONS, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH IN THE LLC AGREEMENT AND/OR A SEPARATE AGREEMENT WITH THE INITIAL HOLDER. A COPY OF SUCH CONDITIONS, REPURCHASE OPTIONS AND FORFEITURE PROVISIONS SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

If a Member holding Certificated Units delivers to Holdings LLC an opinion of counsel, satisfactory in form and substance to the Board (which opinion may be waived by the Board), that no subsequent Transfer of such Units will require registration under the Securities Act, Holdings LLC will promptly upon such contemplated Transfer deliver new Certificated Units which do not bear the portion of the restrictive legend relating to the Securities Act set forth in this Section 9.6.

9.7    Transfer Fees and Expenses. Except as provided in Sections 9.2, and 9.3, the Transferor and Transferee of any Units or other interest in Holdings LLC shall be jointly and severally obligated to

reimburse Holdings LLC for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

9.8     Void Transfers. Any Transfer by any Member or Unitholder of any Units or other interest in Holdings LLC in contravention of this Agreement (including, without limitation, the failure of the Transferee to execute a counterpart to this Agreement) or which would cause Holdings LLC to not be treated as a partnership for U.S. federal income tax purposes shall be void and ineffectual and shall not bind or be recognized by Holdings LLC or any other party. No purported assignee shall have any right to any Profits, Losses or Distributions of Holdings LLC.

9.9     Conversion to Corporate Form Upon a Public Offering.

(a)     Approval. If the Board and the Majority Linden Investors approve a Public Offering with respect to Holdings LLC or the Company or otherwise approves the conversion of Holdings LLC from a limited liability company to a corporation (whether or not in connection with a Public Offering), each Member and Unitholder (and each Person that retains voting control of any Units Transferred in accordance with Section 9.1) hereby consents to such Public Offering and shall vote for (to the extent it has any voting right) and raise no objections against such Public Offering or conversion, and each Member and Unitholder shall take all reasonable actions in connection with the consummation of such Public Offering or conversion as determined by the Board and the Majority Linden Investors.

(b)     Required Actions. Holdings LLC shall, at the request of the underwriters in the case of a Public Offering or the Board or the Majority Linden Investors in the case of any other conversion, effect a conversion to corporate form and, in connection therewith, the Members and the Unitholders shall, at the request and under the direction of the Board and the Majority Linden Investors, take all actions necessary or desirable to effect such conversion (including, without limitation, whether by conversion to a subchapter C corporation, merger or consolidation into any entity, recapitalization or otherwise), giving effect to the same economic, voting and corporate governance provisions contained herein after taking into consideration the structure of Holdings LLC and its Subsidiaries and their respective securities (a "Corporate Conversion"). In connection with the Corporate Conversion, (i) in the event preferred stock of the corporate successor is issued, each holder of Preferred Units will be entitled to receive preferred stock of the corporate successor in a manner which would cause the rights and preferences of the Preferred Units to be preserved as nearly as possible under such new structure, and if no preferred stock is so issued, then each holder of Preferred Units will be entitled to receive a percentage of the shares of common stock of the corporate successor outstanding immediately following the Corporate Conversion equal to the percentage that such holder of Preferred Units would have received of the total amount distributed to all Unitholders had Holdings LLC liquidated and distributed such common stock in accordance with Article XII on the day of the Corporate Conversion, and (ii) thereafter, each holder of Common Units will be entitled to receive a percentage of the shares of common stock of the corporate successor outstanding immediately following the Corporate Conversion equal to the percentage that such holder of Common Units would have received of the total amount distributed to all Unitholders had Holdings LLC liquidated and distributed such common stock in accordance with Article XII on the day of the Corporate Conversion (after giving effect to any payments as a result of the redemption (if any) of any Units). Each Unitholder hereby consents to such Corporate Conversion and agrees that it will, in connection with such Corporate Conversion, consent to and raise no objections against the Corporate Conversion. In connection with such Corporate Conversion, each Unitholder hereby agrees to enter into (i) a securityholders agreement with the corporate successor and each other Unitholder on terms approved by the Majority Linden Investors which contains restrictions on the Transfer of such capital stock and other provisions (including, without limitation, with respect to the governance and control of such corporate successor) in form and substance similar to the provisions and restrictions set forth herein (including, without limitation, in Article IX) and (ii) an agreement with the corporate successor providing

45

for the continued vesting of, and repurchase rights respecting, any capital stock issued in respect of Unvested Common Units in form and substance similar to the provisions and restrictions with respect to vesting and repurchase rights set forth herein. Holdings LLC or its successor shall pay any fees incurred by any Linden Investor pursuant to the HSR Act in connection with any such Corporate Conversion.

(c)     Without limiting the generality of the foregoing or any other provision of this Agreement, it is understood and agreed that the following structures for any such reorganization and subsequent Public Offering shall be utilized by Holdings LLC and approved by the Board and each Unitholder, if such approval is requested by any Linden Investor that is a Corporate Investment Vehicle:

(i)     Subject to Section 9.9(c)(ii), a public offering of shares of common stock by the Specified Corporate Investment Vehicle, which is immediately preceded by a reorganization of Holdings LLC or the Company, as the case may be, so that the Specified Corporate Investment Vehicle is the successor described in this Section 9.9, as follows: the contribution (A) by all Unitholders (other than the other Corporate Investment Vehicles) of all Units of Holdings LLC (excluding Units held by any other Corporate Investment Vehicle) and (B) by the holders of the outstanding debt and equity securities of any other Corporate Investment Vehicles of all outstanding capital stock or other equity interests and all outstanding indebtedness of such other Corporate Investment Vehicles, in each case, to the Specified Corporate Investment Vehicle in exchange for shares of successor stock of the Specified Corporate Investment Vehicle (the allocation of which among the holders shall be in accordance with Section 9.9(b); provided that holders of capital stock or other debt and equity interests of any other Corporate Investment Vehicles shall be entitled to exchange such capital stock or other debt and other equity interest for a number of shares of successor stock, in the aggregate equal to the number to which it would be entitled pursuant to Section 9.9(b) if it were receiving stock in exchange for the Units it holds.

(ii)     If, however, the transactions described in Section 9.9(c)(i) would not qualify as an exchange of property for stock described in Code Section 351, then the Public Offering shall be effected under the following terms and in the following order: (A) the successor is formed; (B) in exchange for shares of the successor stock (the allocation of which among the holders shall be in accordance with Section 9.9(b)) the following property is contributed to the successor: (1) all Units of Holdings LLC other than those Units held by the Corporate Investment Vehicles and (2) all outstanding capital stock or other equity interests and all outstanding indebtedness of the Corporate Investment Vehicles; and (C) the successor issues shares of common stock in the Public Offering.

(d)     Registration Rights. If in connection with a Public Offering with respect to Holdings LLC (or, in the event equity securities of the Company are distributed in connection therewith, with respect to the Company) the Linden Investors enter into a registration rights agreement with Holdings LLC (or the Company, if applicable, or any of their respective corporate successors) with respect to their securities, then such registration rights agreement shall provide for (i) piggyback registration rights to the Lender Investors in connection with any primary registration of the securities of Holdings LLC (or the Company, if applicable, or any of their respective corporate successors) under the Securities Act (other than in connection with a merger, acquisition, corporate reorganization, exchange offers, dividend reinvestment plan, stock option plan or other employee benefit plan) in which the Linden Investors are entitled to register their securities; (ii) such piggyback registration rights granted to the Lender Investors to rank pari passu and to be allocated on a pro rata basis with any registration rights granted to the Linden Investors (subject to customary cutback provisions); (iii) several and reciprocal Holdings LLC indemnification and contribution provisions (with Lender Investors' liability limited to its own representations or statements made in connection with any registrations; and (iv) lock-up provisions (if any) no less favorable than those which apply to the Linden Investors.

46

9.10   Holdback Agreement. No Unitholder shall effect any public sale or distribution of any Units or of any capital stock or equity securities of Holdings LLC or the Company or any corporate successor thereto, or any securities convertible into or exchangeable or exercisable for such Units, stock or securities, during the seven days prior to and the 90-day period (180 days in the case of an initial Public Offering) beginning on the effective date of any underwritten Public Offering, except as part of such underwritten Public Offering or unless otherwise permitted by Holdings LLC.

9.11   Forfeiture of Common Units. Notwithstanding anything to the contrary set forth herein, Common Units may be subject to vesting, forfeiture and/or repurchase as set forth in any applicable Employment Agreement and/or Equity Agreement.

ARTICLE X

ADMISSION OF MEMBERS

10.1   Substituted Members. In connection with the Transfer of Units of a Unitholder permitted under the terms of this Agreement, the Equity Agreements (if applicable), and the other agreements contemplated hereby and thereby, the Transferee shall become a Substituted Member on the later of (a) the effective date of such Transfer, and (b) the date on which the Board approves such Transferee as a Substituted Member, and such admission shall be shown on the books and records of Holdings LLC; provided, however, in connection with the Transfer of Units of a Unitholder to a Permitted Transferee permitted under the terms of this Agreement, the Equity Agreements (if applicable), and the other agreements contemplated hereby and thereby, the Transferee shall become a Substituted Member on the effective date of such Transfer.

10.2   Additional Members. A Person may be admitted to Holdings LLC as an Additional Member only as contemplated under Section 3.1 and only upon furnishing to Holdings LLC (a) a letter of acceptance, in form satisfactory to the Board, of all the terms and conditions of this Agreement, including the power of attorney granted in Section 14.1, and (b) such other documents or instruments as may be deemed necessary or appropriate by the Board to effect such Person's admission as a Member. Such admission shall become effective on the date on which the Board determines that such conditions have been satisfied and when any such admission is shown on the books and records of Holdings LLC.

ARTICLE XI

WITHDRAWAL AND RESIGNATION OF UNITHOLDERS

11.1   Withdrawal and Resignation of Unitholders. No Unitholder shall have the power or right to withdraw or otherwise resign from Holdings LLC prior to the dissolution and winding up of Holdings LLC pursuant to Article XII, without the prior written consent of the Board and the Majority Linden Investors (which consent may be withheld by the Board and the Majority Linden Investors in their sole discretion) except as otherwise expressly permitted by this Agreement or any of the other agreements contemplated hereby. Upon a Transfer of all of a Unitholder's Units in a Transfer permitted by this Agreement, and (if applicable) the Equity Agreements, subject to the provisions of Section 9.5, such Unitholder shall cease to be a Unitholder. Notwithstanding that payment on account of a withdrawal may be made after the effective time of such withdrawal, any completely withdrawing Unitholder will not be considered a Unitholder for any purpose after the effective time of such complete withdrawal, and, in the case of a partial withdrawal, such Unitholder's Capital Account (and corresponding voting and other rights) shall be reduced for all other purposes hereunder upon the effective time of such partial withdrawal.

47

ARTICLE XII

DISSOLUTION AND LIQUIDATION

12.1     Dissolution.

(a)     Holdings LLC shall not be dissolved by the admission of Additional Members or Substituted Members or by the death, retirement, expulsion, bankruptcy or dissolution of any Unitholder. Holdings LLC shall dissolve, and its affairs shall be wound up upon the first of the following to occur:

(b)     Board and the Majority Linden Investors' approval of dissolution; or

(c)     the entry of a decree of judicial dissolution of Holdings LLC under Section 35-5 of the Delaware Act or an administrative dissolution under Section 18-802 of the Delaware Act.

Except as otherwise set forth in this Article XII, Holdings LLC is intended to have perpetual existence. An Event of Withdrawal shall not cause a dissolution of Holdings LLC and Holdings LLC shall continue in existence subject to the terms and conditions of this Agreement.

12.2     Liquidation and Termination. On the dissolution of Holdings LLC, the Board shall act as liquidator or may appoint one or more representatives, Members or other Persons as liquidator(s). The liquidators shall proceed diligently to wind up the affairs of Holdings LLC and make final distributions as provided herein and in the Delaware Act. The costs of liquidation shall be borne as a Holdings LLC expense. Until final distribution, the liquidators shall continue to operate Holdings LLC properties with all of the power and authority of the Board. The steps to be accomplished by the liquidators are as follows:

(a)     The liquidators shall pay, satisfy or discharge from Holdings LLC funds all of the debts, liabilities and obligations of Holdings LLC (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine).

(b)     As promptly as practicable after dissolution, the liquidators shall (i) determine the Fair Market Value (the "Liquidation FMV") of Holdings LLC's remaining assets (the "Liquidation Assets") in accordance with Article XIII hereof, (ii) write up or down any such Liquidation Assets to their Fair Market Value, thus creating Profit or Loss (if any), which shall be allocated in accordance with Section 4.2 and Section 4.3, (iii) determine the amounts to be distributed to each Unitholder in accordance with Section 4.1(b), and (iv) deliver to each Unitholder a statement (the "Liquidation Statement") setting forth the Liquidation FMV and the amounts and recipients of such Distributions.

(c)     As soon as the Liquidation FMV and the proper amounts of Distributions have been determined in accordance with Section 12.2(b), the liquidators shall promptly distribute Holdings LLC's Liquidation Assets to the holders of Units in accordance with Section 4.1(b). In making such distributions, unless otherwise determined by the Board, the liquidators first shall allocate any cash and cash equivalents to Unitholders in respect of Preferred Units and second allocate each type of remaining Liquidation Assets (i.e., cash or cash equivalents, preferred or common equity securities, etc.) among the Unitholders ratably based upon the aggregate amounts to be distributed with respect to the Units held by each such holder; provided that the liquidators may allocate each type of Liquidation Assets so as to give effect to and take into account the relative priorities of the different Units. Any non-cash Liquidation Assets will first be written up or down to their Fair Market Value, thus creating Profit or Loss (if any),

48

which shall be allocated in accordance with Sections 4.2 and 4.3. After taking into account such allocations, it is anticipated that each Unitholder's Capital Account will be equal to the amount to be distributed to such Unitholder pursuant to this Section 12.2(c). If any Unitholder's Capital Account is not equal to the amount to be distributed to such Unitholder pursuant to this Section 12.2(c), Profits and Losses for the Fiscal Year in which Holdings LLC is dissolved shall be allocated among the Unitholders in such a manner as to cause, to the extent possible, each Unitholder's Capital Account to be equal to the amount to be distributed to such Unitholder pursuant to this Section 12.2(c).

The distribution of cash and/or property to a Unitholder in accordance with the provisions of this Section 12.2 constitutes a complete return to the Unitholder of its Capital Contributions and a complete distribution to the Unitholder of its interest in Holdings LLC and all Holdings LLC property and constitutes a compromise to which all Unitholders have consented within the meaning of the Delaware Act. To the extent that a Unitholder returns funds to Holdings LLC, it has no claim against any other Unitholder for those funds.

12.3    Securityholders Agreement. To the extent that units or other equity securities of any Subsidiary are distributed to any Unitholders and unless otherwise agreed to by the Board, such Unitholders hereby agree to enter into a securityholders agreement with such Subsidiary and each other Unitholder which contains restrictions on the Transfer of such equity securities and other provisions (including, without limitation, with respect to the governance and control of such Subsidiary) in form and substance similar to the provisions and restrictions set forth herein (including, without limitation, in Article V and Article IX).

12.4    Cancellation of Certificate. On completion of the distribution of Holdings LLC assets as provided herein, Holdings LLC shall be terminated (and Holdings LLC shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate Holdings LLC. Holdings LLC shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 12.4.

12.5    Reasonable Time for Winding Up. A reasonable time shall be allowed for the orderly winding up of the business and affairs of Holdings LLC and the liquidation of its assets pursuant to Section 12.2 in order to minimize any losses otherwise attendant upon such winding up.

12.6    Return of Capital. The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Unitholders (it being understood that any such return shall be made solely from Holdings LLC assets).

12.7    Hart-Scott-Rodino. In the event the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") is applicable to any Unitholder, the dissolution of Holdings LLC shall not be consummated until such time as the applicable waiting period (and extensions thereof) under the HSR Act have expired or otherwise been terminated with respect to each such Unitholder. Holdings LLC shall bear all costs and expenses of any notifications or the like required to be filed under the HSR Act applicable to any Unitholder.

ARTICLE XIII

VALUATION

13.1    Valuation of Company Securities. The "Fair Market Value" of any equity securities of the Company shall mean the average of the closing prices of the sales of the securities on all securities exchanges on which the securities may at the time be listed, or, if there have been no sales on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such securities are not so listed, the average of the representative bid and asked prices quoted in the NASDAQ System as of 4:00 P.M., New York time, or, if on any day such securities are not quoted in the NASDAQ System, the average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by the National Quotation Bureau Incorporated, or any similar successor organization, in each such case averaged over a period of 21 days consisting of the day as of which the Fair Market Value is being determined and the 20 consecutive business days prior to such day. If the dissolution and liquidation (or deemed dissolution and liquidation) of Holdings LLC occurs in connection with the Company's Public Offering, the Fair Market Value of each equity security of the Company shall equal the price at which such securities are initially offered to the public in connection with such Public Offering. If the dissolution and liquidation (or deemed dissolution and liquidation) of Holdings LLC occurs in connection with a Sale of the Company, the Fair Market Value of each equity security of the Company shall equal the value implied by such transaction. If at any time the equity securities of the Company are not listed on any securities exchange or quoted in the NASDAQ System or the over-the-counter market, and the dissolution and liquidation (or deemed dissolution and liquidation) of Holdings LLC does not occur in connection with a Public Offering of the Company or a Sale of the Company, the Fair Market Value of each such security shall be equal to the fair value thereof as of the date of valuation as determined by the Board in good faith on the basis of an orderly sale to a willing, unaffiliated buyer in an arm's length transaction, taking into account all relevant factors determinative of value.

13.2    Valuation of Other Assets and Securities. The "Fair Market Value" of any other securities issued by Holdings LLC, or any other non-cash assets or securities for which "Fair Market Value" is to be determined hereunder, shall mean the fair value for such assets or securities as between a willing buyer and a willing seller in an arm's-length transaction occurring on the date of valuation as determined by the Board, taking into account all relevant factors determinative of value (and giving effect to any transfer taxes payable or discounts in connection with such sale).

ARTICLE XIV

GENERAL PROVISIONS

14.1    Power of Attorney. Each Unitholder (other than the Lender Investors) hereby constitutes and appoints the Board and the liquidators, with full power of substitution, as his, her, or its true and lawful agent and attorney-in-fact, with full power and authority in his or its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (a) this Agreement, all certificates and other instruments and all amendments thereof in accordance with the terms hereof which the Board deems appropriate or necessary to form, qualify, or continue the qualification of, Holdings LLC as a limited liability company in the State of Delaware and in all other jurisdictions in which Holdings LLC may conduct business or own property; (b) all instruments which the Board deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement adopted in accordance with its terms; (c) all conveyances and other instruments or documents which the Board and/or the liquidators deems appropriate or necessary to reflect the dissolution and liquidation of Holdings LLC pursuant to the terms of this Agreement, including a

certificate of cancellation; and (d) all instruments relating to the admission, withdrawal or substitution of any Unitholder pursuant to Article X or Article XI. The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Unitholder and the Transfer of all or any portion of his or its Units and shall extend to such Unitholder's heirs, successors, assigns and personal representatives.

14.2    Amendments. Subject to the right of the Board to amend this Agreement as expressly provided herein (including, without limitation, pursuant to Section 3.1(b)), this Agreement may be amended, modified, or waived with the written consent of the Majority Linden Investors; provided that (a) if any such amendment, modification, or waiver would adversely affect in any material respect any class and type of Units in a manner different than the Linden Investors holding equity of the same class and type of Units, such amendment, modification, or waiver shall also require the written consent of the holders of a majority of the class and type of Units so adversely affected; and (b) the definition of "Permitted Transferee" in Article I and Sections 3.1(c), 4.1(a), 6.1, 6.6, 6.7, 7.4, 9.1, 9.2, 9.3, 9.9(d), 14.1 and 14.2 (and the definitions used in such Sections) may not be amended, modified or waived without the prior written consent of (x) if only a single Lender Investor is adversely affected in any material respect, then such Lender Investor, or (y) if more than one Lender Investor is adversely affected in any material respect, by a majority of such Lender Investors so adversely affected based on the outstanding Common Units held by such Lender Investors. Notwithstanding the foregoing, none of the foregoing provisos shall prohibit any amendments to any provision of this Agreement to the extent necessary to issue any equity or other securities (e.g., to amend this Agreement to authorize a different class of equity of the Company and/or to issue additional Units or other equity securities that have rights, preferences, privileges, limitations, restrictions and/or obligations that are junior to, pari passu with, superior to or different from those of the existing Unitholders and/or Units) and, only to the extent applicable, such issuance is done in compliance with Section 3.1(c).

14.3    Title to Holdings LLC Assets. Holdings LLC assets shall be deemed to be owned by Holdings LLC as an entity, and no Unitholder, individually or collectively, shall have any ownership interest in such Holdings LLC assets or any portion thereof. Legal title to any or all Holdings LLC assets may be held in the name of Holdings LLC or one or more nominees, as the Board may determine.

14.4    Remedies. Each Unitholder and Holdings LLC shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

14.5    Successors and Assigns. Except as otherwise provided herein, all covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

14.6    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

14.7    Counterparts; Binding Agreement. This Agreement may be executed simultaneously in two or more separate counterparts (including by means of facsimile, electronic mail or comparable electronic transmission), any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto. This Agreement and all of the provisions hereof shall be binding upon and effective as to each Person who (a) executes this Agreement in the appropriate space provided in the signature pages hereto notwithstanding the fact that other Persons who have not executed this Agreement may be listed on the signature pages hereto and (b) may from time to time become a party to this Agreement by executing a counterpart of or joinder to this Agreement.

14.8    Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Whenever required by the context, references to a Fiscal Year shall refer to a portion thereof. The use of the words "or," "either" and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict.

14.9    Applicable Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. Subject to Section 14.18, any dispute relating hereto shall be heard in the state or federal courts of Delaware, and the parties agree to jurisdiction and venue therein.

14.10    Addresses and Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when personally delivered, sent by telecopy (with hard copy to follow) or sent by reputable overnight express courier (charges prepaid), or (ii) three days following mailing by certified or registered mail, postage prepaid and return receipt requested. Such notices, demands and other communications shall be sent to the address for such recipient set forth in Holdings LLC's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or Holdings LLC shall be deemed given if received by a Manager at the following address: Holdings LLC, c/o Linden Capital Partners III LP, c/o Linden LLC, 111 South Wacker Drive, Suite 3350, Chicago, Illinois 60606.

14.11    Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of Holdings LLC or any of its Affiliates, and no creditor who makes a loan to Holdings LLC or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by Holdings LLC in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in LLC Profits, Losses, Distributions, capital or property other than as a secured creditor (to the extent provided in the applicable agreements and instruments).

14.12   <u>Waiver</u>. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

14.13   <u>Further Action</u>. The parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

14.14   <u>Offset</u>. Whenever Holdings LLC is to pay any sum to any Unitholder or any Affiliate or related Person thereof, any amounts that such Unitholder or such Affiliate or related Person owes to Holdings LLC or any of its Subsidiaries under any promissory note or other debt instrument issued to Holdings LLC or any of its Subsidiaries or any other bona fide obligation owed to Holdings LLC or any of its Subsidiaries may be deducted from that sum before payment.

14.15   <u>Entire Agreement</u>. This Agreement, those documents expressly referred to herein and other documents dated as of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

14.16   <u>Opt-in to Article 8 of the Uniform Commercial Code</u>. The Unitholders hereby agree that the Units shall be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of any other applicable jurisdiction).

14.17   <u>Delivery by Facsimile, Electronic Mail or Comparable Electronic Transmission</u>. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, electronic mail or comparable electronic transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall reexecute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine, electronic mail or comparable electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or comparable electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

14.18   <u>MUTUAL WAIVER OF JURY TRIAL</u>. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.

14.19    Survival. Sections 4.6, 5.6, 6.1, 6.4 and 8.3, shall survive and continue in full force in accordance with its terms notwithstanding any termination of this Agreement or the dissolution of Holdings LLC.

14.20    Expenses. Holdings LLC shall or shall cause the Company to pay and hold the Linden Investors and all holders of Linden Equity harmless against liability for the payment of the reasonable out-of-pocket expenses of such Persons (including the reasonable fees and expenses of legal counsel or other advisors) arising in connection with (i) start-up and organizational costs in connection with the formation of Holdings LLC and the Company and the commencement of their respective businesses and operations, (ii) the due diligence review of the Company and the preparation, negotiation and execution of this Agreement, the Acquisition Agreement, the Company's certificate of formation and limited liability company agreement and the other agreements contemplated hereby or thereby, and the consummation of the transactions contemplated hereby or thereby, (iii) any proposed or completed merger, sale, recapitalization or other transaction involving Holdings LLC, the Company or any of their respective Subsidiaries, (iv) any amendments or waivers (whether or not the same become effective) under or in respect of this Agreement, the Acquisition Agreement, the Company's certificate of formation and limited liability company agreement or the other agreements contemplated hereby or thereby (including, without limitation, in connection with any proposed merger, sale or recapitalization of Holdings LLC, the Company or any of their respective Subsidiaries), (v) the interpretation, investigation and enforcement of the rights granted under this Agreement, the Acquisition Agreement, the Company's certificate of formation and limited liability company agreement or the other agreements contemplated hereby or thereby, (vi) any filing with any governmental agency with respect to Holdings LLC's investment in the Company or any such Person's investment in Holdings LLC, or in any other filing with any governmental agency with respect to Holdings LLC or the Company that mentions such Person, (vii) the preparation, delivery and storage of books and records and financial and other statements required or permitted under this Agreement (including, without limitation, all matters concerning the determination of the relative amount of allocations and distributions among the Unitholders and accounting procedures and determinations), (viii) the delivery to each Member any report or other information required by this Agreement, (ix) the delivery to each Unitholder of all information necessary for the preparation of such Person's United States federal and state income tax returns, (x) the preparation and filing of all tax returns required to be filed by the LLC, (xi) stamp and other taxes which may be payable in respect of the execution and delivery of this Agreement or the issuance, delivery or acquisition of any securities (debt or equity) hereunder or under the Acquisition Agreement, the Company's certificate of formation and limited liability company agreement and the other agreements contemplated hereby or thereby and (xii) any transaction, claim or event which any such Person believes affects Holdings LLC, the Company or their respective Subsidiaries or such Person's investment in any of the foregoing and as to which such Person seeks advice of counsel.

14.21    Acknowledgments. Upon execution and delivery of a counterpart to this Agreement or a joinder to this Agreement, each Member (including each Substituted Member and each Additional Member) shall be deemed to acknowledge to each Linden Investor as follows: (a) the determination of such Member to acquire Units pursuant to this Agreement or any other agreement has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of Holdings LLC and its Subsidiaries which may have been made or given by any other Member or any of its Affiliates or by any agent or employee of any other Member or any of its Affiliates, (b) no other Member has acted as an agent of such Member in connection with making its investment hereunder and that no other Member shall be acting as an agent of such Member in connection with monitoring its investment hereunder, (c) each of the Linden Investors has retained Kirkland & Ellis LLP in connection with the transactions contemplated hereby and expect to retain Kirkland & Ellis LLP as legal counsel on behalf of Holdings LLC and its Subsidiaries, (d) Kirkland & Ellis LLP is not

representing and will not represent any other Member in connection with the transaction contemplated hereby or any dispute which may arise between any of the Linden Investors, on the one hand, and any other Member, on the other hand, (e) such Member will, if it wishes counsel on the transactions contemplated hereby, retain its own independent counsel, and (f) Kirkland & Ellis LLP may represent the Linden Investors in connection with any and all matters contemplated hereby (including, without limitation, any dispute between any of the Linden Investors, on the one hand, and any other Member, on the other hand) and such Member waives any conflict of interest in connection with such representation by Kirkland & Ellis LLP.

*     *     *     *     *

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Amended and Restated Limited Liability Company Agreement as of the date first written above.

**PROPHARMA GROUP TOPCO, LLC**

By: _Thomas Jeffrey Hargroves_

Name: Thomas Jeffrey Hargroves

Title:   President and Chief Executive Officer

**PROPHARMA GROUP, INC.**

By:
Name: Thomas Jeffrey Hargroves
Title:   President

**PROPHARMA GROUP BUYER, LLC**

By: _____

Name: Michael Farah

Title:   Vice President

**PROPHARMA GROUP SPLITTER, LP**

By: Linden Manager III LLP
Its: General Partner

By: Linden Capital III LLC
Its: General Partner

By: _____
Name: Anthony B. Davis
Title:   Authorized Signatory

*Signature Page to Amended and Restated Limited Liability Company Agreement*

JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)        The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September __, 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)        By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the ___ day of September, 2016.

SUBSCRIBER

**MONROE CAPITAL PRIVATE CREDIT
FUND II LP**

By:    Monroe Capital Private Credit Fund II LLC
Its:    General Partner

By:    _____
Name:  Matthew R. Lane
Its:     Managing Director

*Joinder to Amended and Restated Limited Liability Company Agreement of
ProPharma Group Topco, LLC*

## JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)      The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September __, 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)      By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the ___ day of September, 2016.

SUBSCRIBER

MONROE CAPITAL PRIVATE CREDIT FUND II (UNLEVERAGED) LP

By:     Monroe Capital Private Credit Fund II LLC
Its:    General Partner

By:     _____
Name: Matthew R. Lane
Its:    Managing Director

## JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)        The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September __, 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)        By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

        Accordingly, the undersigned has executed and delivered this Joinder as of the ___ day of September, 2016.

SUBSCRIBER

MONROE PRIVATE CREDIT FUND A LP

By:    Monroe Private Credit Fund A LLC
Its:    General Partner

By:    _____
Name: Matthew R. Lane
Its:    Managing Director

*Joinder to Amended and Restated Limited Liability Company Agreement of*
*ProPharma Group Topco, LLC*

JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)      The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September      , 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)      By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

       Accordingly, the undersigned has executed and delivered this Joinder as of the ____ day of September, 2016.

                                        SUBSCRIBER

                                        _Rachel Bias_____
                                        Rachel Bias

JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)        The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September       , 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)        By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the ___ day of September, 2016.

SUBSCRIBER

Joseph Biehl

*Joinder to Amended and Restated Limited Liability Company Agreement of
ProPharma Group Topco, LLC*

## JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)          The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September       , 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)          By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the ___ day of September, 2016.

SUBSCRIBER

_____
Mike Burman

*Joinder to Amended and Restated Limited Liability Company Agreement of*
*ProPharma Group Topco, LLC*

JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)        The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September        , 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)        By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

27th        Accordingly, the undersigned has executed and delivered this Joinder as of the 27th day of September, 2016.

SUBSCRIBER

_____

Robert Chestnut

*Joinder to Amended and Restated Limited Liability Company Agreement of*
*ProPharma Group Topco, LLC*

JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)          The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September          2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)          By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

          Accordingly, the undersigned has executed and delivered this Joinder as of the ___day of September, 2016.

                                        SUBSCRIBER

                                        _____
                                        Patrick Donnelly

*Joinder to Amended and Restated Limited Liability Company Agreement of*
*ProPharma Group Topco, LLC*

JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)    The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September    , 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)    By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the 27th day of September, 2016.

SUBSCRIBER

Hardip Dosange

Digitally signed by Hardip Dosange
DN: cn=Hardip Dosange, o=ProPharma Group, Inc., ou=Sr. Director Consulting Practices and Marketing, email=hardip.dosange@propharmagroup.com, c=US
Date: 2016.09.26 15:32:40 -07'00'

Hardip Dosange

*Joinder to Amended and Restated Limited Liability Company Agreement of ProPharma Group Topco, LLC*

## JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT

1)      The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Limited Liability Company Agreement dated as of September     , 2016 (as the same may hereafter be amended, the "LLC Agreement") of ProPharma Group Topco, LLC, a Delaware limited liability company (the "Company").

2)          By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement.

            Accordingly, the undersigned has executed and delivered this Joinder as of the ___ day of September, 2016.


SUBSCRIBER

Kirk Hoffman

**SCHEDULE OF UNITHOLDERS**

**PROPHARMA GROUP TOPCO, LLC**

| Unitholder and Address | Preferred Units | Capital Contribution with respect to Preferred Units | Class A Common Units | Class B Common Units | Capital Contribution with respect to Common Units | Total Amount of Capital Contributions |
|---|---|---|---|---|---|---|
| ProPharma Group Buyer, LLC<br><br>c/o Linden Manager LP<br>111 S. Wacker Dr.<br>Suite 3350<br>Chicago, IL 60606 | 43,853.373 | $43,853,373.35 | 442,963.370 | 0.000 | $442,963.37 | $44,296,336.72 |
| ProPharma Group Splitter, LP<br><br>c/o Linden Manager LP<br>111 S. Wacker Dr.<br>Suite 3350<br>Chicago, IL 60606 | 37,897.546 | $37,897,546.35 | 382,803.50 | 0.00 | $382,803.50 | $38,280,349.85 |
| ProPharma Group, Inc.<br><br>8717 W. 110th St.<br>Suite 300<br>Overland Park, KS 66210 | 10,395.000 | $10,395,000.00 | 105,000.000 | 0.00 | $105,000 | $10,500,000.00 |
| Monroe Capital Private Credit Fund II LP<br><br>c/o Monroe Capital LLC<br>311 S. Wacker Dr.<br>Suite 6400<br>Chicago, IL 60606 | 253.829 | $253,829.47 | 2,563.930 | 0.00 | $2,563.93 | $256,393.40 |

| Unitholder and Address | Preferred Units | Capital Contribution with respect to Preferred Units | Class A Common Units | Class B Common Units | Capital Contribution with respect to Common Units | Total Amount of Capital Contributions |
|---|---|---|---|---|---|---|
| Monroe Capital Private Credit Fund II (Unleveraged) LP<br><br>c/o Monroe Capital LLC 311 S. Wacker Dr. Suite 6400 Chicago, IL 60606 | 43.171 | $43,170.53 | 436.070 | 0.00 | $436.07 | $43,606.60 |
| Monroe Private Credit Fund A LP<br><br>c/o Monroe Capital LLC 311 S. Wacker Dr. Suite 6400 Chicago, IL 60606 | 198.00 | $198,000.00 | 2,000.000 | 0.00 | $2,000.00 | $200,000.00 |
| Individual Investors | | | | | | |
| Rachel Bias<br><br>334 SE. Williamsburg Ct. Lee's Summit, MO 64063 | 272.250 | $272,500.00 | 2,750.000 | 0.00 | $2,750.00 | $275,000.00 |
| Joseph Biehl<br><br>524 Barry Dr. Springfield, PA 19064 | 173.250 | $173,250.00 | 1,750.000 | 0.00 | $1,750.00 | $175,000.00 |
| Mike Burman<br><br>2365 Rosemore Ave. Glenside, PA 19038 | 24.750 | $24,750.00 | 250.000 | 0.00 | $250.00 | $25,000.00 |

| Unitholder and Address | Preferred Units | Capital Contribution with respect to Preferred Units | Class A Common Units | Class B Common Units | Capital Contribution with respect to Common Units | Total Amount of Capital Contributions |
|---|---|---|---|---|---|---|
| Robert Chestnut<br><br>1105 Oak Tree Dr.<br>Lawrence, KS 66049 | 49.500 | $49,500.00 | 500.000 | 0.00 | $500.00 | $50,000.00 |
| Patrick Donnelly<br><br>8 Church Street<br>Charleston, SC 29401 | 132.660 | $132,660.00 | 1,340.000 | 0.00 | $1,340.00 | $134,000.00 |
| Hardip Dosange<br><br>3245 Von Uhlit Ranch Rd.<br>Napa, CA 94558 | 99.000 | $99,000.00 | 1,000.000 | 0.00 | $1,000.00 | $100,000.00 |
| Kirk Hoffman<br><br>21260 W. 115th Terr.<br>Olathe, KS 66061 | 74.250 | $74,250.00 | 750.000 | 0.00 | $750.00 | $75,000.00 |
| **TOTAL** | **93,466.579** | **$93,466,579.70** | **944,106.87** | 0.00 | **$944,106.87** | **$94,410,686.57** |

# EXHIBIT F

133326P 880701

TX2019   05-102
Ver. 10.0   (Rev 9-15/33)

**Texas Franchise Tax Public Information Report**
*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP),*
*Professional Associations (PA) and Financial Institutions*

■ **Tcode** 13196

| ■ Taxpayer number | ■ Report year | **You have certain rights** under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381. |
|---|---|---|
| 32056813606 | 2019 | |

| Taxpayer name  PROPHARMA GROUP HOLDINGS LLC | ■ ☐ Check box if the mailing address has changed |
|---|---|
| Mailing address  8717 W. 110TH STREET STE 300 | Secretary of State (SOS) file number or Comptroller file number |
| City  OVERLAND PARK   State  KS   ZIP code plus 4  66210 | 0802184907 |

☐ Check box if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office  8717 W. 110TH STREET STE 300 OVERLAND PARK, KS 66210 |
|---|
| Principal place of business  8717 W. 110TH STREET STE 300 OVERLAND PARK, KS 66210 |

You must report officer, director, member, general partner and manager information as of the date you complete this report.
*Please sign below!*        **This report must be signed to satisfy franchise tax requirements.**

3205681360619

**SECTION A**  Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | | m m d d y y |
|---|---|---|---|---|
| KCBN HOLDINGS, INC. | | ☐ YES | Term expiration | |
| Mailing address  8717 W. 110TH STREET, SUITE | City  OVERLAND PARK | | State  KS | ZIP Code  66210 |

| Name | Title | Director | | m m d d y y |
|---|---|---|---|---|
| PROPHARMA GROUP BUYER, LLC | | ☐ YES | Term expiration | |
| Mailing address  111 S. WACKER DRIVE, SUITE | City  CHICAGO | | State  IL | ZIP Code  60606 |

| Name | Title | Director | | m m d d y y |
|---|---|---|---|---|
| PROPHARMA GROUP SPLITTER, L | | ☐ YES | Term expiration | |
| Mailing address  111 S. WACKER DRIVE, SUITE | City  CHICAGO | | State  IL | ZIP Code  60606 |

**SECTION B**  Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C**  Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| PROPHARMA GROUP, LLC | KS | | 100.00 |

| Registered agent and registered office currently on file (see instructions if you need to make changes) | You must make a filing with the Secretary of State to change registered agent, registered office or general partner information. |
|---|---|
| Agent: | |
| Office:  City   State   ZIP Code | |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution

| sign here ▶ [signature] | Title  CFO | Date  1/16/19 | Area code and phone number  (888) 242-0559 |
|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ☐ | PIR IND ☐ | ☐ |
|---|---|---|



1019

1930280830318


05-102
(Rev.9-15/33)
FORM

**Texas Franchise Tax Public Information Report**

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP),*
*Professional Associations (PA) and Financial Institutions*

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | ■ Report year |
|---|---|
| 3 2 0 5 6 8 1 3 6 0 6 | 2 0 2 0 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| Taxpayer name | |
|---|---|
| **PROPHARMA GROUP HOLDINGS LLC** | ■ ○ Blacken circle if the mailing address has changed. |

| Mailing address | |
|---|---|
| **8717 W 110TH STREET STE 300** | Secretary of State (SOS) file number or Comptroller file number |
| City **OVERLAND PARK** | State **KS** | ZIP code plus 4 **66210** | **0802184907** |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office | **8717 W 110TH STREET STE 300, OVERLAND PARK, KS, 66210** |
|---|---|
| Principal place of business | **8717 W 110TH STREET STE 300, OVERLAND PARK, KS, 66210** |

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

1000000000015

**SECTION A**   Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | | m m d d y y |
|---|---|---|---|---|
| **KCBN HOLDINGS INC** | | ○ YES | Term expiration | |
| Mailing address **8717 W 110TH STREET SUITE 300** | City **OVERLAND PARK** | State **KS** | | ZIP Code **66210** |
| Name **PROPHARMA GROUP BUYER LLC** | Title | Director ○ YES | Term expiration | m m d d y y |
| Mailing address **111 S WACKER DRIVE SUITE 3350** | City **CHICAGO** | State **IL** | | ZIP Code **60606** |
| Name **PROPHARMA GROUP SPLITTER L** | Title | Director ○ YES | Term expiration | m m d d y y |
| Mailing address **111 S WACKER DRIVE SUITE 3350** | City **CHICAGO** | State **IL** | | ZIP Code **60606** |

**SECTION B**   Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C**   Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| **PROPHARMA GROUP, LLC** | **KS** | | **100.000** |

| Registered agent and registered office currently on file *(see instructions if you need to make changes)* | *You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.* |
|---|---|
| Agent: | |
| Office: | City | State | ZIP Code |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related person, LLC, LP, PA or financial institution.

| sign here ▶ | **ROBERT CHESTNUT** | Title **CFO** | Date **10/13/2020** | Area code and phone number **( 888 ) 242 - 0559** |
|---|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|