# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PATRICK K. DONNELLY, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 21-cv-00894-MAK |
| PROPHARMA GROUP TOPCO, LLC, | ) |
| Defendant. | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINIONS OF JOSEPH ESTABROOK

OF COUNSEL:

Nicholas D. SanFilippo
Keith J. Minson
Michael A. Brody
Daniel C. Masakayan
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102-4215
(703) 712-5000 – Telephone
(703) 712-5220 – Facsimile
nsanfilippo@mcguirewoods.com
kminson@mcguirewoods.com
mbrody@mcguirewoods.com
dmasakayan@mcguirewoods.com

Dated: November 29, 2022

John A. Sensing (#5232)
Jesse L. Noa (#5973)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
jsensing@potteranderson.com
jnoa@potteranderson.com

*Attorneys for Plaintiff Patrick K. Donnelly*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD............................................................................................................2

ARGUMENT.........................................................................................................................2

I.     Estabrook's Methodology is Reliable Because Estabrook Utilized Reliable Data and Provided His Independent Analysis of that Data to Form His Opinions ......................2

       A.     The Pitchbooks Provide A Reliable Source of Data Inputs.....................................2

       B.     Estabrook's use of data from the Pitchbooks to formulate his own analysis is sufficiently reliable............................................................................................5

       C.     Defendant Mischaracterizes Estabrook's Testimony to Suggest That His Analysis is Unreliable .................................................................................8

       D.     The Fact that ProPharma Actually Sold at a Value Below the Low End of Estabrook's Valuation Range Does Not Affect the Reliability of His Conclusions or Methodology................................................................................11

CONCLUSION............................................................................................................................14

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*325 Goodrich Ave., LLC v. S.W. Water Co.*,
   891 F.Supp.2d 1364 (M.D. Ga. 2012) ..................................................................................10

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
   No. CV 21-704-MAK, 2022 WL 3021560 (D. Del. July 29, 2022) (Kearney, J.) ...................3

*Am. Airlines, Inc. v. Delta Air Lines, Inc.*,
   No. 4:19-CV-1053-O, 2021 WL 3629735 (N.D. Tex. May 18, 2021) .....................................5

*Banta Properties, Inc. v. Arch Specialty Ins. Co.*,
   2011 WL 7139154 (S.D. Fla. Dec. 23, 2011) ........................................................................10

*Bruno v. Bozzuto's, Inc.*,
   311 F.R.D. 124 (M.D. Pa. 2015)............................................................................................13

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
   350 F. Supp. 2d 582 (D. Del. 2004)..................................................................................... 6-7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993).............................................................................................2, 7, 9, 10, 13

*In re Blood Reagents Antitrust Litig.*,
   No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) .....................................................4

*In re Corp. Res. Servs., Inc.*,
   603 B.R. 888 (Bankr. S.D.N.Y. 2019).................................................................................. 6-7

*In re Linerboard Antitrust Litig.*,
   497 F. Supp. 2d 666 (E.D. Pa. 2007) ......................................................................................4

*In re SemCrude L.P*,
   648 F. App'x 205 (3d Cir. 2016) .............................................................................................3

*Kannankeril v. Terminix Int'l, Inc.*,
   128 F.3d 802 (3d Cir. 1997).....................................................................................................2

*Legendary Art, LLC v. Godard*,
   No. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ....................................................6

*M & G Polymers USA, LLC v. Carestream Health, Inc.*,
   No. CIV.A. 07C-11-242PLA, 2009 WL 3535466 (Del. Super. Ct. Aug. 5, 2009), aff'd sub
   nom. *Carestream Health, Inc. v. M&G Polymers USA, LLC*, 9 A.3d 475 (Del. 2010).............7

*Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*,
  158 F. Supp. 2d 510 (E.D. Pa. 2001) ..................................................................................4

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000) ................................................................................................2

*Rhoads Indus. v. Shoreline Found., Inc.*,
  No. 15-921, 2021 WL 2778562 (E.D. Pa. July 2, 2021) ......................................................9

*Shire Viropharma Inc. v. CSL Behring LLC*,
  No. CV 17-414, 2021 WL 1227097 (D. Del. Mar. 31, 2021) ............................................13

*TK-7 Corp. v. Estate of Barbouti*,
  993 F.2d 722 (10th Cir. 1993) ............................................................................................8

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
  No. 15-CV-02383-RS, 2018 WL 5013580 (N.D. Cal. Oct. 16, 2018) ...............................10

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir.1987) .............................................................................................10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 702 .............................................................................................. 2, 4, 7, 9-10

Fed. R. Civ. P. 703 ..........................................................................................................................7

Plaintiff Patrick K. Donnelly ("Donnelly" or "Plaintiff"), by and through his undersigned counsel, hereby respectfully submits the following response in opposition to Defendant's Motion to Exclude the Expert Opinions of Joseph Estabrook (Dkt. No. 145).

## **INTRODUCTION**

Plaintiff's retained expert, Joseph Estabrook ("Estabrook"), provides reliable opinions based on market-driven data, in support of his conclusions regarding the 2019 valuation of Plaintiff's incentive equity units ("IEUs") from Defendant ProPharma Group Topco, LLC ("ProPharma" or "Defendant"). Estabrook bases his valuation on Pitchbooks created by non-party investment banks who planned to bid over the sale of ProPharma. Because the data supplied by the disinterested investment banks are the best evidence of how ProPharma's valuation was viewed *at the time* the Pitchbooks were created, there is nothing inherently wrong with Mr. Estabrook's report or his methodology.

Yet, Defendant attempts to seize on the fact that the *actual sale* of the company, which occurred at the height of the COVID-19 pandemic in the United States, was below the low-end of the valuation range established in Estabrook's report. Even in normal times, the valuation of the company at the time of sale would have no bearing on, and thus, not affect the reliability Estabrook's report, which was based on how the market viewed ProPharma's valuation *at the time* the investment banks created the Pitchbooks. That is to say, the time of sale of the company and the time of the investment bank Pitchbooks' creation represent two distinct valuation dates. But, as should be abundantly obvious, the valuation data supplied by the investment banks would not have factored how a global pandemic might affect a variety of factors concerning the sale of ProPharma. As such, and for the following reasons, the Court should deny Defendant's Motion to Exclude Plaintiff's Expert.

## LEGAL STANDARD

Under the Federal Rules of Evidence, one of the Court's roles is to be a "gatekeeper" to ensure that expert testimony is reliable. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Even under the Court's "gatekeeper" function, the Court must still lend credence to underlying policy considerations of the Rules, which "embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannakeril*, 128 F.3d at 806; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000). Specifically, Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods of reliability to the facts of the case

Boiled down to a simpler recitation, Rule 702 simply requires that for an expert's testimony to be admissible at trial, the expert must have the necessary qualifications and the expert's methodology must be reliable and relevant to the case. *Kannakeril*, 128 F.3d at 806. As explained below, Estabrook easily meets this standard.

## ARGUMENT

**I. Estabrook's Methodology is Reliable Because Estabrook Utilized Reliable Data and Provided His Independent Analysis of that Data to Form His Opinions.**

**A. The Pitchbooks Provide A Reliable Source of Data Inputs.**

Contrary to the assumption sprinkled through Defendant's motion to exclude, there is no *per se* rule that requires courts to exclude expert valuation reports that are reliant on third-party projections and data. In the *Daubert* context, the reliability of a valuation expert's report focuses on whether the expert has placed his imprimatur on the data supporting his report, not simply

2

rubber-stamped the data. *See, e.g., In re SemCrude L.P*, 648 F. App'x 205, 214 (3d Cir. 2016) ("Lederman did not simply adopt the Goldman Sachs' evaluation as his own. Instead, Lederman used his own analysis and judgment to adjust the Goldman Sachs Report to account for SemGroup's speculative derivative trading by using the Ritchie Appellees' trading expert, Joseph Graham."). And, as this Court has recently stated, "[a]n expert's reliance upon such projections is appropriate only if the expert can explain why he relied on such estimates and demonstrate why he believed the estimates were reliable." *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704-MAK, 2022 WL 3021560, at *16 (D. Del. July 29, 2022) (Kearney, J.) (internal quotations and citations omitted). This standard has undoubtedly been met here, where Estabrook formed his own opinions based on a benchmark tool that is widely and commonly used as part of the investment process and explained how and why he used that benchmark. *See* Estabrook Report, attached as **Ex. 1**, at para 14.

In essence, the Pitchbooks and the underlying financial data included therein are valid benchmarks just as any other expert might use for performing a business valuation. The underlying valuation methods used (*e.g.*, the guideline public company method) are reliable methods frequently used in the valuation profession. The comparable companies chosen and the resulting valuation multiples are valid benchmarks for purposes of analysis in an expert report because they are based on empirical market data. As Estabrook explains in his report, "[i]nvestment banks *regularly* create pitchbooks in order to pitch their services to prospective clients." *See* Estabrook Report (**Ex. 1**) at para 14 (emphasis added). As to the particular Pitchbooks relied upon here, Estabrook explains that "[a]mongst other things, the Pitchbooks describe the investment banks' expectations as to ProPharma's valuation and offer a range of value that can be used to derive ProPharma's fair market value, as defined in the Management Incentive Unit Agreement." *Id.*

3

Courts have widely recognized that benchmark tools—such as the Pitchbooks here—provide for a strong foundation for comparison in expert reports concerning damages. *See, e.g., In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *10 n.9 (E.D. Pa. Oct. 19, 2015) ("[T]he use of a benchmark [is] a generally accepted methodology for proving … damages."); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 683 (E.D. Pa. 2007) (approving benchmark method where "[t]he benchmark period has been taken as a period that represents the presumably lawful, more competitive conduct")). Moreover, they provide an expert with a principled set of data for purposes of comparison when there is otherwise no strict formula for assessing a monetary figure. *See, e.g., Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 516 (E.D. Pa. 2001) ("There is no standard capitalization rate for companies like Plaintiff's. Biddick attempted to analogize Main Street Mortgage to publicly traded companies in the same business sector. Such an analogy may not be perfect, but it is sufficiently reliable to be admissible under Rule 702. Defendant is free to challenge Biddick's method for calculating lost profits through cross examination and retaining its own damages expert.").

Defendant seems to suggest that because the information supplied by the investment banks was "inherently aspirational" that it is necessarily unreliable.[1] But that view represents a flawed understanding of valuation exercises in the private economy. While there is no doubt that investment entities seek to make acquisitions and other deals on the most favorable terms, that is no reason to think that the valuations they provide as part of a pitch are inherently unreliable. In a market economy, if an investment bank undervalues or overvalues a company thinking that it will obtain an advantage by doing so, then presumably a competitor would provide a more suitable

---

[1] Notably, Defendant bases this point not on any testimony from the investment banks themselves, but Dr. Estabrook's response to a general question not even directed at the intent of the specific investment banks. *See* Def. Mem. Law, p. 10, n.16.

valuation. What's more is that the Pitchbooks here represent the valuation data from *five competing entities*. So to say that the data provided by those banks, in the aggregate, is inherently unreliable, is to assume that the market forces driving those valuations do not exist, which is simply not the case.

In sum, the Pitchbooks not only provide Estabrook with a reliable source of information—but the *best source* of projecting ProPharma's fair market valuation at the time prior to sale.

### B. Estabrook's use of data from the Pitchbooks to formulate his own analysis is sufficiently reliable.

In Estabrook's Report, there are several layers of analysis between the third-party data in this case (the valuations supplied in the Pitchbooks) and his own valuation ranges. The Report should speak for itself as to that point, yet the theme underlying nearly the entirety of Defendant's Motion to Exclude is that Estabrook's methodology is unreliable because it is dependent on third-party data. In making this argument, Defendant presents a strained view of expert admissibility, because "[r]eliance on third parties for information is not a basis for exclusion of expert opinion evidence." *Am. Airlines, Inc. v. Delta Air Lines, Inc.*, No. 4:19-CV-1053-O, 2021 WL 3629735, at *7 (N.D. Tex. May 18, 2021). "Indeed, the [c]ourt would be hard-pressed to find an expert report that did not, to some extent, rely on any information or methods previously developed by others. The focus for the gatekeeper is on the relationship between the underlying data relied upon and the opinion offered." *Id.* Estabrook's Report and methodology easily marries up the underlying data with his own conclusions.

As Estabrook says point blank in his Report, he did not merely copy-and-paste the data from the Pitchbooks, as Defendant nearly implies. Rather, as he explained, "[i]n arriving at the conclusions outlined below, I have based my opinions on my expertise in accounting, business valuation, auditing, financial and damage analysis, independent research of publicly available

5

information, and my review of various documents and pleadings produced to date." *See* Estabrook Report (**Ex. 1**) at para 6. Further, Estabrook made clear that he did not blindly accept the valuations presented in the Pitchbooks. Rather, his report was in large part a "*comment on* the valuation analyses presented" in the Pitchbooks. *See* Estabrook Report (**Ex. 1**) at para 14.

Estabrook investigated the methodologies applied by each of the Pitchbooks and conducted an analysis of the comparable companies identified by each of the investment banks and how those companies compared to those identified by Linden. *See* Estabrook Report (**Ex. 1**) at paras. 15 and 16. And, as Estabrook outlined in his report, the valuation ranges in the Pitchbooks represented only one of the inputs to his calculation's formula. Specifically, Estabrook noted that he also incorporated the formula presented by Michael Farah, the ProPharma chairman of the board, to Plaintiff regarding the offer presented to Plaintiff in September 2019 concerning Plaintiff's IEUs. *See* Estabrook Report (**Ex. 1**) at para 17. Additionally, Estabrook incorporated spreadsheets detailing Linden's internal valuations of its investment in ProPharma. *Id.* Estabrook then also explains his calculation formula, which again only relies on the Pitchbook data to the extent that it provides inputs, not ultimate conclusions, for his report. Estabrook Report (**Ex. 1**) at paras. 18-19. Estabrook performed his calculations as of three different dates, taking into consideration EBITDA multiples, and then reached a conclusion based on his own analysis. *See* Estabrook Report (**Ex. 1**) at paras. 20 and 21.

Defendant relies on *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 590 (D. Del. 2004); *Legendary Art, LLC v. Godard*, No. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012), and *In re Corp. Res. Servs., Inc.,* 603 B.R. 888, 891 (Bankr. S.D.N.Y. 2019) for the proposition that the use of "data supplied by third parties, at face value, with no knowledge of the details surrounding their generation" makes an expert report inherently reliable.

6

As a practical matter, it would be nearly impossible for any expert in any case to conduct an independent evaluation of another data set without relying on at least some unverified inputs. But in any event—as outlined in the preceding paragraph—that is not what Estabrook did here.

The use of third party data only becomes a concern where the expert does not independently review it but rather "rubber stamps" the data without any critical analysis. In *Chemipal*, the data at issue was unverified because the expert "did not know what he was basing his testimony on, as his deposition testimony revealed." 350 F.Supp.2d at 590. Considered an outlier in *Daubert* case law, "*Chemipal* "represents an egregious example of an 'inexpert expert' conducting a clearly unreliable analysis. It does not stand for the proposition that an expert may never reasonably use data reported by a party in conducting an economic damages analysis." *M & G Polymers USA, LLC v. Carestream Health, Inc.*, No. CIV.A. 07C-11-242PLA, 2009 WL 3535466, at *7–8 (Del. Super. Ct. Aug. 5, 2009), *aff'd sub nom. Carestream Health, Inc. v. M&G Polymers USA, LLC*, 9 A.3d 475 (Del. 2010). In *Legendary Art*, the expert's report was deemed unreliable because it relied on a self-serving report generated by the client and provided to the expert. 2012 WL 3550040 at *4 ("Legendary Art's claims of 'market research' are not supported by a single study, analysis, calculation, or document of any kind. Thus, the Business Plan projections constitute precisely the sort of 'subjective belief or unsupported speculation' that renders an expert's opinion inadmissible under Rules 702 and 703."). In *In re Corp. Res. Servs., Inc.*, 603 B.R. 888, 891 (Bankr. S.D.N.Y. 2019), the court concluded that only a portion of the expert's report was unreliable—the portion of his report that was derived "from a publication with which he was unfamiliar and conducted no independent diligence—was unsupportable." But, the court "denie[d] the *Daubert* motion with respect to Gardner's criticism of the analysis and conclusions in the Goldin Report."). *Id.*

7

It is clear that those three cases dealt with experts who specifically do not analyze the underlying data. Whether the actual underlying data was itself actually verified—which is what Defendant appears to rest its hat on—was not the guiding force behind the decisions in those cases, each of which was premised on an expert's failure to add any meaningful input to the data being reviewed.[2]

### C. Defendant Mischaracterizes Estabrook's Testimony to Suggest That His Analysis is Unreliable.

Defendant cherry-picks isolated quotes from Estabrook's deposition to make it sound as if he did not look at the data he was using for his analysis. First, Defendant misrepresents Estabrook's testimony in its brief by stating that "Estabrook simply accepted the numbers in the Pitchbooks at face value and made no effort to contact any of the five investment banks that authored the Pitchbooks." Mot. to Exclude at 6. Defendant, apparently recognizing the vulnerability of its positions based on the outlier case law that it has cited, appears to suggest that Estabrook did not even look at the Pitchbook reports, simply because he responded "I'd say yes" to Defendant's counsel's question "[s]o you took them at face value; is that fair?" *See* Estabrook Dep. Tr. 80:6-8 (attached as **Ex. 2**). Because Defendant's counsel provides no context for that exchange, it is clear that Defendant's counsel's use of that single sentence question and response was an attempt to set up Estabrook's report as if it was just a copy-and-paste job from the Pitchbooks. Any common-sense reading of the actual report would clearly reflect that it is not.

---

[2] One other case that Defendant cites, *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), in support of this proposition, was decided on much narrower grounds. That case merely reinforced a proposition that Plaintiff does not disagree with—that an expert may not rely solely on another expert report. *See id.* ("[T]here [was] no indication in the record that [the expert] had *any familiarity* with the methods or reasoning used by Mr. Weber ...") (emphasis added). Here, Estabrook was not relying on another expert report, and so *TK-7 Corp.* is simply inapplicable, despite Defendant's attempt to cease on language from that case that, when viewed in isolation, suggests that it stands for a far broader proposition than it actually does.

Defendant also suggests that Estabrook needed to independently verify the inputs of the investment banks in the Pitchbooks. But, as explained above, independent verification of third-party data inputs is simply impracticable for any expert, in addition to not being required by *Daubert*. Yet Defendant specifically harps on the fact that when asked about Cantor Fitzgerald's valuation data, Estabrook responded "*I don't know why they did this chart or what they're trying to represent to ProPharma*." See Estabrook Dep. Tr. at 88:18-89:1 (**Ex. 2**). Defendant apparently takes Estabrook's testimony on this point as definitive proof that the Pitchbooks are unreliable. But, when viewed in context, Estabrook was simply stating that he was not there with Cantor Fitzgerald at the time it composed the chart and, therefore, cannot attest to what Cantor Fitzgerald might have been thinking as part of its strategy. He was not saying "I don't know" as if to mean "I question why Cantor Fitzgerald did this." However, that is how Defendant is attempting to characterize his testimony. Estabrook literally does not know—and could not possibly know—what was in the minds of Cantor Fitzgerald employees when they composed the chart. Nor was he obligated to do so.

Nothing in Rule 702 requires Estabrook to personally "verify" information that is consistent with his professional experience and understanding of the data that he has repeatedly utilized. That is simply not required nor necessarily even expected under *Daubert*. Rather, *Daubert* informs us that "[a]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. To that an expert who uses "his training and experience" to arrive at his conclusions, is deemed to have complied with the *Daubert* standard. *Rhoads Indus. v. Shoreline Found., Inc*., No. 15-921, 2021 WL 2778562, at *7 (E.D. Pa. July 2, 2021).

9

Even accepting Defendant's overstated and incorrect characterization that the Pitchbooks are "biased" because the investment banks have an incentive to inflate the underlying data, Defendant's alleged flaw in Estabrook's testimony would go only to the weight of his opinions at trial, not to their admissibility nor to Estabrook's overall qualifications. *See Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987) ("Questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). *See also, e.g., United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, No. 15-CV-02383-RS, 2018 WL 5013580, at *2 (N.D. Cal. Oct. 16, 2018) ("[W]hile UET is correct that an expert may not rely merely on the self-serving projections of his client, there is nothing in the record to suggest that Ray rested his valuation on PG&E's mere say-so. Ray engaged in his own independent analysis of the customer data PG&E provided to him, consistent with his obligations as an expert under Rule 702 and *Daubert*. The validity of the underlying data on which Ray relies may be open to attack, but his approach to analyzing that data is not outside the realm of proper expert testimony."); *325 Goodrich Ave., LLC v. S.W. Water Co.*, 891 F.Supp.2d 1364, 1382 (M.D. Ga. 2012) (holding that even if expert "relied on biased sources to form his opinions … these potential weaknesses in his testimony only go to the weight of the opinions and not their admissibility."); *Banta Properties, Inc. v. Arch Specialty Ins. Co.*, 2011 WL 7139154, at *3 (S.D. Fla. Dec. 23, 2011) (explaining that "experts routinely rely on the work of others" and that "[t]hough some sources [that the opponent's expert relied upon] may have been biased, this bias is a factor on the weight and credibility of [the expert's] report and may be addressed through cross-examination.").

D. **The Fact that ProPharma Actually Sold at a Value Below the Low End of Estabrook's Valuation Range Does Not Affect the Reliability of His Conclusions or Methodology.**

In Defendant's view, the fact that ProPharma was sold to Odyssey Investors Group on September 30, 2020 for $560 million is the only relevant data point and that because it was below the low end of the valuation range in Estabrook's Report, the Report is inherently wrong. But in making this assertion, Defendant misunderstands the valuation exercise, which, despite being forward-looking, actually requires analysis of how ProPharma was viewed *before the time of sale.* Estabrook's methodology—as is consistent with nearly every valuation expert report—requires inputs from a pre-designated snapshot in time, wholly divorced from any real-world events that might eventually overtake those inputs. A valuation analyst can only consider what was known or knowable as of the valuation date.

Defendant is apparently dissatisfied that data pre-dating the COVID-19 pandemic did not factor in that a global crisis of that magnitude that would materially affect the valuation of *every* company. As Estabrook identified in his deposition, that is what likely happened here, as a result of the COVID-19 pandemic.

> Q: Did you – did the fact that ProPharma's actual sales price revealed that these projected valuations were too high affect your analysis at all?
>
> A: Not at all. If you take a look at the investor reports that were put out in August of 2020, they discuss the effect of COVID. It makes perfect sense that something sold in September of 2020 due to COVID, what was going on in the financial markets, and the effect on ProPharma and the economy in general would have an effect and be able to explain why they weren't able to achieve the range of what the investment bankers said that they could.

*See* Estabrook Dep. Tr. 104:20-105:8 (**Ex. 2**). Defendant's counsel nevertheless persisted in trying to conflate the real-world events that *eventually transpired* with the data contained in the Pitchbooks, which were prepared well before the pandemic:

11

> Q: So I just want to make sure I have this clear. You're blaming the effect on COVID in 2020 for the reason that ProPharma sold for 560 million instead of a higher valuation?
>
> A: You asked me – I thought you asked me why it's lower [than] what they were sold for. And I explained – or tried to explain that you had to take a look at what was happening at the time in the marketplace, right. It's right after COVID. The pitchbooks were done in 2019. COVID did not exist. So you have to take into consideration the effects of COVID, which are specifically mentioned in that investor report, affecting the performance of ProPharma. That can explain why they only sold it for $560 million. Other than that, I don't have any knowledge about the negotiations or how – why they ended up selling it for 560.

*See* Dep. Tr. 106:2-20 (**Ex. 2**). Estabrook also rejected any notion that ProPharma's value was increasing at the height of the pandemic:

> A: If you look at the Bates No. 451, the trailing 12 months EBITDA was 33.3 million [as of 6/30/20]. The trailing 12 months as of 3/31/20 is 34.6. So they basically lost 1.3 million in EBITDA in that quarter. So I don't know what they're talking about improvements, but the EBITDA went down. And you failed to read the middle paragraph talking about the company did see a negative financial impact from COVID across several divisions, which is what I was relying upon when I answered your previous questions.

*See* Dep. Tr. 139:1-11 (**Ex. 2**).

Under Defendant's understanding of valuation, the Court need only accept the actual sale price. But if this were the case, there would be no need for any expert valuation at all, on either side. All of this is to say that Defendant's claim of bias and improper valuation methodology is built on a faulty premise. That is transparently obvious after looking into more of the case law Defendant cites in support of its position. In citing *In re: IH 1, Inc.*, 2015 No. 13-1996 (RGA), 2015 WL 5679724, at *4 (D. Del. Sept. 25, 2015), Defendant once again cites a misleading quote from a non-representative case in order to suggest that Estabrook's Pitchbook method is biased. In that case, the court excluded only a narrow portion of the expert's report after concluding that the expert "seem[ed] to pick numbers out of a hat" and that "there [was] no explanation provided as to why the numbers [were] chosen." *Id.* As detailed herein and apparent in the report itself,

that is not the case here. Moreover, the type of "bias" that the court referred to in *1H1, Inc.* was in a completely different context that is not applicable here. *See id. at* \*2 ("[P]ost hoc, litigation-driven forecasts have an untenably high probability of containing hindsight bias and other cognitive distortions." *See id* at \*2 (internal quotations and citations omitted) (emphasis in original).

Defendant also points to *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 127–28 (M.D. Pa. 2015) to suggest that Estabrook's report is unreliable because, among other things, it relies on allegedly unverified data and does not take into account ProPharma's actual sales price. But this Court has previously rejected *Bruno* as standing for that sweeping and seemingly unworkable construct under *Daubert*. Indeed, just last year, this Court rejected a similar argument to those that Defendant makes here:

> Plaintiff relies on the case of *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 127–28 (M.D. Pa. 2015) for the proposition that "experts who use data in their reports without independently verifying the accuracy or reliability of those figures fail to satisfy this Circuit's reliability requirement." (Pl.'s Mot. 11.)
>
> *Bruno*, however, was a breach of contract action wherein the plaintiff's damages experts decided to use internal financial projections purportedly created by the defendant to estimate the sales plaintiff's business would realize after 2007. *Id.* at 127–28. Resort to those internal projections was necessary because the plaintiff had previously destroyed their sales data. *The experts had done no independent research to verify the validity of those profit projections or how those projections were created. Id.* Here, however, the data upon which Dr. Craig relies is scientifically factual data published in a study and submitted to the FDA for use in approval of Haegarda.

*Shire Viropharma Inc. v. CSL Behring LLC*, No. CV 17-414, 2021 WL 1227097, at \*10 (D. Del. Mar. 31, 2021) (emphasis added). As explained in *Shire*, *Bruno* revolved around expert reports based on limited factual data. That is simply not the case here where Estabrook relied on empirical data, composed a sophisticated valuation report, and explained how a material, world-altering event could not have been factored into metrics that is based on data from 2019.

13

In sum, while Defendant attempts to present a superficial argument that Estabrook merely rubber stamped the data of the investment banks, the actual facts clearly do not support that theory, and the law does not prevent Estabrook from basing his analysis on that data.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Exclude.

**POTTER ANDERSON & CORROON LLP**

OF COUNSEL:

Nicholas D. SanFilippo
Keith J. Minson
Michael A. Brody
Daniel C. Masakayan
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA  22102-4215
(703) 712-5000 – Telephone
(703) 712-5220 – Facsimile
nsanfilippo@mcguirewoods.com
kminson@mcguirewoods.com
mbrody@mcguirewoods.com
dmasakayan@mcguirewoods.com

By: /s/ Jesse L. Noa
John A. Sensing (#5232)
Jesse L. Noa (#5973)
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE  19801
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
jsensing@potteranderson.com
jnoa@potteranderson.com

*Attorneys for Plaintiff Patrick K. Donnelly*

Dated:  November 29, 2022