## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PATRICK K. DONNELLY,

     *Plaintiff,*

v.

PROPHARMA GROUP TOPCO, LLC,

     *Defendant.*

C.A. 21-cv-00894-MAK

## PLAINTIFF PATRICK K. DONNELLY'S COMPLIANT OPPOSITION
## <u>TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

OF COUNSEL:

Nicholas D. SanFilippo
Keith J. Minson
Michael A. Brody
Daniel C. Masakayan
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA  22102-4215
(703) 712-5000 – Telephone
(703) 712-5220 – Facsimile
nsanfilippo@mcguirewoods.com
kminson@mcguirewoods.com
mbrody@mcguirewoods.com
dmasakayan@mcguirewoods.com

John A. Sensing (#5232)
Jesse L. Noa (#5973)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE  19801
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
jsensing@potteranderson.com
jnoa@potteranderson.com

*Attorneys for Plaintiff Patrick K. Donnelly*

Dated: December 2, 2022

# **TABLE OF CONTENTS**

**Page**

BACKGROUND ................................................................................................. 1

I.    SUMMARY OF FACTS STILL IN DISPUTE.................................................. 1

II.   INTRODUCTION AND FACTS ...................................................................... 2

    A.    Mr. Donnelly Joins the ProPharma Board ................................................ 2

    B.    The Deterioration of the Relationship Between Mr. Donnelly and
       ProPharma.................................................................................................. 4

    C.    ProPharma Prepares To Sell The Company and Ask Mr. Donnelly
       to Leave..................................................................................................... 5

    D.    Negotiations Cease and ProPharma Unilaterally Wires Funds................. 7

    E.    ProPharma Attempts to Remedy Its Deficient Removal Notice............... 7

III.  STANDARD OF REVIEW ............................................................................... 8

ARGUMENT ...................................................................................................... 9

I.    THE PARTIES GENUINELY DISPUTE WHETHER MR. DONNELY
    WAS PROPERLY REMOVED FROM THE BOARD. ...................................... 9

    A.    It Is Undisputed That The Deficient Removal Notice Dated August
       31, 2019, Was Insufficient As A Matter Of Law To Remove Mr.
       Donnelly And A Genuine Dispute Exists As To When Mr.
       Donnelly Exited The Board. ...................................................................... 9

    B.    The Parties Genuinely Dispute The Veracity And Authenticity Of
       The Purported Removal Document. ........................................................ 10

    C.    The Parties Genuinely Dispute The Effect Of Defendant's
       Statements And Whether They Indicate Resignation From The
       Board....................................................................................................... 13

    D.    The Parties Genuinely Dispute Whether Plaintiff Ever Acquiesced
       to Removal By the Board......................................................................... 15

II.   UNILATERALLY PAYING MR. DONNELLY AND CEASING
    NEGOTIATIONS DID NOT TERMINATE MR. DONNELLY FROM
    THE BOARD OR CONSTITUTE AN ACCORD AND SATISFACTION....... 17

    A.    Defendant Has Failed to Prove That its Dispute with Mr. Donnelly
       was Based on Mutual Good Faith............................................................ 18

    B.    Defendant Has Not Alleged an Agreement or Any Acts
       Constituting Acceptance of Terms or Payment. ..................................... 20

III.  MR. DONNELLY'S IMPLIED COVENANT CLAIM (COUNT III) IS
    NOT DUPLICATIVE OF HIS CLAIMS FOR BREACH OF
    CONTRACT ..................................................................................................... 21

i

IV.     MR. DONNELLY'S BREACH OF FIDUCIARY DUTY CLAIM
        (COUNT IV) IS NOT DUPLICATIVE OF HIS CLAIMS FOR BREACH
        OF CONTRACT ................................................................................................ 24

V.      CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acierno v. Worthy Bros. Pipeline Corp.*,
   693 A.2d 1066 (Del. 1997) ...................................................................................18, 20

*Artoss, Inc. v. Artoss GmbH*,
   2021 WL 706345 (D. Del. Feb. 23, 2021) ...........................................................................25

*Bachmann v. Ontell*,
   1984 WL 8245 (Del.Ch. Nov.27, 1984) ...............................................................................13

*Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*,
   2018 WL 3326693 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho
   Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019)...............................................................15

*Blue Mountain Env't Mgmt. Corp. v. Chico Enterprises, Inc.*,
   190 F. App'x 150 (3d Cir. 2006) .........................................................................................8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................................................8

*Data Ctrs., LLC v. 1743 Hldgs. LLC*,
   2015 WL 9464503 (Del. Super. Oct. 27, 2015)...................................................................21

*DG BF, LLC v. Ray*,
   2021 WL 776742 (Del. Ch. Mar. 1, 2021)...........................................................................22

*Dunlap v. State Farm Fire & Cas. Co.*,
   878 A.2d 434 (Del. 2005) ....................................................................................................21

*Fed Cetera, LLC v. Nat'l Credit Servs., Inc.*,
   938 F.3d 466 (3d Cir. 2019)................................................................................................17

*Gaind v. Cordero*,
   2011 WL 6376679 (S.D.N.Y. Dec. 16, 2011), *aff'd,* 515 F. App'x 68 (2d Cir.
   2013) ...................................................................................................................................11

*Glaxo Grp. Ltd. v. Drit LP*,
   248 A.3d 911 (Del. 2021) ....................................................................................................21

*Hockessin Cmty. Ctr., Inc. v. Swift*,
   59 A.3d 437 (Del. Ch. 2012)................................................................................................15

*Hugh v. Butler Cnty. Fam. YMCA*,
   418 F.3d 265 (3d Cir. 2005)..................................................................................................8

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*,
 691 F.3d 294 (3d Cir. 2012) ........................................................................................9

*Lola Cars Int'l Ltd. v. Krohn Racing, LLC*,
 2009 WL 4052681 (Del. Ch. Nov. 12, 2009) ...............................................................23

*Oracle Partners, L.P. v. Biolase, Inc.*,
 2014 WL 2120348 (Del. Ch. May 21, 2014), *aff'd*, 97 A.3d 1029 (Del. 2014) .....................13

*PT China LLC v. PT Korea LLC*,
 2010 WL 761145 (Del. Ch. Feb. 26, 2010) ...................................................................25

*Schuss v. Penfield Partners, L.P.*,
 2008 WL 2433842 (Del. Ch. June 13, 2008) .................................................................24

*Sears Hometown & Outlet Stores, Inc. v. Rise Residential Constr., LP*,
 2018 WL 2135155 (N.D. Ill. May 9, 2018) ...................................................................21

*Stone & Paper Invs., LLC v. Blanch*,
 2019 WL 2374005 (Del. Ch. May 31, 2019) .................................................................25

*Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*,
 361 F. Supp. 3d 451 (E.D. Pa. 2019) ...........................................................................12

*Villette v. MondoBrain, Inc.*,
 2020 WL 7706961 (Del. Ch. Dec. 29, 2020) .............................................................13, 14

*Willis v. United States*,
 2019 WL 13172380 (W.D. Mo. July 3, 2019) ...............................................................21

*Zohar III Ltd. v. Stila Styles, LLC*,
 2022 WL 1744003 (Del. Ch. May 31, 2022) .................................................................15

**Other Authorities**

Fed. R. Civ. P. 56(a) ........................................................................................................8

*Zohar III Ltd., Inc* ...........................................................................................................15

Plaintiff Patrick K. Donnelly ("Plaintiff" or "Mr. Donnelly"), by and through counsel, files this Opposition to Defendant ProPharma Group TopCo, LLC's ("ProPharma") Motion for Summary Judgment ("Motion").

## BACKGROUND

### I. SUMMARY OF FACTS STILL IN DISPUTE

Mr. Donnelly was never properly terminated from the ProPharma Board of Managers, he never resigned, and while he admittedly was an inactive participant at the direction of the president of the board, he remained a member through the closing of the sale. By his testimony, Mr. Donnelly made the shorthand statement "I am no longer on the ProPharma Board" to a secretary making future travel arrangements at the beginning of negotiations for the terms of his departure from the board because he anticipated resigning shortly and did not want to provide a long explanation of why he did not need travel arrangements. Mr. Donnelly also testified he put together a CV for a prospective business opportunity showing his board membership with ProPharma as ending in 2019 because he was no longer active and wanted to avoid presenting his membership and ongoing dispute as a potential conflict with the opportunity. Neither of Mr. Donnelly's representations has any legal effect nor is dispositive of the issue of his board membership. Neither of Mr. Donnelly's representations is a proper method for removal under the terms of ProPharma's LLC Agreement.

ProPharma did not make its offer or deposit of funds in good faith and Mr. Donnelly never agreed to any amount of payment for his incentive equity units with ProPharma. Instead ProPharma unilaterally decided to deposit funds into Mr. Donnelly's bank account, without any action by Mr. Donnelly, where the funds remain. Therefore, there can be no accord and satisfaction.

Mr. Donnelly's claim for Breach of the Implied Covenant of Good Faith is an equitable claim that is separate and distinct from his Breach of Contract Claim. Every contract includes the implied covenant that it will be performed by each party in good faith. Further, the elements required for Mr. Donnelly's breach of fiduciary duty are separate and distinct from those required for a breach of contract claim. As such, these two equitable claims must survive despite the contract.

## II.   INTRODUCTION AND FACTS

### A.   Mr. Donnelly Joins the ProPharma Board

Mr. Donnelly is an experienced business executive widely known for his work helping lead medical device and pharmaceutical companies.[1] Am Compl. ¶¶ 14-15. Based on his expertise, Mr. Donnelly also served as a consultant with Linden Capital Partners ("Linden"), a private equity firm. Def.'s Mot. For Summary Judgment at 2. In 2016, at the direction and with the assistance of Mr. Donnelly, Linden added ProPharma to its portfolio of companies. *Id.* After the deal closed, Mr. Donnelly was selected to serve on the ProPharma Board of Managers (the "Board"). *Id.* In exchange for his membership on the Board, Mr. Donnelly was offered compensation of thirty-seven thousand, five hundred dollars ($37,500.00) annually to be paid quarterly as well as eight thousand forty-six point three hundred sixty-five thousand (8046.365) units of incentive equity in ProPharma. Am Compl. ¶¶ 30, 33. The value of Mr. Donnelly's equity was directly tied ProPharma' fair market value. *Id.* at ¶¶ 30, 33

To memorialize his position as a Board member, Mr. Donnelly signed three independent, but interconnected agreements. First, Mr. Donnelly signed his offer letter to join the board. (the "ProPharma Offer"). This agreement outlined several board membership duties and

---

[1] First Amended Complaint, filed October 27, 2021 (D.I. 61), ¶¶ 14-15 ("...").

responsibilities as well as his compensation.[2]  The important and relevant portions of the offer letter provide that Mr. Donnelly's compensation was to be $37,500 per year on a quarterly basis in base pay and payment in the form of incentive equity that vested either by time or performance. (**Ex. 1** at A000002).  While Defendant characterizes the ProPharma Offer as a *quid pro quo* with Board duties and responsibilities provided in exchange for payment, no language in the ProPharma Offer expressly support that proposition.  (**Ex. 1** at A000002-05.

Second, Mr. Donnelly signed a joinder to the ProPharma LLC Agreement,[3] which governed the terms of his appointment.  Among other things, the ProPharma LLC Agreement set forth the terms and detailed requirements for Mr. Donnelly and other members of the Board to be both appointed and removed.  *See* Am. Compl. ¶¶ 107 – 119.  In essence, the only entities under the ProPharma LLC Agreement with the authority to remove Mr. Donnelly were ones that appointed him.  Specifically, ProPharma Group Buyer, LLC and ProPharma Group Splitter, LP had this authority.  *See* Am. Compl. ¶¶ 114-120.

Lastly, Mr. Donnelly signed his incentive equity agreement dated January 18, 2017 (the "IEA")[4].  Under the IEA, Mr. Donnelly was entitled to twenty-five percent (25%) of the incentive equity units as time-vested over the course of five years with five percent of his time vesting units earned on the anniversary of each year he remained on the Board ("Time Vesting Units").[5]  The IEA also entitled Mr. Donnelly to performance vesting incentive equity units at certain benchmarks of company performance (the "Performance Vesting Units") and outlined specifically how those units would vest in two relevant, but inconsistent clauses.  To be entitled to the fully vested value of all of his incentive equity units, the IEA provided that "33.33% of the Performance Vesting

---

[2] *See* **Ex. 1,** ProPharma Offer at A000002.
[3] *See* **Ex. 2,** ProPharma LLC Agreement at A000006-82.
[4] *See* **Ex. 3,** IEA at A000083-103.
[5] *See* **Ex. 3,** § 4(b) at A000089.

Units (i.e., 2,011.390 Management Incentive Units) will vest upon the Linden Investors' achievement of a 3.0x Qualified Sale *in connection with* a Liquidity Event." (**Ex. 3,** § 4(c)(iii) at A000090 (emphasis added)).   This clause is in contrast to the preceding clause which provides:

> 75% of the Management Incentive Units (the "Performance Vesting Units") issued to Participant under this Agreement (i.e., 6,034.774 Management Incentive Units) shall become vested over time as follows, if (but only if) Participant has been continuously employed by or providing services to and is still employed by or providing services to the Company or its Subsidiaries from the date hereof through the consummation of a Liquidity Event.

(**Ex. 3**, § 4(c) at A000089.

### B.    The Deterioration of the Relationship Between Mr. Donnelly and ProPharma

In 2018, Mr. Donnelly became the CEO of Advarra, another Linden portfolio company, that directly competed with ProPharma in a limited section of its functions.[6]  While there were some conflicts due to the competition, Linden and Mr. Donnelly were able to deal with them amicably as friends and colleagues.[7]  Toward the end of 2018 and the beginning of 2019, however, Mr. Donnelly's relationship with Linden began to sour.[8]

Consequently, Linden managing partner Tony Davis ("Davis") and partner, Michael Farah ("Farah") began discussing ways to convince Mr. Donnelly that he should resign from the Board.**[9]** Linden's determination of Mr. Donnelly's conflicts due to his role as CEO of Advarra was a pretext.  Personality conflicts were the real reason Linden wanted him to leave the Board.[10]  Farah admits to conversations with the ProPharma management team in which it was stated, "We really don't like Pat. Why is he on the board?"[11]  As evidence of the pretext, both Davis and Farah served joint roles like Mr. Donnelly being on the ProPharma Board while also operating partners of

---

[6] *See* **Ex. 9**, Farah Dep. 66:5-20 at A000136.
[7] *See* **Ex. 33**, Davis Dep. 78:7-21 at A000797.
[8] *See* **Ex. 33**, Davis Dep. 78:22-79:8 at A000797-798.
[9] *See* **Ex. 9**, Farah Dep. 72:23-75:9 at A000143-144, Ex. 32, Farah Dep. Ex 12 at A000776.
[10] *See* **Ex. 33**, Davis Dep. 73:19-74:3 at A000795-796; 80:3-8 at A000799.
[11] *See* **Ex. 32**, Farah Dep. 96:12-13 at A000540.

Linden.[12]   Even further, Richard Thomas ("Thomas"), another Board member, was also on the

Advarra board.[13]   Unlike Mr. Donnelly, Linden had a good relationship with Thomas and he wasn't

asked to resign from the board.[14]   In his deposition, Davis was asked about Linden's relationship

with Thomas as opposed to Mr. Donnelly and stated the following:

> Q. Okay. So there was never any discussion of removing Richard Thomas from the board?
> **A. No.**
> Q. And your working relationship was better with Richard Thomas than Pat, would you say?
> **A. Richard Thomas is a delightful, wonderful man; and Pat, on his best days, is difficult to deal with, by long-standing reputation.**

(**Ex. 33**, Davis Dep. 91:20-92:2 at A000801-802 (emphasis added)).

Thomas was also paid the full value of incentive equity units upon the sale of ProPharma

at a multiple of 3.15x.[15]

### C.   ProPharma Prepares To Sell The Company and Ask Mr. Donnelly to Leave

In 2019, Linden began preparations to sell ProPharma.   In June of 2019, prior to talking to

Mr. Donnelly, Linden requested that Lisa Cohen of Linden calculate the payout value of Mr.

Donnelly's incentive equity units.[16]   Linden's internal calculation of Mr. Donnelly's incentive

equity showed ProPharma as having received a multiple on invested capital ("MOIC") low of 3.0

and high of 4.5.  *Id.*

From June of 2019 through November of 2019, Farah, Davis, and Mr. Donnelly engaged

in negotiations regarding Mr. Donnelly's incentive equity compensation upon departure from the

Board.[17]   Mr. Donnelly was never provided with any notice or indication that he had been officially

---

[12] *See* **Ex. 34**, Def.'s First Supp. Interrogatory Responses, Interrogatory No. 2 at A000806-812.
[13] *See* **Ex. 33**, Davis Dep. 90:8-15 at A000800.
[14] *See* **Ex. 33**, Davis Dep. 91:20-22 at A000801.
[15] *See* **Ex. 32**, Farah Dep. 196:1-5 at A000560.
[16] *See* **Ex. 32**, Farah Dep. 169:17-172:17 at A000553; **Ex. 32**, Farah Dep. Ex. 29 at A000792-793.
[17] *See* **Ex. 11**, Donnelly Dep. 160:14-162:25 at A000162-163.

and unilaterally removed.[18]  Instead, Mr. Donnelly sought backup data about Linden's calculations. (**Ex. 35,** Donnelly Dep**.** 228:14-229:13 at A000818-819).   In response to his request, Linden eventually provided Mr. Donnelly a valuation calculation sheet.[19]  Linden's purported calculations valued ProPharma with an EBITDA multiple of 13.9 which appeared to result in a MOIC of 2.5.[20] *Id*.  Mr. Donnelly immediately recognized the calculation as incorrect based on his knowledge of Linden's recent sale of Advarra, a similar company, at an 18.0 EBITDA multiple.[21]  What Mr. Donnelly did not know is that Linden's "calculation tool" enabled it to arbitrarily select a MOIC, find the associated EBITDA multiple, and explain it away using a discretionary selection of companies with similar multiples.  (**Ex. 36**, Beaton Dep. 147:9-148:18 at A000822-823).  After Linden used its tool to set the value of ProPharma, Farah realized that ERG, an underperforming portfolio company, appeared to have a higher multiple than ProPharma in the calculation sheet to be provided to Mr. Donnelly.  To remedy that issue, Farah asked Linden staff to structure the calculation sheet in a way that would not allow Mr. Donnelly to see and compare the EBITDA multiples of the two companies.[22]  Despite Linden's efforts, Mr. Donnelly realized that the valuation was inappropriate.

From September of 2019 to November of 2019, ProPharma made Mr. Donnelly the same compensation offer.[23]  Each time, Mr. Donnelly declined and refused to sign anything to enact his departure from the Board.  *Id.*  Instead, he made a counteroffer through counsel on November 6, 2019.[24]  Mr. Donnelly's main point of contention was that ProPharama had intentionally

---

[18] *See* **Ex. 11**, Donnelly Dep. 283:3-10 at A000189.
[19] *See* **Ex. 32**, Farah Dep. 155:17-156:24 at A000548-549; **Ex. 32**, Farah Dep Ex. 26 at  .
[20] A 2.5 MOIC disqualified Mr. Donnelly for compensation for the full value of all of his incentive equity units.  *See* **Ex. 3**, § 4(c)(ii) at A0000089.
[21] *See* **Ex. 9**, Farah Dep. 131:24-135:6 at A000144-145; **Ex. 32**, Farah Dep. Ex. 23 at A000787-789.
[22] *See* **Ex. 32**, Farah Dep. 161:25-166:17 at A000547-552; *see also* **Ex. 39** at A000833-836.
[23] *See* **Ex. 32**, Farah Dep. 51:8-52:12 at A000537-538; **Ex. 9**, Farah Dep. 118: 1-119:25 at A000141; 128:1-130:24 at A000143-144; **Ex. 32**, Farah Dep. Exs. 21-23, **Ex. 25**, Farah Dep. Ex. 24 at A000266-269.
[24] *See* **Ex. 9**, Farah Dep. 131:19-134:3 at A000144-145; **Ex. 32**, Farah Dep Ex. 23 at A000787-789.

undervalued his incentive equity units. Am. Compl. ¶¶ 54 – 63.   Mr. Donnelly determined that ProPharma's valuation was improper based on his extensive experience with Linden in the recent sale of Advarra.[25]

### D.      Negotiations Cease and ProPharma Unilaterally Wires Funds

Finally, on November 11, 2019, negotiations reached an impasse and ProPharma made a unilateral payment of funds into Mr. Donnelly's account without his consent.[26]  As planned, Linden sold ProPharma just ten (10) months later in September of 2020 at a valuation far and above that which was offered to Mr. Donnelly for his incentive equity shares.

ProPharma did not provide Mr. Donnelly with any documentation of board removal until September 2020.  The form provided was dated effective on August 31, 2019 but was not endorsed by the entities with proper authority to remove Mr. Donnelly from the Board. (the "Deficient Removal Notice").  Indeed, ProPharma has conceded the insufficiency of the Deficient Removal Notice, referring to it as a document created in error.[27]

### E.      ProPharma Attempts to Remedy Its Deficient Removal Notice

Due to its clear ineffectiveness and presentation as a dispositive removal document, the improper removal form became part of Mr. Donnelly's First Amended Complaint in this action. Am. Compl. ¶¶ 122 – 124.  Acknowledging its error, Defendant created and produced a new and never seen before form in discovery that appears to be signed by the proper entities for Board removal, but is undated. (the "Purported Removal").[28] The only date appearing on the Purported Removal was "2019" not referencing a month or year on its date line.  Ex. 12 at A000198-201.

---

[25] See **Ex. 11**, Donnelly Dep. 235:2-5 at A000177; **Ex. 9**, Farah Dep. 131:19-134:3 at A000144-145.
[26] See. **Ex. 33**, Davis Dep. 120:3-19 at A000803; 138:7-139:25 at A000804-805; **Ex. 28**, Davis Dep. Ex. 28 at A000328-370; **Ex. 25**, Farah Dep. Ex. 24 at A000266-269.
[27] See **Ex. 8**, Davis Dep. 29:5-31:6 at A000117; **Ex. 9**, Farah Dep. 26:2-27:19 at A000133; **Ex. 37**, Davis Dep. Ex. 3 at A000825-828; **Ex. 26**, Davis Dep. Ex. 4 at A000271.
[28] See **Ex. 32**, Farah Dep. 37:14-38:16 at A000528-529; **Ex. 12**, Farah Dep. Ex. 4 at A000198.

There is no email providing Farah with the Purported Removal and it was only ever provided to one other person at Linden.  Neither Mr. Donnelly nor ProPharma ever received the Purported Removal before litigation was imminent.[29]  In March of 2020, Linden employees requested Mr. Donnelly's removal documentation as part of an audit.  (**Ex. 32**, at A000759).  They did not receive the Purported Removal until May 2020, when Linden personnel admitted, "We do not have a repurchase/separation agreement in place."  The first time the Purported Removal was ever provided to Mr. Donnelly was in discovery for this matter.

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment is only appropriate if a party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, any admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party."  *Blue Mountain Env't Mgmt. Corp. v. Chico Enterprises, Inc.*, 190 F. App'x 150, 153 (3d Cir. 2006).  "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor."  *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

---

[29] *See* **Ex. 32**, Farah Dep. 46:24-47:13 at A000533-534; **Ex. 32**, Farah Dep. Ex. 5 at A000759.

## ARGUMENT

I.   **THE PARTIES GENUINELY DISPUTE WHETHER MR. DONNELY WAS PROPERLY REMOVED FROM THE BOARD.**

    **A.**   **It Is Undisputed That The Deficient Removal Notice Dated August 31, 2019, Was Insufficient As A Matter Of Law To Remove Mr. Donnelly And A Genuine Dispute Exists As To When Mr. Donnelly Exited The Board.**

There is no dispute as to the fact that ProPharma failed to provide any written notice to Mr. Donnelly regarding termination until September 23, 2020, long after ProPharma was sold, and litigation was imminent.[30]  There is also no dispute that negotiations regarding the terms of Mr. Donnelly's departure continued until at least November 11, 2019, when Defendant withdrew from negotiations and unilaterally wired Mr. Donnelly $105,227.97.  *Id.*  Mr. Donnelly's testimony is that he and Farah were still negotiating well into 2020.[31]  It is also undisputed that, despite receiving several draft repurchase agreements from Defendant identifying August 31, 2019 as the effective date for termination, Mr. Donnelly never endorsed or agreed to the terms of those agreements.  *Id.*

Still in dispute, however, is the material issue of whether Mr. Donnelly was validly removed from the board, and if so, how.  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant.  A dispute is material if it could affect the outcome of the case."  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (internal citation omitted).  Here, Defendant argues that Mr. Donnelly's removal was effective as of August 31, 2019.  *See* Def's Mot. For Summary Judgment, D.I. 147 at 9.  Further, Defendant argues that Mr. Donnelly's IEA requires hm to be on the Board at the "consummation of the sale of ProPharma, and since he was terminated from the Board as of August 31, 2019, before the company was sold,

---

[30] *See* **Ex. 9**, Farah Dep.  26:2-33:17 at A000133-134; **Ex. 32**, Farah Dep. Ex. 2 at A000563-564, A000271.
[31] *See* **Ex. 11**, Donnelly Dep. 288:3-7 at A000190; 355:18-356:4 at A000194.

he necessarily forfeits his entitlement to the performance vesting shares of his incentive equity. The date of Mr. Donnelly's removal is therefore an extremely material fact to his claims.

The only document produced to memorialize that date, however, is the Deficient Removal Notice provided to Mr. Donnelly on September 23, 2020 during pre-litigation negotiations and months after ProPharma was sold. (**Ex. 12** at A000200-201). As mentioned above, Defendant has conceded the Deficient Removal Notice insufficient to remove Mr. Donnelly from the Board under the terms of the ProPharma LLC Agreement. (**Ex. 9** at A000133). Specifically, when asked about the origin of the Deficient Removal Notice, Farah replied, "I think it's just a -- quite honestly, a clerical error on our lawyer's part to do this."[32] Because the only documents referring to August 31, 2019 as an effective date for Mr. Donnelly's Board termination are the Deficient Removal Notice and the unsigned draft repurchase agreements for his incentive equity shares, **Exs. 18** (A000226-233) and **37** (A000825-828), Mr. Donnelly's Board removal by that date remains a genuinely disputed issue of material fact. And, more importantly, there is certainly enough evidence for a fact-finder to determine that Mr. Donnelly had not been terminated from the Board as of August 31, 2019.

**B.** **The Parties Genuinely Dispute The Veracity And Authenticity Of The Purported Removal Document.**

The Purported Removal is of questionable veracity and authenticity, with evidence demonstrating a strong inference that it was a post-hoc creation in response to the allegations in the Amended Complaint. Consequently, when viewed in a light most favorable to Mr. Donnelly, his removal from the Board through the Purported Removal document remains a genuinely disputed issue of material fact. Defendant's testimony regarding the Purported Removal, the Deficient Removal Notice first produced, and the fact that the Purported Removal was never

---

[32] *See* **Ex. 9**, Farah Dep. 26:2-27:19 at A000133.

distributed, circulated, or produced internally or externally until the Mr. Donnelly's Complaint highlighted the inadequacy of the Deficient Removal Notice is all evidence against the veracity of the Purported Removal. "When the existence or authenticity of a document is called into question, the jury rather than the court should determine its authenticity." *Gaind v. Cordero*, 2011 WL 6376679, at *3 (S.D.N.Y. Dec. 16, 2011), *aff'd,* 515 F. App'x 68 (2d Cir. 2013). There is abundant evidence that calls the existence, authenticity, and veracity of the Purported Removal into question.

First, until the Deficient Removal Notice was called into question in Mr. Donnelly's Amended Complaint, Defendant continuously represented that August 31, 2019 was the date of Mr. Donnelly's termination. It did so in pre-litigation offers and correspondence with Mr. Donnelly on September 4, 2019, October 18, 2019, November 4, 2019, and November 11, 2019. (**Ex. 18** at A000226-233; **Ex. 37** at A000825-828)**.** It did so again immediately preceding this lawsuit on September 23, 2020 when it produced the Deficient Removal Notice in an email to Mr. Donnelly through counsel stating, "[t]his obviously resolves any dispute regarding the [ProPharma] Board." (**Ex. 32**. at A000563-564). In reviewing Defendant's November 4, 2019 offer to Mr. Donnelly, as well as this motion, Defendant cites August 31, 2019 as Mr. Donnelly's termination date. Further, Defendant did not take any actionable steps that it could recall regarding the Purported Removal. In contrast, on September 3, 2019, the Deficient Removal Notice was signed, on September 4 an offer was sent to Mr. Donnelly (without including the Deficient Removal Notice) (*Id.*), and on September 5, 2019, Mr. Farah sent an email informing several employees of Linden (including Brianna Loverich), that "[P]at has been removed from both the ERG and PPG boards. As such, please make sure he is no longer on any board invites, calls, or email distributions."[33] Not once in any of Defendant's internal or external correspondence did

---

[33] *See* **Ex. 32**, Farah Dep. 106:19-107:17 at A000541-542; **Ex. 32**, Farah Dep. Ex. 20 at A000777.

Defendant rely on or provide the Purported Removal to demonstrate that June 27, 2019 was Mr. Donnelly's termination date.   In the context of this motion for summary judgment, "[i]nferences should be drawn in the light most favorable to [Mr. Donnelly], and where [Mr. Donnelly's] evidence contradicts the [Defendant's], then the [Mr. Donnelly's] must be taken as true." *Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, 361 F. Supp. 3d 451, 457 (E.D. Pa. 2019).   The aforementioned evidence creates an inference that prior to this litigation being filed and Mr. Donnelly pointing out the flaw in the Deficient Removal Notice, the Purported Removal did not exist.

Second, even when requested for an internal audit, neither Defendant nor Linden ever produced the Purported Removal Document in response to the audit request.[34]   When inquiring about the proper documentation, on March 5, 2020, Defendant's CEO Rob Chestnut stated, "I assume you would have had a calculation and some type of separation agreement." *Id*.  On May 11, 2020, Linden employee, Bennett Yaskin, responded telling Mr. Chestnut saying, "Rob - see below regarding Pat's incentive equity. We do not have a repurchase / separation agreement in place."[35]  Thus, even as late as May 11, 2020, the Purported Removal was not provided as proof of separation, and instead Defendant performed its audit with no document substantiating the claimed termination date.  (**Ex. 38** at A000829-832).  This is further supports that the Purported Removal did not exist before the Complaint was filed.  Because there was no valid and properly executed termination, removal, or resignation prior to the sale of ProPharma, Mr. Donnelly remained on the Board until the sale and is entitled to compensation for all his performance and time vesting shares calculated using the ProPharma sales price.  Defendant's motion must therefore fail.

---

[34] *See* **Ex. 32**, Farah Dep. 43:23-47:10 at A000530-534; **Ex. 32**, Farah Dep. Ex. 6 at A000760-765.
[35] *See* **Ex. 32**, Farah Dep. 47:19-49:24 at A00534-536; **Ex. 32**, Farah Dep. Ex. 7 at A000766-768.

**C.      The Parties Genuinely Dispute The Effect Of Defendant's Statements And Whether They Indicate Resignation From The Board.**

Plaintiff never resigned from ProPharma.  Although, "the magic words 'I resign' may not be necessary, *there must nonetheless be some objective manifestation of words or actions to that effect*."  *Oracle Partners, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *16 (Del. Ch. May 21, 2014), *aff'd*, 97 A.3d 1029 (Del. 2014) (emphasis added).  "What an act of resignation must be, however, is an action that *clearly manifests* that the director has resigned his fiduciary position.  Where the act is less than clear, *it is not effective as a resignation*."  *Villette v. MondoBrain, Inc.*, 2020 WL 7706961, at *3 (Del. Ch. Dec. 29, 2020) (emphasis added).  "[L]oose and ambiguous language will not be regarded as sufficient to prove the resignation of a corporate officer, at least where the subsequent acts and declaration of the officer are inconsistent with any such contention."  *Bachmann v. Ontell,* 1984 WL 8245, at *3 (Del.Ch. Nov.27, 1984).

Here, it is clear that Mr. Donnelly never resigned.  In large part, Defendant's argument that Plaintiff resigned is premised on two pieces of evidence, neither of which suffice to show that Plaintiff ever resigned or even intended to resign from ProPharma.  Specifically, Defendant cites evidence suggesting "that [Plaintiff] and Tony Davis 'talk[ed] about [Plaintiff] stepping down and what it would entail' in June 2019" and that, in a July 1, 2019 email, Plaintiff stated "I am no longer on the ProPharma Board[.]"  Def.'s Br. in Support of Summary Judgment at 14 (citing Def.'s Ex. 11, Donnelly Dep., at A000163 and Def.'s Ex. 13, at A000203).

The difference between Mr. Donnelly's communications and representations to ProPharma leadership as opposed to third parties, is that he makes clear, when speaking to leadership in an official capacity, that his resignation is a future or prospective event.  The conversation with Davis evinces nothing more than the mere possibility that Plaintiff might leave the company; the use of "would" indicates, at most, that Plaintiff was speaking in the subjective tense.  There is not even

13

an indication in this conversation that resigning was something Plaintiff wanted to do—just that he wanted to learn more about the process.  There is not sufficient evidence for the Court to infer that Plaintiff expressed an intent to resign with this statement.

Regarding the July 1, 2019 to email, Plaintiff's deposition transcript clarifies that this exchange was likewise not reflective of Plaintiff's intent to resign.  When questioned by opposing counsel as to what the email meant, Plaintiff responded that he and Farah "were in discussions on the values of [Plaintiff's] options at the time," not that Plaintiff had made any expression of an intention to resign, formal or otherwise.[36]  When pressed further by Defendant's counsel on this issue, Plaintiff explained that that his statement was only that he *might* resign in the future:

> Q. Okay. Exhibit 10 is an e-mail you sent to Brianna Loverich, and you chose to cc Michael Farah, stating, on July 1st, 2019, "I am no longer on the ProPharma board"; correct?
> A. I didn't see any reason for Brianna to go through all the gyrations to get me an airplane ticket and everything else to the Netherlands [for a board trip] when I assumed I wouldn't be on the board for that meeting at that time with the successful resolution with Mike Farah of consideration.

See **Ex. 35**, Donnelly Dep. 167:5-14 at A000817.

In fact, Defendant's counsel even confirmed, through its own questioning, that Plaintiff never made a statement of intent to resign:

> Q. The e-mail "I'm no longer on the ProPharma board" had more to do with Brianna asking for travel plans than it did for your discussion with Tony about coming off the board?
> A. Correct.

See **Ex. 11**, Donnelly Dep. 179:22-180:1 at A000165.  The context of Plaintiff's conversations reveals that he never resigned, much less made an "unequivocal statement of resignation." *Villette*, WL 7706961, at *3.  Plaintiff's statements are, at most, similar to those in *Villette*, where the court concluded that a contractor's statement to another company consultant "that his health would no

---

[36] *See* **Ex. 35,** Donnelly Dep.166:12-15 at A000816.

longer allow him to serve [the company], and in which he asked t[he] consultant to recommend to him potential future clients," was not a statement of resignation.  *Id.*  Moreover, statements of future intent, standing alone, are insufficient to constitute a resignation.  *See Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 458 (Del. Ch. 2012) ("The evidence demonstrates that Swift, Hughes, and Nichols did not resign.  Reading their communications literally, Swift and Nichols each wrote that they would be resigning in writing in the future.")

Simply put, Defendant does not cite to any evidence that reflects Plaintiff's *intent* to resign. Instead, Defendant cites, without any context, evidence of Plaintiff's *reflections*, where Plaintiff— who is not a lawyer—uses terms of art that do not in any way confirm that he either intended to resign or that he did resign.  The inferences that Defendant requests the Court to draw here are particularly inappropriate in light of the fact that the ProPharma LLC Agreement clearly states that unless specified otherwise, resignation is only "effective upon receipt."

### D.   The Parties Genuinely Dispute Whether Plaintiff Ever Acquiesced to Removal By the Board.

Defendant has failed to show that Plaintiff acted in a way suggesting he resigned or had been removed from the board.  Under Delaware law, "[a]cquiescence can bar a claim as a matter of equity when a plaintiff has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."  *Zohar III Ltd. v. Stila Styles, LLC*, 2022 WL 1744003, at *10 (Del. Ch. May 31, 2022), *judgment entered*, (Del. Ch. 2022), *aff'd sub nom. Tilton v. Zohar III Ltd., Inc.*, 2022 WL 7242692 (Del. Oct. 13, 2022) (internal quotations and citations omitted). To meet its burden of proving acquiescence, Defendant "must show that [Plaintiff] essentially consented to the [challenged action] before or after the fact."  *Basho Techs. Holdco B, LLC v.*

15

*Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *41 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019).  Here, Defendant fails to meet that high bar.

In its motion, Defendant places great weight on the fact that Plaintiff's résumé shows that Plaintiff's service at ProPharma ended in 2019 and that Plaintiff did not actively attend meetings as a board member.  First, while negotiating the appropriate compensation, Mr. Donnelly was acting at the behest of the chairman of the ProPharma board not to attend meetings.  However, Plaintiff admitted that he did not completely write the résumé himself, and he also admitted that the résumé was not reflective of his relationship with ProPharma but rather his communications with prospective ventures, as explained by the following exchange at his deposition:

> Q. If you turn to the last page of this résumé that you provided to Summit, you have a section where you list board of directors positions.  Do you see that?
> A. Yep.
> Q. And the third one down for ProPharma Group, you list the dates of your time on the board of ProPharma as 2016 to 2019; right?
> A. Yep.
> Q. That's what you put in this résumé; right, sir?
> A. It's not what I put, but it was part of the team at ReDiscovery Life who needed it for a venture round.
> Q. You're telling me somebody else other than you put this entry into the dates of your ProPharma board service?
> A. I reviewed it and a number of things, and we decided that let's not get this whole thing about ProPharma and whether I'm on the board or not on the board into the venture discussion for ReDiscovery Life Sciences.
> Q. Okay. So you put in your CV that your board service ended in 2019, but your testimony under oath to this jury is that that was a false date that you picked because you didn't want to end up with disputes about your CV?
> A. I wouldn't say it was a false. We were still -- at the time this CV was out, which was far earlier than the dates on these e-mails, it was still back and forth. I mean, I had another conversation with Tony Davis in January of 2020.  So this was still ongoing.

*See* **Ex. 11**, Donnelly Dep. 286:25-288:15 at A000190.

Plaintiff has provided clear testimony explaining that the dates of service listed on his resume do not have any legal significance or reflect acquiescence to the termination of his relationship with ProPharma.  The use of specific dates for terms of service was part of his marketing efforts and, as explained in the transcript, necessary in order to avoid confusion when soliciting business.  Words and dates on a resume, especially given the highly specialized context in which they were being used, cannot possibly reflect that Plaintiff "consented to" his removal from ProPharma.[37]

## II.   UNILATERALLY PAYING MR. DONNELLY AND CEASING NEGOTIATIONS DID NOT TERMINATE MR. DONNELLY FROM THE BOARD OR CONSTITUTE AN ACCORD AND SATISFACTION.

ProPharma's deposit of $105,228.97 into Mr. Donnelly's account without notifying him and without his consent did not create accord and satisfaction under Delaware law.  In Delaware, "the

---

[37] Even if Plaintiff was removed from the board, triable issues of fact remain as to whether a liquidity event occurred prior to his removal, such that he'd be entitled to full vesting of his IEU units.  Under the IEA, 75% of Plaintiff's ICE units could vest over time if Plaintiff was "continuously employed by or providing services to and [was] still employed by or providing services to [ProPharma] or its Subsidiaries from the date hereof through the consummation of a Liquidity Event."  Although not explicitly stated, Defendant's theory appears to be that because ProPharma's sale to Odyssey did not take place until September 30, 2020, that no liquidity event occurred during Plaintiff's service on the board.  In propounding this theory, Defendant mischaracterizes Plaintiff's testimony and reads the IEA Agreement far too narrowly.  Plaintiff never represented that a liquidity event had not been consummated at the time (that Defendant alleges) Plaintiff had been removed from the board.  Despite Defendant's statement that "Donnelly also admitted that as of the Fall of 2019, no 'consummation of a liquidity event' had occurred in connection with ProPharma," (Def.'s Mot. at 18) Plaintiff's deposition testimony reveals the exact opposite.  Indeed, when asked that very question—when a liquidity event consummates within the meaning of the IEA Agreement, Plaintiff explained that a variety of events could be considered a "consummation."  Specifically, Plaintiff explained "[i]t can mean hundreds of things […] [i]t could be an IPO, a various recap.  It could be an acquisition.  It could be a purchase by other private equity groups.  We can go on and on.  It could be a reverse merger.  It could be a number of things."  **Ex. 35**, Donnelly Dep. Tr. 96:21 (A000815)-97:5 (**Ex. 11** at A000152).  Moreover, the Third Circuit has addressed this very issue—i.e., whether "consummate," as that term is used in contractual language, means to "complete" or if it encompasses a far broader range of activities.  In explaining that the term has a broader meaning, consistent with Plaintiff's position, the court explained as follows:

> Looking at the correct *Black*'s definition—the verb definition—makes it clearer that "consummate," pronounced "con-sum-ayt," *carries less emphasis on something being fulfilled or fully completed*.  While the verb can still mean "to bring to completion," it can also mean "to achieve" or "to perfect."  To "achieve" a contract suggests that a contract has formed, not that a party started performance on a contract.

*Fed Cetera, LLC v. Nat'l Credit Servs., Inc.*, 938 F.3d 466, 472 (3d Cir. 2019) (emphasis added).  Here, a liquidity event was clearly consummated by June of 2019 within the meaning of the IEA Agreement at because ProPharma had engaged with prospective buyers.

elements necessary for a common law accord and satisfaction are: (1) that a bona fide dispute existed as to the amount owed that was based on mutual good faith; (2) that the debtor tendered an amount to the creditor with the intent that payment would be in total satisfaction of the debt; and (3) that the creditor agreed to accept the payment in full satisfaction of the debt." *Acierno v. Worthy Bros. Pipeline Corp.*, 693 A.2d 1066, 1068 (Del. 1997).  The burden to prove *all* the elements necessary for an accord and satisfaction is on the party alleging that it took place.  *Id.* While ProPharma may have intended to tender those funds to satisfy its debt to Mr. Donnelly, it fails to meet its burden on elements one and three.  With all inferences drawn in Mr. Donnelly's favor, the dispute, nor the amount tendered was based on good faith.  And with similar inferences, there was indisputably no agreement to accept the payment as full satisfaction.  In fact, just the opposite.  Despite the payment being made, Mr. Donnelly and Defendant were still in negotiations and discussions well into 2020.

### A.   Defendant Has Failed to Prove That its Dispute with Mr. Donnelly was Based on Mutual Good Faith.

First, Mr. Donnelly has expressly brought a cause of action alleging bad faith.  Second, Defendant's own testimony alleges that they believe Mr. Donnelly was acting in bad faith.  At his deposition, when asked about his beliefs on Mr. Donnelly's last counteroffer on November 6, 2019, Davis testified as follows:

> And so we said: Enough's enough. Take what we owe you, 105, or take what we're offering, 684, but you are ***negotiating in extremely bad faith*** to suggest that this is worth 18 times.

(**Ex. 33**, Davis Dep. 120:16-20 at A000803 (emphasis added)).  When asked about whether Defendant was negotiating in good faith, Mr. Donnelly stated, "*I do not think that they did a good faith effort* to value my shares, as is reflective in all the investment banking documents that are the

same time period."[38]  On November 4, 2019, by correspondence through counsel, ProPharma made

its last offer to Mr. Donnelly, before depositing funds.  (**Ex. 32,** Farah Dep. Ex. 22 at A000779-

786).  The offer was for Mr. Donnelly to accept payment for his incentive equity shares calculated

using a 13.9 EBTDA Multiple and 2.5x return or take payment for far fewer shares than he was

awarded.[39]  At the same time this offer was made and Defendant disbursed funds, it had the

investment bank reports in its possession demonstrating much higher EBITDA multiples and much

higher company valuations than the ones it presented to Mr. Donnelly as fair market value.[40]  The

investment bank EBITDA multiples ranged from 15x to 20x.[41]  At his deposition, Farah was asked,

"[y]ou would have had this report when you responded -- when you made your final response to

Pat's demand, correct?" to which he responded "Correct. Yep."  (**Ex. 32,** Farah Dep. 184:13-16 at

A000559).  Despite that knowledge, when Mr. Donnelly provided his counteroffer with

documentary support and figures more in line with the investment bank multiples, it was ignored.[42]

When asked about Defendant's response to Mr. Donnelly's counteroffer, Farah responded,

"[o]bviously we disagree with it.  I mean, this is -- *his notion of good faith is laughable* based on

the comps he's put forth here, alone." (**Ex. 9,** Farah Dep. 134:1-3 at A000145 (emphasis added)).

The total amount of payment Mr. Donnelly sought using his calculations for the value of his

incentive equity was $1,446,390.45.  Defendant's deposit of $105,227.97 is miniscule given the

independent valuation documents Defendant had in hand.  Moreover, Mr. Donnelly has testified

under oath that he did not believe Defendant to have negotiated in good faith.  For that reason

alone, Defendant's accord-and-satisfaction defense fails on the first element.

---

[38] *See* **Ex. 11**, Donnelly Dep. 235:2 – 235:5 at A000177.
[39] *See* **Ex. 9**, Farah Dep. 128:5 – 131:11 at A000143-144.
[40] *See* **Ex. 32**, Farah Dep. 181:16 – 181:22 at A000557.
[41] *See* **Ex. 32**, Farah Dep. 183:12 – 184:16 at A000558-559.
[42] *See* **Ex. 9**, Farah Dep. 131:19 – 134:3 at A000144.

**B.      Defendant Has Not Alleged an Agreement or Any Acts Constituting Acceptance of Terms or Payment.**

Defendant relies on *Acierno v. Worthy Bros. Pipeline Corp* to argue that Mr. Donnelly assented to payment.  That case involved physical checks that had to be walked into a bank and handed to a teller to be deposited.  So while Defendant correctly states the law that "[a]n overt manifestation of assent, ***not a subjective intent***, controls the formation of a contract," *Acierno v. Worthy Bros. Pipeline Corp.*, 693 at 1070 (emphasis added), Mr. Donnelly did not make such a manifestation.  Mr. Donnelly never agreed to the amount tendered nor did he take any action to retrieve the funds.  In deposition when asked about the transfer, the following exchange took place:

> Q. Okay. And you accepted that money. It was wired into your account; right?
> A. It was wired into my account.  I never accepted it.  I never signed any agreement.
> I never acknowledged it.  It just showed up. I didn't even know what it was for until my bank called me and said, Do you have any idea what this is for?

(**Ex. 11**, Donnelly Dep. 273:22-274:4 at A000187).

Clearly, Mr. Donnelly did not make the "overt manifestation" necessary to create an accord and satisfaction.  Further, the language in Defendant's offer did not provide Mr. Donnelly with the opportunity to reject the payment without accepting the other payment.  Defendant coercively instructed Mr. Donnelly that, "[i]f we have not received such executed document by such date and time, the offer described in the attached repurchase agreement is revoked, and we will exercise our repurchase option only for your ProPharma units that are vested pursuant to the express terms of your incentive unit agreement, which means that 804.6354 vested Time Vesting Units will be repurchased for $105,227.97." *Id.*  Mr. Donnelly made no effort to accept either and continued to express to Defendant that he did not consider the deposit full and final payment.  According to his testimony, he and ProPharma "were still in negotiations and discussions well into 2020." (**Ex. 11,** Donnelly Dep. 288:3-7 at A000190).  Lastly, not only has Mr. Donnelly not spent the funds deposited into his account, but they remain available to date, under the assumption they would be

"netted off of any settlement."[43]  Multiple courts examining the matter of accord and satisfaction as applied to wire transfers have found that unilateral wire transfers do not suffice to satisfy the elements of an accord and satisfaction.  *See Sears Hometown & Outlet Stores, Inc. v. Rise Residential Constr., LP*, 2018 WL 2135155, at *2 (N.D. Ill. May 9, 2018) (holding that the non-return of a wire payment does not constitute an accord and satisfaction when one party unilaterally characterizes the payment as full and final); *see also Willis v. United States*, 2019 WL 13172380, at *6 (W.D. Mo. July 3, 2019).  This Court should similarly reject any implication of an accord and satisfaction.

## III.    MR. DONNELLY'S IMPLIED COVENANT CLAIM (COUNT III) IS NOT DUPLICATIVE OF HIS CLAIMS FOR BREACH OF CONTRACT

The implied covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted).  The purpose of the covenant is "to preserve the economic expectations of the parties."  *Glaxo Grp. Ltd. v. Drit LP,* 248 A.3d 911, 919 (Del. 2021).  "Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms."  *Dunlap,* 878 A.2d at 442.  Nonetheless, "contractual gaps always exist because human negotiators and drafters lack perfect foresight, operate with limited resources, and practice their craft using the imprecise tool of language."  *Data Ctrs., LLC v. 1743 Hldgs. LLC,* 2015 WL 9464503, at *8 (Del. Super. Oct. 27, 2015).  "To state a claim for breach of the implied covenant, the Plaintiffs must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage

---

[43] *See* **Ex. 11**, Donnelly Dep. 275:1-3 at A000187; 356:11-18 at A000194.

to the plaintiff." *DG BF, LLC v. Ray*, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021) (internal quotations and citations omitted).

The conduct alleged here does not rest on the violation of any contractual language but rather is premised on Plaintiff's contention that Defendant was shutting him out of the company with no formal or even informal recognition that—at least according to Defendant—Plaintiff was no longer on the board. There is no express contractual language governing that scenario; rather, it is implied that Defendant would continue working, or at least communicating, with Plaintiff on a good-faith basis and in a manner where the parties' relationship was clear.

Defendant's attacks Plaintiff's claim by suggesting that Plaintiff is merely seeking the same relief as with his breach of contract claims, but Defendant misinterprets Plaintiff's allegations and otherwise ignores the actual facts. As stated in the Amended Complaint, Plaintiff's implied covenant claim is premised not on anything contained with the LLC Agreement but rather on the fact that he was "ready, willing, and able to provide services to Propharma" up until the time of its sale, that board members never provided him with documents nor informed him of meetings necessary for him to execute his duties, and that he was otherwise prevented from carrying out such duties." *See* Am Compl. ¶¶ 158-60. The record also reflects that, during this time period, Plaintiff was operating on the understanding that he was still a member of ProPharma. In Michael Farah's deposition, for example, he could not confirm that Defendant actually provided noticed to Plaintiff of his purported removal from the Board. In response to Plaintiff's counsel asking Farah "is it possible that [Plaintiff] could continue on for an entire year and not know that he was removed?," Farah responded that it was "[h]ard to speak in a hypothetical like that, because that just wouldn't happen. So, again, we're -- you know, we're colleagues. We work together. We've got a business relationship. We're going to talk to somebody about that. And that's what

happened." (**Ex. 9**, Farah Dep. Tr. 32:21-33:9 A000134; **Ex. 32** at A000527).

Farah's response is confusing in that Defendant seems to have an *unwritten* policy that it need not inform board members of their removal, because, as stated by Farah himself, the company would "talk to somebody about that." But, here, neither of those things happened. Plaintiff was *never* notified of his purported removal—formally or otherwise. Regardless of what ProPharma actually believed—or even if it relied on some unwritten internal policy in failing to provide notice to Plaintiff—it is ultimately *Plaintiff's* good faith perception of the issue that matters. Given Plaintiff's clear subjective belief that he remained a member of the ProPharma board, Defendant's actions here—or lack thereof—clearly fall within a category of conduct that is not specifically spelled out contractually.

Allowing the implied covenant claim to proceed would be consistent with Delaware courts that have concluded that removal-related implied covenant claims can proceed separate apart from a contract, even where the contract has a specific provision addressing removal. *Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2009 WL 4052681, at *9 (Del. Ch. Nov. 12, 2009) (explaining that even though operating agreement had specific provisions for director removal, the plaintiff's implied covenant claim could proceed where it was premised, in part, on the fact that the defendant failed "even to consider ... [the proposed] termination or to attend board meetings to that end."). Defendant's suggestion that ProPharma "***could have*** but ***chose not to*** guarantee Donnelly a full term of five years thereby insulating Donnelly from removal," (Mot. at 21) has no bearing on this issue whatsoever, because the implied covenant is concerned not with obligations that *could have* arisen had the parties negotiated differently, but rather with obligations that are implied—and breached—within what the parties did actually negotiate.

As such, Plaintiff's implied covenant claim is not duplicative of his breach of contract

claim, and he has provided sufficient triable issues of fact on this issue.

### IV.    MR. DONNELLY'S BREACH OF FIDUCIARY DUTY CLAIM (COUNT IV) IS NOT DUPLICATIVE OF HIS CLAIMS FOR BREACH OF CONTRACT

As with the implied covenant claim, Plaintiff's breach of fiduciary claim encompasses conduct separate and apart from anything governed by the LLC Agreement.  Defendant argues that the breach of fiduciary duty claim should be dismissed because Plaintiffs' breach of fiduciary duty claim is addressed by the LLC Agreement.   However, Defendant's argument should be rejected, because "[a]lthough these fiduciary duty claims share a common nucleus of operative facts with Plaintiffs' breach of contract claim, they depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy."  *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008).  For example, Defendant's reliance on Section 2(b) of Plaintiff's IEA is misplaced.  Although Section 2(b) of the IEA does not obligate Defendant to disclose any material information to Plaintiff, that provision is not a license to mislead Plaintiff.  Yet, that is precisely what Plaintiff alleged happened.  *See* Am. Compl. ¶¶ 168-69 ("Mr. Farah breached his fiduciary duty by omitting material facts from Mr. Donnelly[…];" "In failing to address applicable market comparables or recent third party valuations of ProPharma, Mr. Farah further breached his fiduciary duty by failing to attain all the information necessary to make a proper valuation of Mr. Donnelly's Incentive Equity […]").

And that is what Farah's deposition bears out.  Farah acknowledged in his deposition that Plaintiff was asking to see these third-party reports and valuations in November 2019, and Farah avoided answering whether Defendant responded to Plaintiff:

> Q. So would you agree he's asking to see those November 2019 investment bank investor -- I'm sorry -- investor reports from investment banks that were completed?
> A. Yeah, in that paragraph, that's what he's requesting.
> Q. Okay. And did you or anyone at ProPharma provide them at that time?
> A. At this time, in September – in response –

24

Q. Right.
A. -- to this letter? I don't recall what was provided after -- in response to this letter.
Q. Okay. Do you recall ever providing Mr. Donnelly with those reports?
A. Those reports came after -- after Pat was -- so the timeline -- right? -- after he was terminated, he acknowledged his removal from the board June of 2019, we had the discussion around the repurchase of the shares later, in August/September.

See **Ex. 9**, Farah Dep. Tr. 21:3-24 at A000133.

Delaware law allows breach of fiduciary duty claims to proceed when parties have a written contractual agreement so long as the plaintiff's allegations address conduct not explicitly governed by the agreement.  *See, e.g., Artoss, Inc. v. Artoss GmbH*, 2021 WL 706345, at *7 (D. Del. Feb. 23, 2021), *report and recommendation adopted,* 2021 WL 2138544 (D. Del. Mar. 11, 2021) (finding that allegations regarding self-interested dealing and use of confidential information, were "alleged wrongful acts [that] d[id] not arise from the Distributor Agreement."); *Stone & Paper Invs., LLC v. Blanch,* 2019 WL 2374005, at *6 n.57 (Del. Ch. May 31, 2019) ("The fiduciary duty claims are grounded in additional distinct facts and depend on allegations that Richard and Skinner engaged in self-interested transactions that were unfair to the Company and/or committed waste of the Company's assets.  Thus, the claims are not duplicative.") (citations omitted); *PT China LLC v. PT Korea LLC,* 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010) (concluding breach of fiduciary claim not duplicative because "the allegation that Wang misappropriated PT Holdings' resources for his own benefit and that of his affiliates would be a classic example of self-dealing, 0and another breach of the duty of loyalty").  The result should be no different here.

## V.    <u>CONCLUSION</u>

For the reasons set forth, this Court should deny ProPharma's Motion for Summary Judgment.

**POTTER ANDERSON & CORROON LLP**

By: */s/ Jesse L. Noa*

OF COUNSEL:

Nicholas D. SanFilippo
Keith J. Minson
Michael A. Brody
Daniel C. Masakayan
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA  22102-4215
(703) 712-5000 – Telephone
(703) 712-5220 – Facsimile
nsanfilippo@mcguirewoods.com
kminson@mcguirewoods.com
mbrody@mcguirewoods.com
dmasakayan@mcguirewoods.com


Dated: December 2, 2022

John A. Sensing (#5232)
Jesse L. Noa (#5973)
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE  19801
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
jsensing@potteranderson.com
jnoa@potteranderson.com

*Attorneys for Plaintiff Patrick K. Donnelly*