# EXHIBIT A-5



PHILIP J. O'BEIRNE
pobeirne@steinmitchell.com  |  *Direct* 202.661.0900

901 15th Street, NW Suite 700          P 202.737.7777          www.steinmitchell.com
Washington, DC 20005                   F 202.296.8312

September 28, 2021

**By Email**

Nicholas D. SanFilippo
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA  22102
nsanfilippo@mcguirewoods.com

**Re:**    *Patrick K. Donnelly v. ProPharma Topco LLC*, No. 2:20-cv-04110-MBS (D.S.C.).

Dear Nick,

I write to follow up on my correspondence of December 24, 2020, regarding the above referenced matter.

As you will recall, in my letter I pointed out that Mr. Donnelly's claims against ProPharma could not proceed in South Carolina, based on the clear venue provision in the governing contract. I further explained that the case should never have been brought in the first place given the obvious lack of any factual or legal support for Mr. Donnelly's claims.

You never responded to my letter.  Instead, Mr. Donnelly contested transfer of venue in this case despite having affirmed unequivocally that (1) he and his counsel had been given every opportunity to review the LLC Agreement and in fact (2) he fully understood its terms and conditions.  Mr. Donnelly instead speciously argued that his affirmation in the IEA was false, he did not understand the terms and conditions of the LLC Agreement he was becoming party to, and thus the venue provision in the LLC Agreement should not apply to him.  The Court easily rejected Mr. Donnelly's far-fetched argument and transferred the case to the District of Delaware.

Mr. Donnelly's refusal to abandon these meritless claims leaves PPG no choice but to seek relief under Rule 11 for the demonstrably false factual and legal assertions you and your client have chosen to pursue.  We provide this draft motion and the included information in accordance with the requirements of Rule 11, so that Mr. Donnelly is afforded the opportunity to withdraw these allegations or risk sanction by the Court.  Below is a brief summary of the central factual contentions for which there is no good faith basis in the well-developed record available to Mr. Donnelly.

Stein Mitchell Beato & Missner LLP

September 28, 2021
Page 2 of 5

As you know, this is not the first Rule 11 safe harbor letter you have received in connection with your representation of Mr. Donnelly. You have already once been forced to amend pleadings and withdraw allegations based on their obvious falsity. I had hoped that your concession regarding the baseless allegations levelled by Mr. Donnelly in that other case would have caused you to reexamine the equally false claims you have advanced on Mr. Donnelly's behalf here. That has apparently not occurred.

### Mr. Donnelly Obviously Knew and Understood that He Had Been Terminated from ProPharma's Board

Central to Mr. Donnelly's complaint are the allegations that (1) he supposedly remained on the ProPharma Board through the sale of ProPharma in 2020,[1] and (2) the first time he ever received notice of his removal from the Board was in September 2020.[2] He seeks payment for all performance shares, which only would have vested if he remained on the Board through 2020.

These allegations are frivolous even when considered in light of the rest of Donnelly's Complaint. Mr. Donnelly does not even attempt to allege any conduct consistent with a good faith belief that he was still on the ProPharma Board. In fact, he alleges the opposite. He stopped attending Board meetings and has not pointed to a single communication he made to any person, ever, suggesting that he believed he was on the ProPharma Board after August 2019. In fact, he flatly pleads that he stopped receiving Board materials and invitations.[3]

The evidence cannot reasonably be disputed that (1) Mr. Donnelly, Tony Davis, and Michael Farah all discussed the prospect that Mr. Donnelly's continued Board service presented potential conflicts of interest, and (2) both Tony Davis and Michael Farah discussed with Mr. Donnelly his removal from the Board in August 2019. In fact, the record is obvious because it is only Donnelly's removal from the Board in 2019 that triggered the discussions regarding repurchasing his shares, since his termination from the Board was a precipitating event that forfeited his performance shares and triggered the buyback in the first place, as his Complaint readily admits.[4]

It is even more troubling that your firm cooperated with Mr. Donnelly in levelling these obviously false allegations, given that ***contemporaneous written communications to and from your law firm prove that Donnelly knew he was removed from the Board in August 2019.***

---

[1] "Mr. Donnelly remained a ProPharma Board member until September 30, 2020 upon sale of the company. ProPharma never notified Mr. Donnelly that it was removing him from ProPharma's Board prior to the sale of the company." ¶44

[2] "Prior to September 23, 2020, ProPharma did not ever otherwise indicate to Mr. Donnelly that he was no longer a ProPharma Board member." Compl. ¶ 94

[3] "Between September 1, 2019 and September 23, 2020, other ProPharma Board members never provided necessary board materials or invitations to board meetings to Mr. Donnelly." *Id.* ¶ 96

[4] "The ProPharma Offer mandates that "if [Mr. Donnelly's] position with the [ProPharma Board of Directors] is terminated for any reason, [his] equity [would] be subject to customary buyback provisions set forth in [his] incentive equity agreement." *Id.* ¶ 33

Michael Farah, the Chairman of the Board of ProPharma, sent an email to Mr. Donnelly and your former partner Mr. Robinson on November 5, 2019.  The email itself is sufficient proof that Donnelly was aware that he had been removed from the Boards of ProPharma and ERG, since the discussion is about the repurchase (and corresponding forfeiture of his performance shares) occasioned by his termination:

> As you know, per the express terms of the ProPharma Incentive Unit Agreement, 804.6364 of your Time Vesting Units are vested *and 0 of the Performance Vesting Units are vested.* However, we have offered in good faith to vest an additional 402.3182 Time Vesting Units and 4,023.384 Performance Vesting Units, which is more than what the agreement stipulates. In fact, it equates to $578,780.23 of additional value that you are not otherwise entitled.
> […]
> If we have not received such executed document by such date and time, the offer described in the attached repurchase agreement is revoked, and we will exercise our repurchase option only for your ProPharma units that are vested pursuant to the express terms of your incentive unit agreement, which means that 804.6364 vested Time Vesting Units will be repurchased for $105,227.97 and all unvested units are forfeited and cancelled.  Please note, all ERG related units have been forfeited as there is no value in them *as of your termination date.*

Attached to this email that was received by Messrs. Donnelly and Robinson is a draft Repurchase Agreement for their review that repeatedly informs Mr. Donnelly of the fact that he was already well aware of – he was off the ProPharma Board:

> ***WHEREAS, the Investor's employment with and service to the Company and its Subsidiaries terminated on August 31, 2019 (the "Separation Date");***
>
> WHEREAS, on the Separation Date, 804.6364 Management Incentive Units were vested and 7,241.7286 Management Incentive Units were unvested;
> […]
> WHEREAS, pursuant to the terms of the Issuance Agreement, the unvested Management Incentive Units *were automatically forfeited and ceased to be outstanding effective as of the Separation Date*;
> […]
> (a) The Company hereby acknowledges that an additional 402.3182 Time Vesting Units and 4,023.384 Performance Vesting Units shall be deemed vested under the Issuance Agreement effective *as of the Separation Date*.
> […]
> (c) The Investor hereby acknowledges that the unvested Management Incentive Units (i.e., 2,816.0264 Management Incentive Units) were *automatically forfeited and ceased to be outstanding effective as of the Separation Date*.

Mr. Donnelly and your firm were obviously aware that, as of August 31, 2019 Mr. Donnelly had been terminated from these Boards, including the ProPharma Board.  In fact, Mr. Robinson is likely a fact witness to this knowledge, as may be other lawyers at your firm.

The repeated allegations in Mr. Donnelly's Complaint that (1) his Board service continued until 2020 and (2) no notice of removal was ever provided to him before September 2020, lack any good faith basis, and thus are in plain violation of Rule 11.

**There is No Formal Notice Requirement in Any Relevant Contract and Thus Mr. Donnelly's Claims Independently Fail as a Matter of Law**

As you well know, prior to the filing of this matter, Mr. Robinson first interacted with our firm in connection with Mr. Donnelly's dispute as to the valuation of his vested shares that ProPharma had repurchased in 2019.

During those discussion, Mr. Robinson asked for any written proof that Mr. Donnelly had in fact been terminated from ProPharma's board.  This request was obviously unwarranted, given that written proof of Mr. Donnelly's board termination had, at the time Mr. Robinson requested it from me, been sitting in his own inbox for nearly a year.  Regardless, on September 23, 2020, I provided Mr. Robinson a copy of the August 31, 2019, written removal of Mr. Donnelly from the ProPharma board, signed by Mr. Farah.

Two months later – and without responding to the provision of the board termination document that he had requested – Mr. Robinson filed suit against ProPharma on behalf of Mr. Donnelly.  Because he could obviously not ignore the existence of the very board termination document he had requested, Mr. Donnelly and Mr. Robinson instead chose to make spurious and utterly baseless allegations regarding the provenance of the August 31, 2019 Board removal:

> 98. In preparation for litigation, on September 23, 2020, counsel for ProPharma sent counsel for Mr. Donnelly a document, dated September 3, 2019, which purported to have removed Mr. Donnelly from the ProPharma Board, effective as of August 31, 2019.
> […]
> 104.   The alleged sham "removal" of Mr. Donnelly from the ProPharma Board on September 23, 2020, conducted surreptitiously and without notice, was conducted in bad faith with the sole intention of depriving Mr. Donnelly of the fair market value of his Incentive Equity.
> […]
> 156. The attempt to notify Mr. Donnelly of his removal from the ProPharma Board on September 23, 2020 was a sham and not made in good faith.

There was never any good faith basis for your firm and Mr. Donnelly to contest the authenticity of the August 31, 2019 board removal document signed by the then-Chairman of the board.  It is exactly consistent with the share buyback discussion conducted in September 2019 with your firm.  Yet, once again, rather than embrace the consequences of the well-documented factual record, you and Mr. Donnelly chose instead to level baseless allegations.

Stein Mitchell Beato & Missner LLP

Setting aside the baseless claim that the August 31, 2019 removal was a "sham", Mr. Donnelly's Complaint implicitly argues that he never received formal notice of his termination from the Board, and thus the removal – even if signed in August 2019 – was ineffective.  Such a claim is obviously irreconcilable with the factual record, given the communications to Mr. Donnelly and counsel discussed above.

Regardless, Mr. Donnelly's Complaint fails to allege that any of the operative contracts includes such a notice requirement, ***because they do not***.  There is nothing in the Incentive Equity Agreement or the ProPharma LLC Agreement (which governs the Board of Directors) requiring formal notice for termination from the Board to be effective. In fact, the governing agreement provides for automatic forfeiture of his unvested shares upon termination "***without any action on the part of [Mr. Donnelly] or the Company.***" (D.I. 24-3, § 5.a).  Therefore, pursuant to Mr. Donnelly's agreements with ProPharma, his termination from the Board resulted in the forfeiture of all unvested ProPharma shares at the time of his removal whether he was notified or not (and he obviously was).

We request that you withdraw the Amended Complaint and voluntarily dismiss the operative Complaint.  If you refuse, Linden reserves the right to file the attached motion and seek dismissal of your action, and Linden's fees and costs for having to oppose these factually unsound claims.

I am available at your convenience to discuss this matter.

Sincerely,

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE
## Wilmington

| | |
|---|---|
| PATRICK K. DONNELLY | |
| *Plaintiff,* | |
| v. | Case No. 1:21-cv-00894-CFC |
| PROPHARMA GROUP TOPCO, LLC | |
| *Defendant.* | |

## DEFENDANT PROPHARMA GROUP TOPCO, LLC'S [PROPOSED] MOTION FOR SANCTIONS PURSUANT TO RULE 11

Pursuant to Rule 11 of the Federal Rules of Civil Procedure, Defendant ProPharma Group Topco, LLC ("ProPharma"), by and through undersigned counsel, respectfully submits this Motion for Sanctions against Plaintiff Patrick K. Donnelly ("Donnelly") and his counsel. For the reasons set forth in the accompanying Memorandum of Law, ProPharma respectfully requests that the Court grant the motion and (i) dismiss Plaintiff Patrick K. Donnelly's claims with prejudice, and (ii) award Linden the reasonable fees expended in defending this action.

### Certificate of Conference

Pursuant to Local Rule 7.02, on [Day], [Month] [Date], 2021, counsel for ProPharma conferred with counsel for Plaintiff in good faith about the issues raised in this motion. During that [Month] [Date] meet and confer, counsel for Plaintiff

indicated that [insert description].

Dated: [Month] [Date], 2021                    Respectfully submitted,

By: _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE
### Wilmington

PATRICK K. DONNELLY

       *Plaintiff,*

v.

PROPHARMA GROUP TOPCO, LLC

       *Defendant*.

Case No. 1:21-cv-00894-CFC

## MEMORANDUM IN SUPPORT OF DEFENDANT PROPHARMA TOPCO, LLC'S MOTION FOR SANCTIONS

Defendant ProPharma Group Topco, LLC ("ProPharma"), by and through the undersigned counsel, hereby submits this Memorandum in support of its Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure, and respectfully requests that the Court dismiss Plaintiff Patrick K. Donnelly's Complaint with prejudice and award ProPharma the reasonable fees and costs expended in defending this action for the reasons fully explained herein.

## **INTRODUCTION**

Plaintiff Patrick Donnelly was removed from ProPharma's Board of Directors on August 31, 2019. It is undisputed that from that date forward Mr. Donnelly (1) performed no board functions, (2) received no board compensation, and (3) engaged in share repurchase negotiations contractually triggered only by his termination. These actions reflect the parties' mutual understanding that Mr. Donnelly was terminated from the Board.

Yet Mr. Donnelly has now sued ProPharma, claiming that because he did not receive notice of his termination, he remained an apparently secret, non-participating Board member *for more than a year following his removal.* This suit is a transparent attempt to reclaim forfeited ProPharma shares that would only have vested had Mr. Donnelly remained on the Board until ProPharma's sale in September 2020. Mr. Donnelly's allegations cannot pass muster under the objective reasonableness standard of Rule 11 and should be dismissed.

*First,* Donnelly's Complaint disregards numerous documents establishing that his assertions that he never received notice of his termination are demonstrably false. These include a draft share Repurchase Agreement repeatedly referencing his termination; ProPharma's letter notifying Mr. Donnelly of its offer to repurchase his vested shares; and the corresponding response from Mr. Donnelly's own counsel that, far from disputing his termination, referred to his Board service in the past

tense. Mr. Donnelly's own factual allegations are consistent with the clear record of his removal and independently sufficient to reject his claims.

**Second,** even if true, Donnelly's factual claims are irrelevant given that there are no provisions in any relevant agreement – including the ProPharma LLC Agreement governing the Board of Directors – requiring formal notice for termination from the Board to be effective. The governing agreement provides for automatic forfeiture of his unvested shares upon termination "***without any action on the part of [Mr. Donnelly] or the Company.***" (D.I. 24-3, § 5(a)).[1]  Therefore, pursuant to Mr. Donnelly's agreements with ProPharma, his termination from the Board resulted in the forfeiture of all unvested ProPharma shares at the time of his removal whether he was notified or not (and he obviously was).

Thus, when Mr. Donnelly and his counsel filed the Complaint against ProPharma, they knowingly filed claims based on manifestly untrue assertions and a deliberate indifference to obvious facts. Mr. Donnelly's claims have been brought for an improper purpose: to harass his former business associates at Linden Capital Partners ("Linden"), a private equity firm that (through one of its funds) formerly owned ProPharma and formerly contracted with Mr. Donnelly for advisory services. Accordingly, the allegations set forth in Mr. Donnelly's Complaint warrant both dismissal with prejudice and monetary sanctions under Rule 11.

---

[1] Emphasis added unless otherwise indicated.

## FACTUAL BACKGROUND

### I.    MR. DONNELLY'S BUSINESS RELATIONSHIP WITH PROPHARMA

#### A. Mr. Donnelly's Board Service and Compensation

On October 24, 2016, ProPharma extended an "Offer to Join the Board of Directors" to Mr. Donnelly, which he executed on October 31, 2016 ("Offer Letter"). (Compl., D.I. 1 ¶ 22; Compl. Ex. A, D.I. 1-2). Mr. Donnelly agreed to attend four quarterly board meetings and one strategic growth meeting each year. (Compl. Ex. A). As compensation for his board service, Mr. Donnelly would receive quarterly payments totaling $37,500.00 per year and "incentive equity units" (shares) in the company which were "subject to time and performance-based vesting provisions and subject to customary repurchase provisions." (Compl. Ex. A). Mr. Donnelly received 8,046.365 incentive equity units—2,011.591 Time Vesting Units and 6,034.774 Performance Vesting Units—governed by the Management Incentive Equity Agreement dated January 18, 2017 ("IEA"). (D.I. 24-3). However, in the event "[Mr. Donnelly's] position with the Board is terminated for any reason," the Offer Letter provided that "[Mr. Donnelly's] equity will be subject to customary buyback provisions set forth in [the IEA]." (Compl. Ex. A, Compl. ¶ 33).

Under the IEA, 20% of Mr. Donnelly's Time Vesting Units would vest yearly for his anticipated five-year term. (*See* D.I. 24-3, IEA § 4(b)). Mr. Donnelly's Performance Vesting Units would only vest if ProPharma was sold during Donnelly's tenure on the Board. (*Id.* at § 4(c)). Further, the IEA also provides that,

3

"[u]pon [his] termination for any reason, (i) all or any portion of the vested Management Incentive Units . . . will be subject to repurchase . . . and (ii) all of the unvested Management Incentive Units . . . shall ***automatically be forfeited***, effective as of the Termination Date, ***without any action on the part of Participant or the Company***". (D.I. 24-3, IEA § 5(a)).

### B. Mr. Donnelly's August 2019 Removal from the Board

Mr. Donnelly served on ProPharma's Board until he was removed, effective August 31, 2019. (Compl. ¶ 98; D.I. 24-4 ("Board Removal")). Mr. Donnelly had accepted the CEO position at another Linden-owned company—Advarra—that was a potential competitor of ProPharma. Mr. Donnelly perceived a potential conflict of interest and, over the ensuing months, discussed this concern with his fellow ProPharma Board members. (Decl. M. Farah ¶ 6). When Mr. Donnelly concluded that an eventual conflict of interest was inevitable, he specifically requested to be removed from the Board. (*Id.* ¶ 7).  In August 2019, then-Chairman, Michael Farah ("Chairman Farah"), and Board Director, Tony Davis ("Director Davis"), had two separate conversations with Mr. Donnelly concerning his requested removal from the Board based on Mr. Donnelly's concern of conflicts issues. (*Id.* ¶ 8).[2]

---

[2] Contrary to Mr. Donnelly's assertions (*see* Compl. ¶ 47), it was Mr. Donnelly who raised the issue of potential conflicts of interest and suggested his own removal from the Board. Indeed, discovery will confirm that Mr. Donnelly routinely flagged conflicts of interest occasioned by his Board role with ProPharma and written communications ***from Mr. Donnelly himself*** will reveal that Mr. Donnelly

Mr. Donnelly was terminated from the Board, effective August 31, 2019, by signed written consent dated September 3, 2019. (D.I. 24-4 ("Board Removal"); Decl. M. Farah ¶¶ 10, 11). Mr. Donnelly was also removed from the Board of another Linden-owned company, Evolution Research Group ("ERG"). Consistent with his removal and immediately thereafter, Mr. Donnelly no longer performed any board function, including attending board meetings or reviewing board materials. (Compl. ¶ 96).

### C. Negotiations for the Repurchase of Mr. Donnelly's Shares

As a result of his termination from the Board, Mr. Donnelly and ProPharma began negotiating the repurchase of his shares pursuant to the terms of Mr. Donnelly's Offer Letter and IEA. (Comp. gen. ¶¶ 33, 37-38 and 47-49; *see* D.I. 24-3, IEA § 5). Mr. Donnelly clearly understood that repurchase discussions were only triggered by his separation from the Board. Indeed, in their separate conversations with Mr. Donnelly ahead of his termination, both Mr. Davis and Mr. Farah informed Mr. Donnelly that repurchase of his shares would follow his impending separation from the Board. (Compl. ¶¶ 89-90; Decl. M. Farah ¶ 9.)

At the time of his termination in August 2019, only a fraction of Donnelly's time-vesting shares had vested, and no sale had occurred.  Thus, Mr. Donnelly's

---

proactively recused himself from certain discussions among the Board of ProPharma due to a conflict of interest that he himself perceived. (Decl. M. Farah ¶ 6).

termination resulted in the forfeiture of the remainder of his unvested time shares and all the unvested performance shares. Even so, as a gesture of good will, in August 2019 ProPharma offered to pay Donnelly for additional **unvested** time and performance shares.  On September 4, 2019, Mr. Farah sent Mr. Donnelly a draft Repurchase Agreement which reaffirmed his termination from the Board (only days before) and the resulting forfeiture of Mr. Donnelly's unvested shares:

> WHEREAS, the Investor's employment with and service to the Company and its Subsidiaries **terminated on August 31, 2019 (the "Separation Date"**);
>
> WHEREAS, on the Separation Date, 804.6364 Management Incentive Units were vested and 7,241.7286 Management Incentive Units were unvested; […]
>
> WHEREAS, pursuant to the terms of the Issuance Agreement, the unvested Management Incentive Units **were automatically forfeited and ceased to be outstanding effective as of the Separation Date**; […]

(D.I. 24-6 ("Draft Repurchase Agreement")). Mr. Donnelly and ProPharma then communicated in writing, repeatedly, about the repurchase of his shares—an event that only makes sense if he were removed from the Board—for another **two months** immediately following his removal.

These communications included ProPharma resending the draft Repurchase Agreement on November 5, 2021 to both Mr. Donnelly and his counsel, Stephen Robinson of McGuireWoods LLP, who became involved in the negotiation as the weeks passed. (D.I. 24-5 ("Farah Email")). This document once again stated,

repeatedly, that Mr. Donnelly had been terminated from the Board. In the cover email, Chairman Farah reiterated Linden's generous offer to purchase Time and Performance shares that had not vested prior to Mr. Donnelly's termination. In doing so, Chairman Farah once again emphasized that Mr. Donnelly's unvested shares in ProPharma (and all his shares in ERG) had been forfeited based on his termination:

> Attached for your signature is a repurchase agreement pursuant to which ProPharma is willing to provide for the vesting of the additional units described above, their immediate repurchase, and the other terms and conditions pursuant to which Pro Pharma is willing to repurchase your units. …If we have not received such executed document by such date and time, the offer described in the attached repurchase agreement is revoked, and we will exercise our repurchase option only for your ProPharma units that are vested pursuant to the express terms of your incentive unit agreement, which means that 804.6364 vested Time Vesting Units will be repurchased for $105,227.97 **and all unvested units are forfeited and cancelled.** We will send a wire in the applicable amount to the account we have on file per the Advarra sale unless you provide different account details. **Please note, all ERG related units have been forfeited as there is no value in them as of your termination date.**

(D.I. 24-5 ("Farah Email")). The next day, Mr. Robinson sent a letter responding to Mr. Farah's email. Ex. A, Nov. 6, 2019 S. Robinson Ltr.  Despite alleging here that, in September 2019 Mr. Donnelly believed that he was still on the Board of ProPharma, nowhere in this formal letter does Mr. Robinson express surprise at the discussion of termination or forfeiting of shares, let alone contest his client's removal from the Boards of ProPharma and ERG as of August 31, 2019. Just the opposite—Mr. Robinson's letter refers to Mr. Donnelly's Board service as having

7

concluded on August 31, 2019: "Pat was an Operating Partner **until August 30, 2019**.[3] He was also on the Board of Directors of all three of the Pharma companies **during that time**." Ex. A, Nov. 6, 2019 S. Robinson Ltr.

Mr. Donnelly did not execute the Repurchase Agreement and thus ProPharma wired Donnelly $105,227.97 in early November, 2019.  (Compl. ¶ 68).   On September 30, 2020—13 months after Mr. Donnelly's termination—ProPharma was sold. (Compl. ¶ 19). At no time between August 2019 and the filing of this action did Mr. Donnelly ever represent *to anyone* at Linden or ProPharma that he believed himself still to be a Board member. Nor does Mr. Donnelly attempt to allege any conduct consistent with his belief that he remained a Board Member, such as requests to receive board materials or attempts to attend board meetings.

### D. Mr. Donnelly Files a Lawsuit Based on Patently Incorrect Facts

On November 25, 2020, Mr. Donnelly and Mr. Robinson filed the instant Complaint in the United States District Court for the District of South Carolina. (D.I. 1). Central to Mr. Donnelly's Complaint are various factual allegations that are demonstrably false given the well-established documentary record described above.

Mr. Donnelly's Complaint acknowledges that a signed August 31, 2019 board removal document exists, which was provided to his counsel on September 23, 2020,

---

[3] Mr. Donnelly's baseless claims regarding his Operating Partner agreement are the basis of a separate lawsuit.

prior to the filing of this lawsuit.  What Mr. Donnelly now alleges is that (1) the first time he ever received notice of his removal from the Board was in September 2020 (2) he supposedly remained on the ProPharma Board through the sale of ProPharma in 2020, and (3) the August 31, 2019 board removal was a "sham:"

> 44.   Mr. Donnelly remained a ProPharma Board member until September 30, 2020, upon sale of the company. ProPharma never notified Mr. Donnelly that it was removing him from ProPharma's Board prior to the sale of the company.  […]

> 94.   Until September 23, 2020, Mr. Donnelly never received any communications from ProPharma regarding his status as a ProPharma Board member.

> 95.  Prior to September 23, 2020, ProPharma did not ever otherwise indicate to Mr. Donnelly that he was no longer a ProPharma Board member. […]

> 99.  September 23, 2020, was the first time Mr. Donnelly received any communication addressing his status [sic] ProPharma Board of Directors.  […]

> 102. The document Mr. Donnelly received on September 23, 2020 did not constitute notice to Pat of his removal from the ProPharma Board. […]

> 104.  The alleged sham "removal" of Mr. Donnelly from the ProPharma Board on September 23, 2020, conducted surreptitiously and without notice, was conducted in bad faith with the sole intention of depriving Mr. Donnelly of the fair market value of his Incentive Equity.

(Compl. ¶¶ 44, 94-95, 99, 102, 104). Based on the clear documentary record referenced above, each allegation is demonstrably false and both Mr. Donnelly and his counsel knew it prior to the filing of the Complaint.  Regardless, Mr. Donnelly

notably nowhere alleges that formal written notice of his board removal was required by any agreement.

Mr. Donnelly's Complaint includes other obvious false statements, less relevant to the central legal deficiencies in his claims but equally sanctionable under Rule 11. For example, regarding the payment of $105,2227.97 wired to Donnelly by ProPharma for Donnelly's vested shares in November 2019, Donnelly claims: "ProPharma neither notified Mr. Donnelly ahead of the $105,227.97 direct deposit, nor after the direct deposit to inform him that the sum was for his Incentive Equity." (Compl. ¶ 71). Yet cited above is the written notice from Mr. Farah to Mr. Donnelly that ProPharma would wire the amount for his vested shares.[4]

Mr. Donnelly filed this action in the District of South Carolina in plain violation of the venue provision in the ProPharma LLC agreement, to which Mr. Donnelly agreed to be bound as a condition of the receipt of his shares.[5] Despite having affirmed in writing repeatedly having reviewed and understood the LLC Agreement (and its venue provision), Mr. Donnelly fought the change of venue by arguing that he merely signed the documents without reading them.[6]

---

[4] "…804.6364 **vested Time Vesting Units will be repurchased for $105,227.97** and all unvested units are forfeited and cancelled. **We will send a wire in the applicable amount to the account we have on file** …." (D.I. 24-5 ("Farah Email")).

[5] *See gen.* Def.'s Mot. to Transfer, D.I. 24.

[6] *See gen.* Pl.'s Resp. Opp'n Mot. to Transfer, D.I. 28.

On June 22, 2021, the District of South Carolina rejected Mr. Donnelly's arguments and granted ProPharma's motion to transfer the present action to this Court. Following transfer, on September 27, 2021, counsel for ProPharma sent Mr. Donnelly's counsel a "safe harbor" letter (accompanied by ProPharma's Rule 11 motion and the instant Memorandum) demanding that Mr. Donnelly withdraw his Complaint within 21 days or else, pursuant to Rule 11, ProPharma would file the motion for sanctions against Mr. Donnelly and his counsel.  (*See* O'Beirne Decl.). This motion follows.

## **SUMMARY OF ARGUMENT**

The undersigned acknowledges the gravity of requesting relief under Rule 11 and does not bring this motion lightly. But Mr. Donnelly's filing of baseless claims against ProPharma is precisely the type of meritless and harassing conduct that Rule 11 exists to prevent.

1.     Mr. Donnelly's claims rely on demonstrably false factual contentions and therefore violate Rule 11.  Mr. Donnelly's claim that he never received notice of his August 2019 removal from the Board is directly refuted by multiple, contemporaneous written communications to him (and his counsel) that confirmed his removal effective August 31, 2019. In fact, Mr. Donnelly's own Complaint is actually consistent with the clear record of his removal and independently sufficient to reject his claims.

11

2.     Mr. Donnelly's "lack of notice" assertions are ultimately irrelevant because the operative agreements (1) lack any relevant notice provision but rather (2) provide for ***automatic*** forfeiture of his unvested shares.  Donnelly's Complaint ignores these contract provisions because they are fatal to his claims.

3.     The claims warrant dismissal with prejudice and awarding of attorneys' costs and fees. Rule 11 requires that representations to the Court "not be[] presented for any improper reason, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(1), (b)(3). Here, Mr. Donnelly pleads facts which he knows to be false and which would not entitle him to relief even if they were true. The clear intentions behind Mr. Donnelly's conduct are to harass ProPharma and its former owner, Linden, and impose unnecessary litigation costs. Therefore, Rule 11 sanctions are necessary and appropriate.

## **LEGAL STANDARD**

"[T]he central purpose of Rule 11 is deter baseless filings in district court." *Cooter & Gell v. HartmarxCorp.*, 496 U.S. 384, 393 (1990). Sanctions under Rule 11 are appropriate if a pleading has been "presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation,"

*see* Fed. R. Civ. P. 11(b)(1); "the claims, defenses, and other legal contentions" are not supported by existing law or by a good-faith argument for an extension or change in existing law, *see* Fed. R. Civ. P. 11(b)(2); or the allegations and other factual statements lack "evidentiary support" or are unlikely to gain evidentiary support "after a reasonable opportunity for further investigation or discovery," *see* Fed. R. Civ. P. 11(b)(3). After the non-moving party has been provided notice and opportunity to respond, Courts finding a Rule 11(b) violation may impose appropriate sanctions. *See* Fed. R. Civ. P. 11(c)(1).

"The legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 289 (3d Cir. 1991); *Karpov v. Karpov*, 307 F.R.D. 345, 348 (D. Del. 2015). In the context of a Rule 11 inquiry, reasonableness has been defined as "an objective knowledge or belief at the time of filing of a challenged paper that the claim was well-grounded in law and fact." *Ford Motor Co.*, 930 F.2d at 289. Moreover, "pleadings 'without factual foundation,'" may be subject to Rule 11 sanctions "even though the paper was not filed in subjective bad faith.'" *Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480, 492–93 (D. Del. 1998), *aff'd*, 178 F.3d 1279 (3d Cir. 1999).  "Bad faith is not required for a Rule 11 violation, and thus there can be no "empty head, pure heart" justification of the filing

13

of frivolous claims." *Leuallen v. Borough of Paulsboro*, 180 F. Supp.2d 615, 618 (D.N.J. 2002)).

## ARGUMENT

### I. MR. DONNELLY AND HIS COUNSEL VIOLATED RULE 11 BECAUSE THE COMPLAINT RESTS ON FACTUAL CONTENTIONS THAT THEY KNOW ARE FALSE.

#### A. Mr. Donnelly and His Counsel Omitted the Existence of Documents that Render His Claims Objectively Baseless

Mr. Donnelly's claim that he never received notice of his August 2019 removal from the Board is directly refuted by repeated, written communications to Mr. Donnelly—*and his counsel*—confirming his removal from the Board effective August 31, 2019. Yet Mr. Donnelly peppered his Complaint with bald allegations that "ProPharma never notified Mr. Donnelly that it was removing him from ProPharma's Board prior to the sale of the company[,]" (Compl. ¶ 44), and "[p]rior to September 23, 2020, ProPharma did not ever otherwise indicate to Mr. Donnelly that he was no longer a ProPharma Board member[,]" (Compl. ¶ 95). These statements are patently false.

Less than a week after his termination, ProPharma sent Mr. Donnelly a draft Repurchase Agreement which contained repeated reference to his termination from the Board and then resent the draft Repurchase Agreement to Mr. Donnelly *and his counsel*. *Supra* Factual Background ¶ I.C.  Mr. Donnelly's counsel, Mr. Robinson, then sent a letter responding to Chairman Farah's email in which he refers to Mr.

Donnelly's Board service in the past tense and expressly acknowledges that it concluded on August 31, 2019. *Id.*

These documents, received in Fall 2019, are sufficient on their own to establish that Mr. Donnelly and his counsel received written notice of his removal long before ProPharma's sale in September 2020, contrary to their baseless claims to the contrary.

### B. Mr. Donnelly's Own Conduct Shows that He Clearly Understood He Had Been Removed from the Board.

Setting aside the omitted documents in possession of Mr. Donnelly and his counsel, Mr. Donnelly's assertion that he was not aware of his removal from the Board is also belied by various concessions in Mr. Donnelly's Complaint. The most cursory reading of the Complaint reveals that Mr. Donnelly understood his position with ProPharma terminated as of August 31, 2019.

*First*, Mr. Donnelly concedes that Mr. Davis gave him advance notice of his removal. Setting aside the dispute over who first raised conflicts concerns, it is an undisputed fact that the two of them discussed Mr. Donnelly's separation from the Board prior to his removal in August 2019.  (Compl. ¶ 84). In fact, Mr. Donnelly had *numerous* conversations on the topic of his separation from the Board many of which he himself initiated. (Decl. M. Farah ¶¶ 6, 7, 8).

*Second*, Mr. Donnelly admits that as of September 1, 2019, he no longer performed any board function, including attending board meetings or reviewing

board materials. (Compl. ¶¶ 96, 137.)   Mr. Donnelly does not even attempt to reconcile how he allegedly remained a Board member despite discontinuing all board duties, for the understandable reason that no such justification exists.   Mr. Donnelly stopped acting like a Board member because he knew he was no longer a Board member.

*Third*, as if the above concessions were not sufficient to illustrate the frivolousness of his Complaint, the parties' conduct establishes that Mr. Donnelly knew he had been removed from the Board. Mr. Donnelly admits that he began negotiating the buyback value of his Incentive Equity shares within days of his termination, consistent with the process outlined in the Offer Letter and IEA following separation or termination.[7] As his Complaint correctly points out, ProPharma's option to repurchase Mr. Donnelly's Incentive Equity could only be triggered by his termination from ProPharma's Board of Directors:

- "ProPharma had the option to elect to purchase all or any portion of the vested ProPharma Incentive Equity units by delivery of a written notice at any time ***within six months after Mr. Donnelly's separation from ProPharma***." (Compl. ¶ 37.)

- "Under the IEA, the purchase price for the ProPharma Incentive Equity is the fair market value of the units ***as of the date Mr. Donnelly separated from ProPharma***." *(*Compl. ¶ 38.)

---

[7] "On or around September 23, 2019, Mr. Donnelly had a telephone discussion with then ProPharma Board Chairman, Mike Farah ("Mr. Farah") regarding the buyback value of his ProPharma Inventive [sic] Equity." (Compl. ¶ 47.)

However, nowhere in his Complaint does Mr. Donnelly allege that, during these negotiations, he questioned his termination or otherwise suggest that he believed his Board service continued following August 2019. Mr. Donnelly's course of conduct following the August 2019 separation, and specifically his participation in these negotiations, demonstrates that he was aware of his removal from the Board.

Knowingly putting false information—or concealing the very facts from the Court that make this litigation objectively baseless—is a clear-cut violation of Rule 11. *See Vehicle Operation Techs. LLC v. Am. Honda Motor Co. Inc.*, 67 F. Supp. 3d 637, 653 (D. Del. 2014) (finding violation of Rule 11 where "Plaintiff's attorneys litigated this suit for over a year, without regard to the prosecution disclaimer that made this suit objectively baseless, or for that matter Rule 11's basic requirement for an adequate pre-suit investigation."); *Zion v. Nassan*, 727 F. Supp. 2d 388, 411 (W.D. Pa. 2010) ("An attorney must conduct a reasonable inquiry before filing a lawsuit and cannot pursue the action unless he or she reasonably believes that facts exist to support the allegations.").

## II. MR. DONNELLY'S CLAIMS RELY ON A FICTION THAT HIS REMOVAL FROM THE BOARD – AND THE FORFEITURE OF HIS SHARES – DEPENDED ON A WRITTEN NOTICE REQUIREMENT.

Needing to account for the August 31, 2019 board removal document that he cannot deny exists, Mr. Donnelly claims that he never received ***notice*** of that removal until September 23, 2020 and then implicitly argues that his removal was

not effective until such notice.  In fact, Mr. Donnelly now dates his termination from the Board as occurring on September 23, 2020, the first date he claims he received notice.[8]  As already discussed above, this claim is refuted by Mr. Donnelly's contemporaneous written correspondence with ProPharma and his own conduct. However, even if Donnelly hadn't received notice of his termination, his claims still fail because there is no provision conditioning termination on notice.

Mr. Donnelly and his counsel obfuscate the terms of his IEA by only listing provisions relating to vestment qualifications. (Compl. ¶¶ 33, 37, 38). But Mr. Donnelly fatally ignores a key superseding provision subjecting his shares to automatic forfeiture. The IEA mandates that his shares shall be ***"automatically forfeited"*** upon termination for any reason ***"without any action"*** by ProPharma:

> Upon [Mr. Donnelly's] termination for any reason, (i) all or any portion of the ***vested*** Management Incentive Units . . . will be subject to repurchase . . . and (ii) all of the ***unvested*** Management Incentive Units . . . shall ***automatically be forfeited***, effective as of the Termination Date, ***without any action on the part of Participant or the Company***". (D.I. 24-3, § 5.a).

Mr. Donnelly cannot point to a single provision of the IEA requiring notice of his removal from the Board of ProPharma.

Nor does any such notice provision exist in the ProPharma LLC Agreement, which Mr. Donnelly agreed to be bound by and which governed (1) his board

---

[8] Compl. ¶¶ 104, 105.

service[9] and (2) his ownership of ProPharma shares.[10]  Specifically, Section 5.2(b) of the LLC Agreement provides that Donnelly could be removed from the Board, for any reason, and with no formal notice required:  "Any Linden Manager or Independent Manager will be removed from the Board, with or without cause, at the written request of the Linden Investors entitled to appoint such Linden Manager or Independent Manager pursuant to this Section 5.2."  (D.I. 24-2, LLC Agreement § 5.2(b).  The August 31, 2019 removal was a written removal in accordance with Section 5.2(b) and thus effective under the LLC Agreement to remove Mr. Donnelly from the Board; no further action was necessary.

These agreements, taken together, allow ProPharma to remove Donnelly from the Board (which he requested) for any reason; do not require ProPharma to notify him of his termination; mandate that his unvested shares are automatically forfeited upon his termination; and specifically include that ProPharma does not need to perform any action for that forfeiture. Accordingly, Mr. Donnelly's claim that he never received "notice" of his termination, apart from being demonstrably false, fails as a matter of law.

Yet Mr. Donnelly and his counsel have rested their entire case on this obvious misrepresentation. By knowingly filing claims based on manifestly untrue assertions

---

[9] See gen. D.I. 24-2, LLC Agreement, Article V – Management.
[10] See gen. D.I. 24-2, LLC Agreement, § 3.9.

19

and a deliberate indifference to obvious facts, Mr. Donnelly and his counsel disregarded their obligation to have "an objective knowledge or belief at the time of filing of a challenged paper that the claim was well-grounded in law and fact." *Ford Motor Co.*, 930 F.2d at 289; *Karpov*, 307 F.R.D. at 348. Because Mr. Donnelly cannot "un-see" the multiple documents he failed to disclose, it is obvious that Mr. Donnelly cannot gain evidentiary support "after a reasonable opportunity for further investigation or discovery" *See* Fed. R. Civ. P. 11(b)(3).

In the same vein as its omission of key documents, when Mr. Donnelly's Complaint fails to cite the automatic forfeiture provision, it "exhibits a deliberate indifference to obvious facts" and thus warrants Rule 11 sanctions. *Keister v. PPL Corp.*, 318 F.R.D. 247, 256 (M.D. Pa. 2015). Finally, by filing a facially implausible complaint, Mr. Donnelly and his counsel fundamentally violated Rule 11's "obligation on counsel and client to 'Stop, Think, Investigate and Research' before filing papers either to initiate a suit or to conduct the litigation." *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987).

The Advisory Committee and the Third Circuit have identified certain factors to help courts determine the reasonableness of counsel's conduct, including "the amount of time available to ... conduct[ ] the factual and legal investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advocated" and "the complexity of the legal and

factual issues implicated." *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir. 1988). All of these factors weigh in favor of ProPharma's position that Mr. Donnelly's counsel violated Rule 11. Specifically, it bears mentioning that the same counsel that represented Mr. Donnelly in buyout negotiations, Stephen Robinson, was the same attorney who filed this lawsuit. Mr. Robinson, therefore, undoubtedly had knowledge of the omitted documents before filing, had previously reviewed the operative agreements, and (since he was involved in the negotiation) did not even need to extensively rely on their client for underlying factual information.

## III.    PROPHARMA IS ENTITLED TO DISMISSAL OF ALL CLAIMS AND REASONABLE FEES EXPENDED IN DEFENDING THIS ACTION.

"[O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion[,] and "the 'less severe sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power as well." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). Indeed, "[a] court can award sanctions if a party or attorney has presented a motion for an 'improper purpose,' the claims or defenses put forth in a motion are frivolous, the claims in a motion are not likely to be supported by the evidence after investigation, or a party wrongfully denies a factual allegation." *Tech. Innovations, LLC v. Amazon.com, Inc.*, 35 F. Supp. 3d 613, 623 (D. Del. 2014) (quoting Fed. R. Civ. P. 11).

This case, which is based on no more than Mr. Donnelly's frivolous and unsubstantiated claims, and, thus, is the exact type of case that this Court has held

warrants dismissal with prejudice under Rule 11. In *Vehicle Operation Tech. LLC*, this Court held that "while dismissal of a lawsuit with prejudice is the harshest sanction available to the Court, it is warranted . . . [where] Plaintiff's attorneys litigated the suit . . . without regard to [the document] that made this suit objectively baseless, or for that matter Rule 11's basic requirement for an adequate pre-suit investigation." 67 F.Supp.3d at 653. Similar to the Plaintiff in *Vehicle Operating Technologies*, Mr. Donnelly has decided to litigate this case despite the undeniable facts and evidence that wholly refute his claims. Moreover, where—as here—"the entire suit is objectively baseless," this Court has suggested that dismissal with prejudice is the ***only*** sanction available reasoning that "any lesser sanction would be ***ineffective***." *Id.*

In *Poulis v. State Farm Fire and Cas. Co.*, the Third Circuit set forth criteria for considering whether dismissal is appropriate, including "the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and the meritoriousness of the claim or defense." 747 F.2d 863, 868 (3d Cir. 1984).[11]

---

[11] In *Poulis*, the Third Circuit also identified the following six factors: "(1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense." 747 F.2d at 868.

The Supreme Court has directed that the trial court in interpreting Rule 11 "must give effect to the rule's central goal of deterrence." *Cooter & Gell*, 496 U.S. at 392. *See also In re Taylor*, 655 F.3d 274, 288 (3d Cir. 2011) (noting that the "prime goal" of Rule 11 sanctions "should be the deterrence of repetition of improper conduct"). Mr. Donnelly's goal in filing this case is to harass his former business associates at Linden, a private equity firm that (through one of its funds) formerly owned ProPharma and formerly contracted with Mr. Donnelly for advisory services.

## <u>CONCLUSION</u>

For these reasons, ProPharma respectfully requests that the Court grant ProPharma's Motion for Sanctions, dismiss Mr. Donnelly's claims with prejudice and award ProPharma the reasonable fees and costs expended in defending this action.

Dated: [Month] [Day], 2021                    Respectfully submitted,


By: _____

## <u>INDEX OF [PROPOSED] EXHIBITS</u>

EXHIBIT A – November 6, 2019 Letter from S. Robinson

EXHIBIT B – Declaration of Michael Farah

# EXHIBIT A

**McGuireWoods LLP**
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102-4215
Phone: 703.712.5000
Fax: 703.712.5050
www.mcguirewoods.com

**Stephen W. Robinson**
Direct: 703.712.5469

# McGuireWoods

srobinson@mcguirewoods.com
Fax: 703.712.5258

November 6, 2019

**VIA ELECTRONIC MAIL**
Melanie B. Harmon, Esq.
KIRKLAND & ELLIS LLP
300 North LaSalle,
Chicago, IL 60654
melanie.harmon@kirkland.com

Re:     **ProPharma and ERG Agreements for Patrick K. Donnelly**

Dear Ms. Harmon:

In response to your questions about Pat's issues, the following information is being provided. As Pat advised your client yesterday, the imposition of artificial deadlines is not going to impact Pat's position, and certainly will not be beneficial to trying to reach a resolution of these issues.

While the parties have very disparate positions on these issues, Pat would like to amicably resolve the issues, but is fully prepared to pursue his positions if necessary. As your client knows, Pat is a very principled and determined individual and he feels very strongly about these matters.

The Operating Partner Agreement issues are very straight forward. Pat was an Operating Partner until August 30, 2019. He was also on the Board of Directors of all three of the Pharma companies during that time. Under the Agreement, Pat was to be paid $180,000 a year for Advisory Services. This fee has not been paid from November 7, 2017 to date, and totals $326,250.00 for this 21.75 month period.

While Pat was paid the required 10% on the initial closings at ProPharma, ERG and Advarra, he did not receive his portion of additional transaction fees. Pat also invested 50% of the initial transaction fees as required, but he has not received the required 10% of the transaction fees paid to Linden, and I believe those fees are $15M or more. Obviously, Pat is owed a substantial amount for his shares for his fees.

Atlanta | Austin | Baltimore | Charlotte | Charlottesville | Chicago | Dallas | Houston | Jacksonville | London | Los Angeles - Century City
Los Angeles - Downtown | New York | Norfolk | Pittsburgh | Raleigh | Richmond | San Francisco | Tysons | Washington, D.C.

Melanie B. Harmon, Esq.
November 6, 2019
Page 2


Regarding the valuation of Pat's ProPharma incentive equity, please see attached for a Jefferies report on recent comparable values for transactions closed this year (including Advarra which closed in July). The overall mean on the multiples for Pharma Services M&A is 18.8 times EBITDA. As applied to ProPharma, this would translate to a 3.88X return on investment for Linden, which would result in a valuation of $199.73 per unit. Linden has offered a unit price of only $130.78, representing a 34.52% haircut off of market. Linden has also offered vesting of the performance units at only the 2.5x return on investment level, instead of the 3.0x level supported by these comps. The award agreement calls for the board to determine the fair market value in good faith and without regard to any minority or marketability discounts, and Pat does not feel like the board has shown good faith with the $130.78 valuation. Pat is requesting vesting of a total of 7,241.7286 units, including 100% of the performance units at the 3.0x return on investment level, and pricing at $199.73 per unit, or an aggregate repurchase price of $1,446,390.45 in addition to the amounts described above.


We look forward to your prompt response.


Very truly yours,

Stephen W. Robinson


Attachment

123394709_2

# Pharma Services M&A Trends

## Pharma Services M&A Activity

## Key Takeaways

- Strategic M&A activity levels have increased driven by:
  - Need for scale as big pharma narrows down vendor relationships
  - Diversifying service offering for cross-selling opportunities
  - Moving up the value curve to enhance competitive positioning
- Private equity has also embraced the positive long term sector fundamentals driven by:
  - Accelerating R&D growth rates
  - Increasing levels of outsourcing
  - Attractive consolidation opportunities
  - No reimbursement risk
- The leverage markets are also appreciative of Pharma Services platforms with scale given sector macro fundamentals and inherently positive cash flow characteristics

## LTM EBITDA Multiples

Financial Buyer Mean: 17.5x
Strategic Buyer Mean: 19.7x
Overall Mean: 18.8x

| Target | Acquirer | Financial Buyer | Announcement Date | LTM EBITDA Multiple |
|---|---|---|---|---|
| Medpace | Cinven Limited | ✓ | 2014 Feb 24 | 10.5x |
| Galapagos | Charles River Labs | | 2014 Mar 31 | 12.0x |
| Aptiv Solutions | Icon | | 2014 Mar 31 | 10.2x |
| Covance | LabCorp | | 2014 Nov 03 | 13.2x |
| CRF Health | Vitruvian | ✓ | 2015 Jan 08 | 17.6x |
| Celsis | Charles River Labs | | 2015 Jul 09 | 14.0x |
| Theorem | Chiltern | | 2015 Aug 06 | 15.7x |
| WuXi | Ally Bridge | ✓ | 2015 Aug 14 | 19.1x |
| WIL Research | Charles River Labs | | 2016 Jan 07 | 12.9x |
| ERT | Nordic | ✓ | 2016 Mar 08 | 16.1x |
| Euticals | AMRI | | 2016 May 05 | 13.3x |
| Gland | Fosun | | 2016 Jul 28 | 17.1x |
| Bio-clinica | Cinven | ✓ | 2016 Aug 22 | 15.6x |
| Capsugel | Lonza | | 2016 Dec 15 | 15.1x |
| CMC Biologics | Asahi Glass | | 2016 Dec 19 | 20.0x |
| Bracket | Genstar | ✓ | 2017 Mar 14 | 15.5x |
| PPD | Carlyle Group, H&F | ✓ | 2017 Apr 26 | 13.0x |
| inVentiv Health | INC Research | | 2017 May 10 | 12.2x |
| Patheon | Thermo Fisher | | 2017 May 15 | 17.0x |
| AMRI | Carlyle Group, GTCR | ✓ | 2017 Jun 06 | 13.4x |
| Parexel | Pamplona | ✓ | 2017 Jun 20 | 14.1x |
| Certara | EQT | ✓ | 2017 Jul 11 | 17.0x |
| Aptuit | Evotec | | 2017 Jul 30 | 20.0x |
| Chiltern | LabCorp | | 2017 Jul 31 | 14.0x |
| Cook Pharmica | Catalent | | 2017 Sep 19 | 17.3x |
| Crown Bio | JSR | | 2017 Dec 20 | 25.8x |
| MPI Research | Charles River Labs | | 2018 Feb 13 | 11.7x |
| Alcami | Madison Dearborn Partners | ✓ | 2018 Jun 01 | 13.0x |
| AMPAC | SK Holdings | | 2018 Jul 16 | 12.8x |
| CRF Health | Bracket / Genstar | | 2018 Jul 17 | 22.6x |
| Halo Pharma | Cambrex | | 2018 Jul 23 | 15.7x |
| Avista Pharma Solutions | Cambrex | | 2018 Oct 20 | 16.8x |
| Citoxlab | Charles River | | 2019 Feb 13 | 13.8x |
| Brammer Bio | Thermo Fisher | | 2019 Mar 24 | 56.7x |
| Paragon | Catalent | | 2019 Apr 15 | 59.1x |
| Advarra | Genstar | ✓ | 2019 Jun 6 | 18.5x |
| Medidata | Dassault Systemes | | 2019 Jun 11 | 36.4x |
| Aris Global | Nordic | ✓ | 2019 Jun 16 | 23.8x |
| Quotient Sciences | Permira | ✓ | 2019 Jul 17 | 20.2x |
| Aldevron | EQT | ✓ | 2019 Jul 31 | 34.0x |
| ERT | Astorg, Nordic & Novo | ✓ | 2019 Oct 21 | 18.1x |

Sources: SDC, Capital IQ and company filings.
Note: Mean and median includes multiples from non-disclosed transactions that Jefferies worked on.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELWARE
### Wilmington

PATRICK K. DONNELLY
8 Church Street
Charleston, South Carolina 29401,

       *Plaintiff,*

v.

       Case No. 1:21-cv-894- CFC

PROPHARMA GROUP TOPCO, LLC

       *Defendant.*

### [PROPOSED] DECLARATION OF MICHAEL FARAH

I, MICHAEL FARAH, under penalty of perjury, declare as follows:

1.    I am a Partner at Linden Capital Partners ("Linden") and former Chairman of the ProPharma Board of Directors. I am over the age of 18, have personal knowledge of the matters set forth in this Declaration, and, if called as a witness, I am competent to testify to the matters in this Declaration.

2.    The facts stated in this Declaration are true and correct to the best of my knowledge and belief.

3.    In 2016, Linden acquired ProPharma Group Topco, LLC ("ProPharma").

4.    In October 2016, Plaintiff Patrick K. Donnelly joined the ProPharma Board of Directors.

1

5.      Following his acceptance of a CEO position at another Linden-owned company, Plaintiff began to perceive potential conflicts of interest arising from his continued ProPharma Board service.

6.      Plaintiff raised the perceived conflict of interest with his fellow Board members both verbally and in writing on various occasions.

7.      Plaintiff ultimately concluded that an eventual conflict of interest was inevitable and Plaintiff specifically requested that he be removed from the ProPharma Board of Directors.

8.      In August 2019, I and fellow Board Director, Anthony Davis, had two separate conversations with Plaintiff concerning his requested removal from the Board based on potential conflicts of interest that Plaintiff himself perceived.

9.      During these conversations, we informed Plaintiff that repurchase of his incentive equity shares would follow his termination from the Board of ProPharma.

10.     Based on these discussions, Plaintiff was removed from the Board of ProPharma effective August 31, 2019.

11.     On September 3, 2019, I signed Plaintiff Patrick Donnelly's Board Removal on behalf of Linden Capital Partners III, L.P. and Linden Capital Partners III-A, L.P.

I declare under penalty of perjury that the foregoing is true and correct.

This _____ day of [Month], 2021 at _____.


_____

MICHAEL FARAH